AVI WEITZMAN (*pro hac vice* application forthcoming)
aviweitzman@paulhastings.com
JENNIFER CONN (*pro hac vice* application forthcoming)
jenniferconn@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 230-7689

PETER MEIER (SBN 179019)
petermeier@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, California 94111
Telephone:  (415) 856-7070

Attorneys for Plaintiff
CYRUS HODES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CYRUS HODES,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>MOHAMMAD AMAD MOSTAQUE, STABILITY AI INC., a Delaware Corporation, and STABILITY AI LTD., a UK Corporation,<br><br>　　　　　　　Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Cyrus Hodes ("Hodes" or "Plaintiff") by and through his undersigned counsel, Paul Hastings LLP, for his Complaint against Defendants Mohammad Emad Mostaque ("Mostaque"), Stability AI, Inc. and Stability AI Ltd. (with Stability AI, Inc., "Stability AI," and collectively with Mostaque, "Defendants"), and in support thereof, alleges as follows:

## NATURE OF ACTION

1.      This action seeks relief for the fraudulent purchase by Defendant Mostaque— Stability AI's CEO and majority shareholder—of one million shares of Stability AI stock from Stability AI's co-founder and minority shareholder, Plaintiff Hodes, based on Defendants' fraudulent misrepresentations and omissions, in breach of Mostaque's fiduciary duties to Plaintiff.  Specifically, in October 2021 and May 2022, Mostaque purchased from Hodes his entire 15% stake in Stability AI for only $100.00, having led Hodes to believe that the company he had helped build was essentially worthless.  But just a few months later, in August 2022, the company engaged in a seed funding round in which venture capital firms invested $101 million at a post-money valuation of $1 billion.  More recently, the company has been in the marketplace seeking funding at a valuation of $4 billion.  At that valuation, the shares that Mostaque purchased from Hodes for a mere $100.00 would have a market value of over half a billion dollars (on an undiluted basis).  Mostaque's purchase of these shares from his co-founder and minority shareholder for a mere $100.00 epitomizes corporate greed at its worst and simply shocks the conscience.  As alleged below, the purchase of Hodes's shares were plainly based on fraud, misrepresentations, and breaches of fiduciary duty.  Those transactions should be rescinded and Hodes's ownership interest in Stability AI restored.

2.      Hodes is a world-renowned thought leader and policy maker in the evolving field of artificial intelligence ("AI").  Hodes and Mostaque conceived of Stability AI together, and Hodes spent countless hours working full time to develop, fundraise, market, and advance Stability AI.  Among other things, Hodes played a central role in the development of Stability AI's central proof-of-concept project:  leveraging generative AI to help governments develop faster and better responses to the COVID-19 pandemic.  This project was titled "CAIAC," which stands for "Collective and Augmented Intelligence Against COVID-19."  The CAIAC project

was launched in or about March 2020, right as the COVID-19 outbreak was spreading throughout the world.

3.      Hodes worked full time for approximately eighteen months to help build Stability AI, including developing its flagship CAIAC project.  He gave up other business opportunities to pursue Stability AI because he saw great potential in its mission.  He received only *de minimis* monetary compensation from Stability AI, as his principal means of compensation was his 15% stock interest in Stability AI.

4.      Unfortunately, due to Mostaque's dereliction of duty, incompetence, and lack of transparency with key stakeholders, the CAIAC project—whose operational and technological elements were overseen by Mostaque—was greatly delayed and largely unsuccessful, resulting in various stakeholders involved in the project losing confidence in Mostaque and Stability AI.

5.      Around the same time, Hodes also learned that Mostaque had embezzled funds from Stability AI to pay the rent for his family's lavish London apartment.  Hodes further learned that Mostaque had a long history of cheating investors in prior ventures in which he was involved.

6.      Concerned about his personal liability and reputation in light of Mostaque's misconduct and failure to perform, and led to believe that the company had no real value due to Mostaque's failure to deliver the CAIAC project, Hodes decided to extricate himself from Stability AI.  Following discussions with Mostaque, Hodes agreed to sell Mostaque Hodes's shares in Stability AI.  Given the collapsed CAIAC project, and based on misrepresentations and omissions by Mostaque and Stability AI, Hodes believed that the shares of Stability AI were largely worthless, and he agreed to sell them to Mostaque for $100.00.

7.      In truth and in fact, the reason the CAIAC project was unsuccessful was that Mostaque was secretly diverting his attention and, on information and belief, company resources, to a different project that he failed to disclose to Hodes—the creation of a text-to-image generator, which is a program that produces AI-generated images based on text prompts.

8.      In August 2022, after Mostaque purchased Hodes's 15% interest in Stability AI

for a mere $100.00, Stability AI released an open source model of a text-to-image generator called "Stable Diffusion." The release of Stable Diffusion captured the imagination of millions of people around the world, and launched Stability AI into immediate "unicorn" status with a potential value in the billions of dollars.

9.     In an act of self-dealing by a faithless fiduciary, Mostaque brazenly deceived Hodes about the core business of Stability AI that Mostaque was developing, its likely valuation, and its fundraising. Indeed, in May 2022, at the precise time that Mostaque purchased the final block of shares Hodes owned, Mostaque and Stability AI were secretly negotiating with venture capital firms looking to invest in Stability AI at a $1 billion post-money valuation. That funding seed round closed in August 2022, just three months after Mostaque bought out Hodes's entire position in Stability AI.

10.    Before purchasing Hodes's shares, Mostaque and Stability AI never disclosed their discussions with venture capital firms to Hodes, or even that Stability AI's new business plan involved text-to-image generation. Instead, they misled Hodes about the value of Stability AI's shares, leading Hodes to believe that they were nearly worthless. In so doing, Mostaque, aided by Stability AI, fraudulently cheated Hodes out of his 15% ownership interest in Stability AI, one of the world's most influential and prospective generative AI companies.[1]

11.    As described below, Mostaque, while a controlling shareholder of Stability AI, and in his capacity as CEO of Stability AI, made material misrepresentations and omissions to Hodes in order to induce Hodes to sell his shares for little value.

12.    *First*, Mostaque misrepresented the intended core business of Stability AI on an ongoing basis. Instead of advising Hodes that Stability AI would now be focused on a new business project involving text-to-image generation, he falsely told Hodes that he was "[f]ully pivot[ing]" Stability AI to tackle climate change. And rather than Stability AI profiting from that new business model, Mostaque claimed to be working primarily with a non-profit research

---

[1] "Generative AI" is a subfield of artificial intelligence in which computer algorithms are used to generate outputs that resemble human-created content, such as images, art, music, text, and software code. The output is based on training data from large language models (LLM) that are large quantities of data from which a computer can learn to create the desired output.

group.  These representations were simply false and caused Hodes to want to exit the company.

13.     *Second*, Mostaque and Stability AI did not disclose to Hodes, then a minority shareholder in Stability AI, that Stability AI was actively engaged in fundraising prior to the May 2022 sale of the final portion of Hodes's shares.  In fact, by May 2022, Stability AI was actively engaged with venture capital firms about fundraising millions of dollars at a massive valuation. At the time, Stability AI was out of funds and likely on the verge of bankruptcy, so fundraising tens of millions of dollars was incredibly consequential to the company and material to its shareholders.  The discussions with venture capital firms culminated in an August 2022 seed round during which Stability AI raised $101 million from three respected venture capital firms at a post-money valuation of $1 billion.

14.     Separately and collectively, these material misrepresentations and omissions deceived Hodes and caused him to believe—wrongly—that Stability AI had no prospects and that his shares were nearly valueless.  Had Hodes known the truth about the business plan for Stability AI and its fundraising efforts, he would not have sold his shares for a mere $100.00. Instead, he would have insisted on additional information and an independent valuation before selling his stake in the company, or otherwise remained invested in the company.

15.     Justice and the law now demand that the fraudulent transactions by which Mostaque purchased Hodes's shares for woefully inadequate consideration be rescinded, or in the alternative, that Hodes receive the fair market value of those shares.

16.     Fearing claims by Hodes, after learning of this potential lawsuit in December 2022, it appears that Mostaque also may have spoliated the records of his WhatsApp account, deleting all of his WhatsApp electronic messages.  On information and belief, Mostaque's WhatsApp account was one of his primary means of communicating about Stability AI.  This apparent spoliation occurred after Hodes informed Defendants of his intention to sue, and was likely a deliberate effort to get rid of incriminating evidence.

17.     Accordingly, Hodes asks the Court to: (1) void or otherwise rescind the share purchase agreements entered into between Mostaque and Hodes in October 2021 and May 2022; (2) award damages against Defendants arising from their wrongdoing; (3) require Defendants to

1   disgorge all benefits they received from their wrongdoing; and (4) award Plaintiff his attorneys'

2   fees.

3   ## PARTIES

4   18.     Plaintiff Cyrus Hodes is an individual domiciled in Boca Raton, Florida.  He was

5   the co-founder of Stability AI and, prior to October 21, 2021, owned 15% of the outstanding

6   common shares of Stability AI.

7   19.     Defendant Mohammad Emad Mostaque is an individual domiciled in London,

8   England.  Along with Plaintiff Hodes, Mostaque co-founded Stability AI and currently serves as

9   its President.

10   20.     Defendant Stability AI Inc. is a Delaware corporation with a principal place of

11   business during the relevant time period in San Francisco, CA and in London, England.  Stability

12   AI, Inc. conducts business in this judicial district.  On information and belief, Defendant Stability

13   AI, Inc. is a wholly owned subsidiary of Defendant Stability AI Ltd.

14   21.     Defendant Stability AI Ltd. is a UK corporation with its principal place of

15   business located at 88 Notting Hill Gate, London, England, W11 3HP.  Stability AI Ltd.

16   conducts business in this judicial district.

17   ## JURISDICTION AND VENUE

18   22.     This Court has subject matter jurisdiction over this action under and pursuant to

19   28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in

20   controversy exceeds $75,000, exclusive of interest and costs.

21   23.     This Court has personal jurisdiction over Defendants Stability AI Inc., Stability

22   AI Ltd., and Mostaque because they have transacted business in the State of California,

23   contracted to supply services or things in the State of California, and/or engaged in purposeful

24   activities in California relating to Plaintiff's claims.  Furthermore, pursuant to the Stock Purchase

25   Agreement executed in early October 2020, Defendants have consented to jurisdiction in "the

26   appropriate state or federal court for the district encompassing the company's principal place of

27   business"; at that time, the company's principal place of business was San Francisco, California.

28   Indeed, more than 20% of Stability AI Ltd.'s U.S.-based workforce resides in California, and

Defendants Stability AI Ltd. and Stability AI Inc. have both consented to personal jurisdiction in the Northern District of California.

24.     Defendant Mostaque executed stock purchase agreements in October 2021 and May 2022 with identical provisions consenting to jurisdiction in "the appropriate state or federal court for the district encompassing the company's principal place of business," which is the Northern District of California.  Accordingly, Defendant Mostaque has also consented to jurisdiction in the United States District Court for the Northern District of California.

25.     Venue is proper in this district, by agreement of the parties in the stock purchase agreements referenced above, and because Defendant Stability AI is subject to the Court's personal jurisdiction, pursuant to 28 U.S.C. § 1391(d), and Defendant Mostaque does not reside in the United States and thus may be sued in any judicial district, pursuant to 28 U.S.C. § 1391(c)(3).

## **FACTUAL ALLEGATIONS**

### A.     **A World-Renowned AI Expert, Hodes Meets Mostaque and They Co-Found Stability AI**

26.     Hodes is a world-renowned thought leader on issues of AI.  AI is a software program that attempts, using algorithms and neural networks, to simulate human reasoning.

27.     Hodes has an extensive background in the sciences, policy and issues relating to AI.  In June 1989, Hodes received a B.A. from Sciences Po Paris, where he later was a Lecturer in International Security.  In May 2004, he received a M.A. (Hons) from Paris II University in Defense, Geostrategy, and Industrial Dynamics.  And in May 2007, Hodes was awarded an M.P.A. from Harvard John F. Kennedy School of Government.  After receiving his M.P.A. from Harvard, Hodes moved to the United Arab Emirates ("UAE"), and after several years working in the defense and robotics industries, he eventually became an Advisor to the UAE Minister of Artificial Intelligence (the "AI Minister").  As an Advisor to the AI Minister, Hodes was responsible for organizing the Global Governance of AI Forum at the World Government Summit, an annual event held in Dubai, UAE that brings together, and fosters dialogue among, leaders in government and business from around the world.

28.     In addition to his work in the UAE, Hodes has achieved widespread, international recognition as a thought leader on AI.  Hodes founded and was the Director of the AI Initiative at the Harvard Kennedy School, which was created to permit a wide range of global stakeholders to engage, study, discuss, and implement solutions regarding the governance of AI.  The AI Initiative was subsequently folded into The Future Society, which is a think-and-do tank whose mission is to advance the responsible adoption of AI for the benefit of humanity.

29.     In addition to his work with think tanks, Hodes has published on the ethical use of AI technology, and has consulted with numerous governments and international organizations about, among other things, the governance of AI, including France, the United Kingdom, the United States, the UAE, Saudi Arabia, the United Nations (through the Office of the Secretary General's Envoy on Technology), the European Parliament, the Organization for Economic Cooperation and Development ("OECD"), and the Global Partnership on Artificial Intelligence.

30.     In or about February 2019, Hodes was introduced to Mostaque at the World Government Summit in Dubai, UAE, which was a conference that Hodes helped organize.  Mostaque informed Hodes that he was a successful former hedge fund portfolio manager who had a deep interest in learning more about artificial intelligence.  Hodes and Mostaque struck up a friendship discussing various issues in AI, finance, and other topics.

31.     Acknowledging Hodes's reputation and leadership in the field of AI, Mostaque solicited Hodes's assistance to burnish Mostaque's credibility in the AI space.  To that end, Mostaque asked Hodes to help him obtain invitations to international conferences on AI and to be invited as a panelist or speaker about issues in AI.  Hodes understood that Mostaque wanted such engagements in order to market himself as an expert thought leader on AI.  Despite Mostaque's lack of professional experience with AI, Hodes was willing to assist.  Among other things, Hodes agreed to assist Mostaque and arranged for him to attend meetings at the Future Investment Initiative ("FII") conference in Riyadh, Saudi Arabia, which was held in late October 2019.  The FII conference is an annual event run by the Public Investment Fund ("PIF") (Saudi Arabia's $500 billion sovereign wealth fund) that attracts notable leaders in government and business from around the world.  At the conference, Hodes facilitated introductions for Mostaque

with thought leaders and business contacts in AI.  Hodes also secured an invitation for Mostaque to speak at the World Economic Forum in Davos, Switzerland in or about January 2020.

32.     As Hodes and Mostaque continued to collaborate, Hodes served as a mentor to Mostaque, who is approximately fifteen years younger than Hodes.  Over many hours of discussions, Hodes helped educate Mostaque about the field of AI.  For much of his career, Mostaque was an investment professional who worked at a number of hedge funds.  Prior to Stability AI, he had no meaningful professional experience working with artificial intelligence, other than perhaps as a tool used by financial professionals.  Hodes, by contrast, was a globally-recognized AI thought leader and expert in the governance of AI.  Mostaque thus learned much about the field of AI from Hodes.

33.     Hodes and Mostaque first conceived of Stability AI in or about late 2019 or early 2020.  The original purpose of Stability AI was developing and leveraging AI models for a wide variety of use cases, from stabilizing oil markets to helping governments and policy makers implement better policy surrounding COVID-19 and climate change.

34.     At the core of Stability AI was Hodes's view—which he often discussed with Mostaque—that AI constitutes a Fourth Industrial Revolution that will infiltrate all markets and complex systems, including in diverse fields such as health care, finance, knowledge management, culture, and the creative arts.  Stability AI was envisioned to help lead that Fourth Industrial Revolution by harnessing AI to tackle some of the world's biggest problems.

35.     Hodes and Mostaque spent much of 2020 developing Stability AI's business plan and marketing it to potential partners and funders.  By 3Q2020, they were ready to incorporate. In early October 2020, Hodes and Mostaque incorporated Stability AI, Inc. in Delaware, and executed a stockholder's agreement.

36.     In recognition of the important role Hodes played in the formation and development of Stability AI (described in greater detail below), it was agreed that Hodes would receive 15% of the equity of Stability AI, Inc., while Mostaque would receive 70% of the equity of Stability AI, Inc., in recognition of Mostaque's role as CEO of Stability AI handling operational matters.   A third founder who primarily contributed some working capital to

Stability AI also received 15% of the equity of Stability AI.

37.    Hodes's equity in Stability AI vested immediately.  As a result, he owned 15% of the equity in Stability AI Inc. as of October 2020.

38.    As mentioned above, Stability AI was formed to harness the power of AI— including generative AI—to improve the world through various use cases.  One potential use case for Stability AI was a project to harness the power of AI to permit greater stabilization of the global oil markets.  Hodes successfully obtained a meeting between Stability AI and Saudi Arabia's PIF to pursue this project.  While the PIF declined to pursue the project, Hodes's introduction of Mostaque to business leaders in Saudi Arabia provided Mostaque and Stability AI additional credibility with important government and finance leaders interested in the field of AI.

39.    Another use case that Hodes and Mostaque conceived of for Stability AI was to harness the power of AI to promote religious tolerance and fight hatred among various religions—thereby stabilizing politics in the Middle East (titled "Project Ananas").  Once again, it was solely as a result of Hodes's international reputation and wide network that Mostaque and Stability AI were even able to pitch this idea to others.   In early 2020, Hodes secured a meeting between Stability AI and the UAE Ministry of Interior to discuss Project Ananas.  Although this project was not funded, it was favorably received and provided Mostaque and Stability AI additional credibility with important government and finance leaders interested in the field of AI.

40.    A third use case was to use the power of generative AI to help governments develop faster and better responses to the COVID-19 pandemic.  This project was titled "CAIAC," which stands for "Collective and Augmented Intelligence Against COVID-19."  The CAIAC project was launched in or about March 2020, right as the COVID-19 outbreak was spreading throughout the world.  At the time, Stability AI was operating out of Los Altos, California, which is where Hodes was residing.

41.    The idea behind the CAIAC project was that governments were hampered in their response to COVID-19 by lack of information and the inability to digest large volumes of data quickly enough to deploy the best solutions to the pandemic as efficiently as possible.  Hodes

and Mostaque believed that AI, coupled with collective intelligence, could help solve that problem by mapping the research around the virus, as well as government responses, interventions and mitigation measures, in order to improve decision-making.

42.     Hodes was instrumental in conceiving of the CAIAC project, and Mostaque frequently touted Hodes's involvement in order to gain credibility with potential stakeholders and funders.  The CAIAC project ultimately became Stability AI's flagship project and provided Stability AI with substantial credibility and notoriety in the AI community.

43.     Starting in early 2020, Hodes worked countless hours on a full-time basis on promoting and building Stability AI.  Among other things, his duties and responsibilities included business development, fundraising, sourcing strategic partnerships, enhancing the global awareness of Stability AI, government relations, and public policy.  Hodes participated in daily "stand up" meetings with Mostaque and others to discuss the management of Stability AI and its progress in its various initiatives.

44.     In order to launch the CAIAC project, Stability AI needed a source of funding.  Neither Mostaque nor Hodes had the means to self-finance the project.  Hodes was instrumental in creating an investment pitch deck to potential investors of the CAIAC project.  Hodes then introduced Stability AI to numerous potential investors over several months to discuss funding for the CAIAC project.

45.     Largely as a result of Hodes's hard work, international stature and credibility, and broad network of relationships, Stability AI was successful at raising substantial funds to launch the CAIAC project.  In internal correspondence between Mostaque and Hodes, Hodes was credited with obtaining funding for the CAIAC project.  As explained below, obtaining that funding was critical to the success of Stability AI today.

46.     The CAIAC project was launched in collaboration with prestigious organizations, including the Stanford Institute for Human-Centered Artificial Intelligence ("Stanford HAI"), with additional funding from the Patrick J. McGovern Foundation.  It was Hodes's hard work and international reputation that enabled Stability AI to secure these partnerships.

47.     In addition, in or around June 2020, Hodes was responsible for securing a

partnership between Stability AI and The Future Society, a nonprofit corporation in
Massachusetts that Hodes helped found.

48.     Hodes's international reputation, wide network of contacts in business and
government, and indefatigable work ethic on behalf of Stability AI permitted the company to get
off the ground.  Indeed, were it not for Hodes, Stability AI would never have been able to launch
the CAIAC project and secure much-needed funding to advance the project.  Mostaque
acknowledged as much in a May 27, 2020 email, when he stated that Stability AI is "in an
enviable position thanks to Cyrus's hard work in particular in having almost cornered the
multilateral demand for sense-making apparatus and a map to the future."

49.     Hodes was committed to Stability AI, and invested, not just substantial time, but
also his own capital in building Stability AI.  In fact, between 2020 and late 2021, Hodes spent
more than $15,000 of his own funds to pay for company expenses.

50.     Hodes worked full time for approximately eighteen months to help build Stability
AI, including developing its flagship CAIAC project.  He gave up other business opportunities to
advance Stability AI because he saw great potential in its mission.  Other than being reimbursed
for certain expenses, Hodes received only *de minimis* income from Stability AI, as his principal
means of compensation was his 15% stock interest in Stability AI.

**B.     Mostaque Fails to Deliver the CAIAC Project On Time, Damaging Hodes's
        Reputation With Important AI Stakeholders**

51.     As stated above, Mostaque was responsible for the operational and technological
elements of the CAIAC project.  This included, among other things, responsibility for developing
the source code and training of the model at the heart of the CAIAC project.

52.     Hodes was not responsible for the operations of Stability AI or the technology
behind the CAIAC project.  Rather, as referenced above, one of his primary responsibilities
involved marketing CAIAC to governments, and sourcing strategic partners and investors around
the world.  Hodes communicated with a large number of potential investors and government
officials to promote the CAIAC project.

53.     In addition, Hodes also promoted the CAIAC project in various international fora.

For example, Hodes moderated a panel discussion that involved the CAIAC project at the G20 summit in Riyadh, Saudi Arabia in September 2020, and got Mostaque an invitation to participate in the panel as well.  At Hodes's initiation, he, Mostaque and others also attended the Paris Peace Forum in November 2020, where they delivered a lengthy presentation on the CAIAC project.  These international presentations helped enhance the credibility of Mostaque and Stability AI in the field of AI.

54.     Along with assistance from Stability AI's Chief Scientific Officer, Hodes also helped secure substantial financial support from The Trinity Challenge, an international coalition of leading universities, philanthropic foundations, and pharmaceutical and other companies, that helps fund projects to protect the world against health emergencies.

55.     Stability AI also secured substantial assistance from the UK government, which agreed to help fund computer programmers in the UK to work on projects for Stability AI.

56.     Hodes's hard work paid off and he was able to get the CAIAC project worldwide awareness.  In one article, for example, Hodes explained the predictive power of AI to help defeat the COVID-19 crisis, and a video interview of Hodes was publicized on the website for the OECD AI Policy Observatory.  *Video available at* https://oecd.ai/en/wonk/collective-and-augmented-intelligence-against-covid-19-a-decision-support-tool-for-policymakers.

57.     Unfortunately, while Hodes delivered on his principal duties and responsibilities, Mostaque repeatedly and inexplicably failed to deliver on his own.  Starting at least in April 2021, various stakeholders, including The Future Society, began to complain to Hodes about the lack of deliverables from Mostaque.

58.     In mid-May 2021, for example, The Future Society sent Mostaque a number of emails marked "Urgent," complaining that Mostaque has been unable to deliver the CAIAC prototype or demonstration on schedule or provide adequate explanations in response to questions from The Future Society.  In one email dated May 20, 2021, The Future Society informed Mostaque that there was a "delivery crisis" and the Board of The Future Society had an "extreme preoccupation on the way the project has been going over the past months, weeks, and days."  Despite the dire situation, Mostaque failed to timely respond.

59.     By June 2021, the situation had become dire and numerous stakeholders, as well as Stability AI employees, began to lose confidence in Mostaque.  On June 1, 2021, Hodes sent Mostaque a WhatsApp message that said, "We need to talk ASAP plse: emergency situation with Trinity Challenge, grant people etc.  Tayab [Stability's Chief Scientific Officer] wants out.  He talked to Oceane [an employee at The Trinity Challenge] who told him they are considering cancelling our contract altogether. . . .  Big crisis looming. . . .  I'm afraid this means the end of the CAIAC project and we have to find an honorable way out with TFS [The Future Society], Stanford, McGovern, UNESCO and WHO."

60.     Hodes did his best to keep Stability AI on deadlines, and regularly instructed Mostaque to update relevant stakeholders about Stability AI's progress, but Mostaque often failed to respond or carry out Hodes's requests.  Often Mostaque would simply fail to respond at all, disappearing for days and weeks at a time, and often missing the daily stand up calls.  On those occasions when he did provide updates, Mostaque offered only inadequate explanations for his repeated failure to meet key deadlines and provide deliverables, or he told the stakeholders that deliverables would soon arrive, but they did not.

61.     Mostaque refused to accept responsibility for his failures to deliver the CAIAC project on time.  He instead claimed that the failures were caused by some external force, or were not failures in any way.  Indeed, even when he purported in mid-July to deliver the CAIAC project, Mostaque failed to provide one of his principal deliverables: a functioning website.

62.     Due to Mostaque's repeated failures to deliver the CAIAC project on schedule, key stakeholders that had contributed time, knowledge and resources to the project had grown dissatisfied with Mostaque.

63.     Stanford HAI, for example, repeatedly complained that Mostaque failed to deliver the CAIAC project on time.

64.     As did The Future Society.  Indeed, on July 28, 2021, The Future Society notified Stability AI that it was terminating its Gift Collaboration Agreement with Stability AI due to "repeated failure to deliver."  In its email, The Future Society stated that final delivery of the CAIAC project was due in November 2020, but Stability AI had still failed to deliver even a

prototype of the platform seven months later. The Future Society complained that Mostaque displayed a shocking "lack of transparency" and "poor communication" regarding "the finances."

65.     At the same time as these performance issues, issues with the finances of Stability AI began to concern Hodes. Hodes had succeeded in obtaining approximately $500,000 in funding for Stability AI from various sources. However, Stability AI was inexplicably unable to pay its vendors and employees.

66.     It became clear to Hodes that the CAIAC project was failing due in large part to Mostaque's inability or unwillingness to complete crucial tasks. Moreover, Mostaque's failures were causing damage to Hodes's credibility with key stakeholders, thereby damaging his reputation in the AI community.

**C.     Hodes Sells His Stock Interests In Stability AI Due to Material Misstatements and Omissions by Mostaque.**

67.     By mid-2021, Hodes had grown concerned by Mostaque's complete failure to fulfill his duties and responsibilities on the CAIAC project, and Mostaque's continued refusal to address those failures in an honest and straightforward manner.

68.     Hodes repeatedly communicated his dissatisfaction to Mostaque, orally and in writing. For example, in one email in June 2021, Hodes complained that he had "zero visibility" into Mostaque's work.

69.     Hodes also complained that he did not receive information about the finances of Stability AI, which was solely controlled by Mostaque. Indeed, in multiple emails in June and July 2021, Hodes confirmed that he "never got involved with payments with Stability [AI]," and that he "never had any visibility on Stability's money in and out."

70.     The reality, which Hodes only discovered after the fact, is that Mostaque was secretly diverting money from Stability AI for his own personal use. While Mostaque fashioned himself a wealthy former hedge fund portfolio manager, in truth, he was often out of money and needed to borrow from friends and others in order to sustain his lavish lifestyle. As a former investor in one of Mostaque's businesses recently disclosed to undersigned counsel, Mostaque

has a pattern of bamboozling investors and misappropriating investor and company assets for personal use.  The former investor, for example, discovered that Mostaque improperly used investor funds in a prior venture to pay for schooling for Mostaque's children and housing expenses for his London apartment.  In or about mid-2021, Hodes discovered that Mostaque did the same with funds provided to Stability AI by The Trinity Challenge.

71.    Upon the discovery of this misappropriation, Hodes confronted Mostaque, who acknowledged that he had improperly used company funds for personal use.  Hodes was shocked and dismayed, and this discovery, along with Mostaque's failure of performance and Hodes's understanding that Stability AI would likely need to be wound down, led Hodes to believe that he needed to extricate himself from Stability AI.

72.    Soon thereafter, in mid-July 2021, Hodes asked to exit from Stability AI, given the ongoing damage that Mostaque's conduct was causing and threatened to cause to Hodes's reputation and the apparent failure of the company.  Mostaque and Hodes agreed that Hodes could sell his shares of Stability AI back to the company.

73.    At the time that Mostaque made this offer to Hodes, Hodes understood that Mostaque was making the offer on behalf of Stability AI, given that Mostaque was its Chief Executive Officer.

74.    The sales of Hodes's Stability AI stock occurred in two tranches:  one sale of 800,000 shares on October 4, 2021 (the "October 2021 Stock Sale") and a second sale of 200,000 shares on May 21, 2022 (the "May 2022 Stock Sale").

75.    At the time that Hodes communicated his desire to exit the company in July 2021, Mostaque had led Hodes to believe that Stability AI was being wound down given the failures of the CAIAC project.  Hodes was therefore willing to sell the shares back to Stability AI for the same price that he paid for the shares:  $100.00 for 1 million shares.

### 1.    The October 2021 Stock Sale

76.    The first sale of Hodes's stock in Stability AI occurred on October 4, 2021.  In order to effect the sale, Mostaque used a stock purchase agreement that had been drafted for Stability AI by its outside counsel and modified it to reflect that Hodes was the seller of stock

15

and Mostaque was the purchaser.  Hodes had expected that Stability AI would be the purchaser, but he was willing to sell the shares to Mostaque as CEO of the company instead.  Hodes understood that the purchase of his shares was in Mostaque's capacity as a CEO of Stability AI.

77.    Some time prior to the October 2021 Stock Sale, Hodes was informed that Stability AI would not be wound down but would instead work on developing AI to affect climate change policy.  Specifically, in an October 1, 2021 WhatsApp exchange between Mostaque and Hodes, Mostaque stated that he was "[f]ully pivot[ing] stab" [referring to Stability AI] to "climate"—a reference to an early plan that Hodes and Mostaque conceived to use generative AI to help governments adopt better policy on climate change.  Mostaque sent this WhatsApp message to Hodes a mere three days before the October 2021 Stock Sale.

78.    Thus, at the time of the October 2021 Stock Sale, Mostaque and Stability AI led Hodes to believe that Stability AI would continue down the same uneconomic path of focusing on government policymaking—the path on which Mostaque already showed Hodes he was incapable of delivering.  Based on Mostaque's representations, in connection with Hodes's sale of Stability AI shares to Mostaque, Hodes remained willing to sell his shares in Stability AI at the same price that he purchased them.

79.    On October 4, 2021, Hodes and Mostaque entered into a stock purchase agreement by which Mostaque purchased 800,000 shares of Stability AI from Hodes for $80.00 (the "October 2021 SPA").  Given that Mostaque used the same form share purchase agreement that had been drafted by the company's outside counsel, Hodes believed that the company and its outside counsel were involved in the drafting of the October 2021 SPA.  While Hodes sold to Mostaque 80% of his equity interest in Stability AI, Hodes retained 200,000 shares in the company after the October 2021 Stock Sale.

80.    On or about October 8, 2021, Stability AI Ltd. wired $80 to Hodes's bank account in satisfaction of Mostaque's obligation under the October 2021 SPA.

81.    Stability AI and Mostaque misled Hodes about the business of Stability AI prior to the October 2021 Stock Sale.  In fact, before that stock sale, Stability AI and Mostaque had changed their business plans to invest in and develop text-to-image generation software.

82. According to Mostaque himself, Stability AI and Mostaque began investing significant time and resources into developing text-to-image generation in early 2021. Indeed, in a tweet from Mostaque in April 2023, Mostaque acknowledged that it took "18 months"—or beginning in February 2021—to "make models of all media types, produce cutting edge infra code for RLHF [referring to reinforcement learning from human feedback] & run one of the largest public supercomputers in the world." Therefore, by the time of the October 2021 Stock Sale, Mostaque had long been working on a text-to-image generation business without disclosing the same to Hodes.

83. Moreover, Mostaque has admitted that he first conceived of a text-to-image generator in late 2020. In podcasts in December 2022 and January 2023, Mostaque stated that he started "the journey" to have Stability AI release a text-to-image generator "[a]bout two years ago" after "Stability ha[d] been going for about thirteen months." He stated that the idea of a text-to-image generator occurred to him when he had contracted COVID. Based on Mostaque's communications with Hodes, Hodes is aware that Mostaque had contracted COVID in late 2020. Mostaque claimed to have "built a system" for his daughter to generate art, which became a text-to-image generator, in or about January 2021.

84. After returning to work following his recuperation from COVID, Mostaque did not inform Hodes that he was working on transforming the business of Stability AI to offer a text-to-image generation platform. To the contrary, he purported to continue to work on the CAIAC project, but failed in performing his duties, clearly due to the distraction of his secret side project.

85. Not only was Mostaque secretly developing an image generation model, he was also apparently using Stability AI resources to develop the new business project, without disclosing it to his co-founder Hodes. More specifically, in or about June 2021, Mostaque purchased certain highly sophisticated computer processors—known as tensor processing units ("TPUs")—in order to enhance Stability AI's ability to improve and expedite machine learning. TPUs excel at machine learning because they have a higher memory bandwidth that permits them to handle larger operations more efficiently, which result in faster training of large

17

language models.  The creation of a text-to-image generator typically requires substantial computing power in the form of GPUs (Graphics Processing Unit) or even-faster TPUs (Tensor Processing Unit).

86.     On or about June 11, 2021, Mostaque, in his capacity as the CEO of Stability AI, informed Hodes that he was purchasing the TPUs for use "to train on climate," referring to the alleged climate change business plan Mostaque claimed Stability AI was pursuing.

87.     On information and belief, Mostaque had no intention to use the TPUs to launch a climate change AI program.  Rather, Stability AI and Mostaque's purchase of TPUs were intended to give the company the ability to have enhanced machine learning of large language models that can be used for a text-to-image generator.

88.     On September 2, 2021, Mostaque posted on his Twitter account a Tweet for his followers that he was working on "some . . . new models" that resulted in a "[f]ully AI generated" image of a landscape.  A copy of the Tweet is below.  With the benefit of hindsight, this Tweet confirms that, at least four weeks before the October 2021 Stock Sale, Mostaque was transforming Stability AI to offer a text-to-image generation platform, which was undisclosed to Hodes prior to the October 2021 Stock Sale.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16

89.    Hodes did not follow Mostaque on Twitter, did not keep track of, or review,

17

Mostaque's Tweets, and was unaware of this Tweet by Mostaque prior to his sales of Stability

18

AI stock to Mostaque in October 2021.  Even had Hodes seen the Tweet, which does not

19

reference Stability AI or its business, Hodes would have only understood it to reflect a personal

20

interest on the part of Mostaque, not an intention to shift the entire business of Stability AI to a

21

text-to-image generation business.

22

90.    Moreover, on October 28, 2021, just a few of weeks after the October 2021 Stock

23

Sale, Mostaque announced to his Twitter followers that he had created an AI-generated image of

24

former UK Prime Minister Boris Johnson, which he purported to have created from "text only

25

prompts . . . using conventional neural networks (diffusion & OpenAI's CLIP model)."  A copy

26

of the Tweet is below:

27
28



91.     This Tweet again confirms that Mostaque had long planned to transform Stability AI to focus on text-to-image generation, and had been training large language models to support text-to-image generation, without disclosing these facts to Hodes.  Indeed, in a December 2022 interview, Mostaque acknowledged that the first version of Stable Diffusion was created using LAION and OpenAI's CLIP model, which confirms that the Boris Johnson art he created was an early version of Stable Diffusion.  An investigative reporter confirmed in an April 2023 article that Mostaque began funding the creation of open-source AI models that would be later released as Stable Diffusion "a few years ago"—which would suggest that it predated the October 2021 Stock Sale.  This confirms that Mostaque used funding that was earmarked for the CAIAC project to finance the creation of a text-to-image generator before the October 2021 Stock Sale.

92.     On November 23, 2021, Mostaque included another Tweet on his Twitter account for his followers to see, explaining that each image took about thirty seconds for his AI technology to create.  A copy of the Tweet is below.  This Tweet, which Mostaque released to

his followers less than a month after the October 2021 Stock Sale, in retrospect makes clear that Mostaque and Stability AI were devoting substantial resources to improve Stability AI's text-to-image generation capabilities.



93.     Again, Hodes did not follow Mostaque on Twitter, did not keep track of or review Mostaque's Tweets, and was unaware of these October and November 2021 Tweets by Mostaque.  Even had he seen the Tweet, which does not reference Stability AI or its business, Hodes would have only understood it to reflect a personal interest on the part of Mostaque, not an intention to shift the entire business of Stability AI to a text-to-image generation business.

94.     Technologically, the creation of a text-to-image generator (such as Stable Diffusion) is a time consuming and expensive task.  Training large language models to generate realistic images from text prompts (such as the images released on Mostaque's Twitter account) would have required an investment of substantial time, resources, and computing power.  Indeed, it has been reported that Stable Diffusion was trained on 5 billion images scraped from the web.  This necessarily required many months of work on the part of Stability AI and its partners.  It would have been technologically impossible for Mostaque to have generated these images between September and November 2021 without Mostaque and Stability AI spending substantial

time and resources in the summer of 2021 developing text-to-image capabilities.   This is further confirmed by the acquisition in or about June 2021 of TPUs by Stability AI, which Mostaque acknowledged were intended for "direct training" of large language models.  Stability AI and Mostaque thus necessarily began the process of conceiving, designing, funding, creating, and developing text-to-image generation capabilities substantially before the October 2021 Purchase of Stability AI stock from Hodes, but concealed that fact from Hodes prior to the purchase of stock from Hodes in October 2021.

95.     Mostaque has claimed that it cost approximately $600,000 to train the large language models to create Stable Diffusion, and he claimed to have funded this project on his own.  As previously stated, Mostaque, however, lacked the funds to pay his rent.  And a recent *Forbes* article exposed that Mostaque in fact did not have a successful career in the hedge fund industry.  Thus, on information and belief, he personally lacked liquid funds to pay to train the models for Stable Diffusion, and Mostaque instead diverted funds that had been provided to Stability AI for the CAIAC project—funds that Hodes was instrumental in securing for Stability AI—in order to invest in the creation of a text-to-image generator.

96.     At no point in time prior to the October 2021 Stock Sale did Mostaque or Stability AI disclose to Hodes that Stability AI's business plan was focused on developing a text-to-image generator.

97.     During the life of the CAIAC project, Mostaque repeatedly acknowledged, orally and in writing, that Hodes was the "co-founder" of Stability AI and Mostaque's "partner." Hodes, however, was a minority shareholder and lacked visibility into the operations of Stability AI, which Mostaque kept closely guarded.

98.     Mostaque was the CEO of Stability AI, as well as its majority and controlling shareholder.  Before the October 2021 Stock Sale, Mostaque possessed all relevant and material information about Stability AI's future business plans.  Because Hodes was a minority shareholder in Stability AI, Mostaque owed Hodes a fiduciary duty to disclose to Hodes all material facts and information relevant to Hodes's decision whether to sell his shares in Stability AI to Mostaque, and if so, at what price.  Mostaque made misrepresentations to Hodes and

omitted material information about the business of Stability AI and its financial prospects, despite his duty of complete candor to Hodes.

99.     Had Mostaque or Stability AI informed Hodes of Stability AI's business plans prior to the October 2021 Stock Sale, Hodes would not have entered into the October 2021 SPA to sell 800,000 shares for merely $80.00.  Instead, Hodes would have insisted on obtaining more information from Mostaque and Stability AI about the creation of Stable Diffusion, its progress, and the likely valuation of Stability AI.  Hodes justifiably relied on the material misstatements and omissions by Mostaque and Stability AI when he entered into the October 2021 SPA to sell 800,000 shares of Stability AI—which apparently were valued at $120 million only ten months later—at the grossly inadequate price of $80.00.

### 2.     The May 2022 Stock Sale

100.     After the October 2021 Stock Sale, Hodes continued to be a minority shareholder of Stability AI, as he owned approximately 200,000 shares in the company.  Mostaque and Hodes had very little interactions and communications after October 2021, and Mostaque failed to keep Hodes apprised of material events and plans with respect to Stability AI.

101.     On May 21, 2022, Mostaque emailed Hodes to ask Hodes to sell Hodes's remaining 200,000 shares in Stability AI back to Mostaque.  Mostaque stated that he would pay Hodes $20.00 for those shares and sent Hodes an electronic contract for Hodes's signature. Mostaque made clear that this stock sale "need[s] to be actioned."

102.     As requested, Hodes signed a stock purchase agreement that Mostaque had sent him on May 21, 2022 (the "May 2022 SPA").  Pursuant to the May 2022 SPA, Hodes sold to Mostaque 200,000 shares of Stability AI for $20.00.

103.     On or about May 23, 2022, Stability AI Ltd. wired $20 to Hodes's bank account in satisfaction of Mostaque's obligation under the May 2022 SPA.

104.     In connection with the May 2022 Stock Sale, Mostaque was acting in his capacity as CEO of Stability AI, as well as its majority and controlling shareholder.  In his May 21, 2022 email seeking to purchase Hodes's remaining shares, Mostaque told Hodes that he and Stability AI were "focusing on Eleuther"—a reference to EleutherAI, which is a grass-roots non-profit

artificial intelligence research group. This representation again led Hodes to believe that Stability AI was uneconomic and would not become a profitable venture; as such, Hodes was willing to sell what he believed were largely worthless shares back to Mostaque. In purporting to disclose the nature of Stability AI's business, Mostaque was acting in his capacity as CEO of Stability AI, which is the basis for his knowledge. Moreover, as with the October 2021 Stock Sale, Mostaque sent Hodes the form stock purchase agreement that had been prepared by Stability AI's outside counsel to execute the May 2022 SPA.

105. As with the October 2021 Stock Sale, Mostaque once again made material misrepresentations and omissions that deceived Hodes into selling his shares to Mostaque. Not only did Mostaque falsely advise Hodes that Stability AI was "focusing on Eleuther," he omitted to disclose the fact that Stability AI was in the business of creating a text-to-image generator that would soon be released publicly.

106. Mostaque's misrepresentations and omissions were deliberate, as he well knew that Stability AI was focusing on a text to image generator in May 2022. Indeed, on May 9, 2022, approximately two weeks before the May 2022 Stock Sale, Mostaque Tweeted to his followers: "Looking across the various teams we have huge number of open AI art models coming in the next few months, very exciting times." This Tweet confirms that Mostaque and Stability AI had already trained a large language model and developed technology to support text-to-image generation, and that Mostaque had already shifted the business plan for Stability AI to focus on text-to-image generation. But Mostaque and Stability AI failed to disclose any of these facts to Hodes, who did not follow Mostaque on Twitter, did not keep track of, or review, Mostaque's Tweets, and was unaware of these Tweets by Mostaque prior to his May 2022 sale of Stability AI stock to Mostaque. Hodes therefore was unaware in May 2022 that Stability AI was focusing on text-to-image generation or would soon release Stable Diffusion.

107. Unbeknownst and undisclosed to Hodes, by May 2022, Stability AI was already preparing to release an open source version of Stable Diffusion in the summer of 2022.

108. Stability AI issued a press release announcing the release of an open source model of Stable Diffusion on or about August 10, 2022. After the release of Stable Diffusion, Stability

AI experienced exponential growth, quickly reporting more than 100 million daily users.  Indeed, within two months, Stability AI reported that Stable Diffusion had been downloaded more than 200,000 times.

109.    Also undisclosed to Hodes was the fact that, by May 2022, Stability AI had already begun discussions with investment banks and venture capital firms about fundraising millions of dollars at a massive valuation.

110.    Those discussions culminated in an August 2022 seed round during which Stability AI raised $101 million from three respected venture capital firms at a valuation of $1 billion.  Stability AI announced that seed round fundraising in October 2022, but it occurred at the same time or "right after" after Stability AI released Stable Diffusion, as one of Stability AI's investors has acknowledged.  Thus, the valuation of Stability AI was based solely on the prospectivity of a text-to-image generator like Stable Diffusion.  That prospectivity and the accompanying $1 billion valuation thus applies equally at the time that Hodes sold his shares in Stability AI to Mostaque.

111.    As is customary for start-ups engaged in fundraising, Mostaque and Stability AI likely retained their own valuation experts and investment bankers to conduct a valuation exercise to support a $1 billion valuation for Stability AI.  On information and belief, Stability AI commenced that valuation exercise before the May 2022 Stock Sale.

112.    Indeed, Jim O'Shaughnessy, the principal of O'Shaughnessy Ventures LLC, which was one of the three venture capital firms that invested in Stability AI's $101 million seed round, publicly confirmed that he met with Mostaque and then "started due diligence [of Stability AI] way back in April [2022]," before the May 2022 Stock Sale from Hodes. Following that investment, O'Shaughnessy was elected the Executive Chair of the board of directors of Stability AI.

113.    In addition, the press has reported the existence of leaked pitch decks, from May and June 2022.  On information and belief, those pitch decks, and others preceding it, were created before the May 2022 Stock Sale.

114.    It is thus apparent that, before Mostaque reached out to Hodes on May 21, 2022 to

25

acquire Hodes's remaining 200,000 shares of Stability AI, Mostaque and Stability AI already had advanced discussions with investment bankers and venture capital firms about raising substantial funding for Stability AI. Nevertheless, at no point in time prior to the May 2022 Stock Sale did Mostaque or Stability AI disclose to Hodes that Stability AI was engaged in fundraising or otherwise reveal any external or internal valuations, projections, or financial statements for Stability AI. Nor did Mostaque or Stability AI disclose that the business of Stability AI now involved text-to-image generation and that Stability AI was anticipating an imminent release of Stable Diffusion.

115. The lack of disclosure by Mostaque and Stability AI of the company's fundraising efforts was particularly egregious given that Mostaque and Hodes had a pattern and practice of discussing fundraising efforts throughout Hodes's involvement as a shareholder in Stability AI during the life of the CAIAC project. For example, in one WhatsApp exchange in February 2021, Mostaque provided Hodes detailed information about the timing of a potential seed round for Stability AI's CAIAC project. Mostaque and Hodes had numerous other discussions about fundraising, which confirms that Mostaque understood he had a fiduciary duty to share such fundraising information with Hodes.

116. The misrepresentations and omissions by Stability AI and Mostaque were clearly a deliberate effort to deceive Hodes into selling his stock to Mostaque. The sale of stock from Hodes to Mostaque benefitted both Mostaque and Stability AI. It benefitted Mostaque because he was able to secure an additional 15% of the equity in Stability AI before engaging in fundraising, which permitted him to maintain greater control over Stability AI despite the dilution that would result following the seed round fundraising. In addition, with a valuation of $1 billion, the 1 million shares Mostaque acquired were valued at approximately $150 million, on an undiluted basis.

117. The misrepresentations and omissions described above also benefitted Stability AI. Before engaging in fundraising, start-up companies often "clean" their "cap table"—which tracks the equity ownership in a company—because a clean cap table is perceived by investors and venture capital firms to form a closer and more synergistic relationship with other investors,

smooth communication, and easier vote collection.  In addition, there is frequently a preference to avoid investors who do not work in the company from owning large portions of the equity of a company, as such equity held by inactive founders and advisors results in "dead equity" that "languishes on the cap table, weighing down the startup and making it harder to attract and motivate the people who could impact its growth."  Noam Wasserman & Furqan Nazeeri, "Is Dead Equity Crippling Your Company?" Inc., May 29, 2012, available at https://www.inc.com/noam-wasserman/the-dead-equity-problem.html.  In October 2021, Hodes was exactly in that position—he was no longer involved in the operations of Stability AI yet owned 15% of the equity of the company.  Thus, ensuring that Hodes was excluded from the cap table and his shares repurchased before any fundraising likely was important to and benefitted Stability AI.

118.    As a majority shareholder and director of Stability AI, Mostaque owed duties of disclosure and candor to Hodes prior to Mostaque's self-interested purchase of stock from Hodes in May 2022.  Among other things, Mostaque owed Hodes a fiduciary duty to disclose to Hodes all material facts and information relevant to Hodes's decision whether to sell his shares in Stability AI to Mostaque, and if so, at what price.  This fiduciary duty required Mostaque to act and speak with complete candor.  Mostaque did just the opposite.  He deliberately provided to Hodes misinformation and omitted material information about the business of Stability AI, its financial prospects, its valuation, and its discussions with investment banks and venture capital firms.

119.    Had Mostaque informed Hodes of Stability AI's business, valuation, and fundraising plans prior to the May 2022 Stock Sale, Hodes would not have entered into the May 2022 SPA.  Instead, Hodes would have insisted on obtaining more information from Mostaque and Stability AI about the creation and release of Stable Diffusion, the internal projections and valuation of Stability AI, and Stability AI's fundraising efforts and communications.  It is solely due to the material misstatements and omissions by Mostaque and Stability AI that Hodes was willing to enter into the May 2022 SPA and sell 200,000 shares of Stability AI—which were valued at approximately $30 million—for a mere $20.00.

120.    Mostaque's and Stability AI's fraudulent misconduct has caused Hodes great harm.  The business press has reported that, by March 2023, Stability AI was in the market to raise additional funds at a valuation of about $4 billion.  At that valuation, on an undiluted basis, the shares that Hodes sold in October 2021 were worth $480 million, and the shares he sold in May 2022 were worth $120 million.  That Hodes was deceived to sell what may amount to $600 million worth of shares for a mere $100.00 simply shocks the conscience.

121.    Adding insult to injury, Mostaque has publicly taken credit for Hodes's hard work conceiving, fundraising for, and promoting the CAIAC project.  For example, in an interview mere days after the release of Stable Diffusion in August 2022, Mostaque has claimed that he "designed and led" the CAIAC initiative.  In other interviews, Mostaque falsely claimed that he was the "lead architect" of the CAIAC project.  Despite dozens of interviews, Mostaque has not recognized or given credit to Hodes for his role in conceiving of and developing the CAIAC project.  The fact that Mostaque has attempted to leverage the CAIAC project to enhance his and Stability AI's reputation and credibility, without recognition for Hodes or disclosure of Mostaque's own self-inflicted failures in connection with the project, shows the depths to which Mostaque will go to benefit himself at the expense of Hodes.

122.    Indeed, Mostaque has a pattern of falsely taking credit for work that was not his own.  As one investigative journalist reported, a leaked pitch deck in June 2022 made false claims that Stability AI "had 'co-created' other products with several generative AI startups, including AI text and image generation platform NovelAI and text-to-image generator Midjourney," and falsely claimed to have millions of people using its "models" thereby "conflating Stability's compute grants with ownership of the models."  Before the announcement in October 2022 of the funding round, Mostaque falsely claimed that Stability AI had "spear-led" the creation of Stable Diffusion.  As the press has reported, these statements are false and misleading.  Indeed, after the announcement of the funding round, he more accurately reported that a team of researchers at a German University had developed Stable Diffusion.

123.    Indeed, one investigative journalist has bluntly stated: Mostaque "can . . . be prone to exaggeration."  And *Forbes* recently stated that Mostaque "has a history of

28

1    exaggeration," including about his education, his prior experiences and purported success as a

2    hedge fund manager, his role in other AI projects, and even Stability AI's "strategic partnership"

3    with Amazon. *Forbes* described Mostaque's misrepresentations an elaborate "billion-dollar

4    gambit." It is now clear that this is a gross understatement. Along with Stability AI, Mostaque

5    has engaged in blatant fraud in an effort to cheat Hodes out of hundreds of millions of dollars of

6    Stability AI stock. This was corporate greed at its worst.

7            **D.    After The Truth Starts To Emerge, Stability AI And Mostaque Spoliate**
                    **Incriminating Evidence**
8

9            124.    As stated above, Stability AI released its text-to-image generator known as Stable

10   Diffusion in or about August 2022, and announced its seed funding round in October 2022.

11           125.    Realizing for the first time that he sold Mostaque his shares in Stability AI based

12   on misrepresentations, Hodes promptly retained counsel. On December 27, 2022, Hodes,

13   through counsel, reached out to Stability AI and Mostaque to alert them of the potential claims.

14   In addition, Hodes demanded that Stability AI and Mostaque undertake preservation efforts of all

15   relevant documents, including Mostaque's WhatsApp messages. Hodes's counsel wrote:

16           Because litigation against Stability AI and Mr. Mostaque may be imminent, we
             hereby demand that Stability AI and Mr. Mostaque, as well as its officers, directors
17           and investors, **preserve and not destroy**, and suspend any automatic deletion or
             records management procedures affecting, all documents and information, whether
18           in hardcopy or electronic or other format (including all notes, e-mails, phone logs,
             calendars, office applications, text messages, WhatsApp, ephemeral messaging,
19           instant message, chat and collaboration applications, including associated metadata),
             beginning January 1, 2020 concerning Stability AI, including all documents and
20           communications regarding: (1) Mr. Mostaque's and Mr. Hodes's roles at and
             contributions to Stability AI; (2) Stability AI's business model and plans, board of
21           directors, corporate leadership structure, capital structure, and financial condition;
             (3) Mr. Hodes (including in both business and personal communications); (4) the
22           valuation of the Company or its products and offerings, including both
             communications with any Stability AI director or prospective director, employee,
23           and with or about banks, venture capital firms, and strategic advisors or investment
             bankers; (5) the conceptualization, training, and development of AI models; (6) the
24           right of first refusal of Stability AI to repurchase its shares; (7) the capital structure
             of the Company, as well as the stock registers and records reflecting the purchase of
25           Mr. Hodes's shares in October 2021 and May 2022; and (8) the payment for and
             purchase        of        shares        from        Mr.        Hodes."
26

27           126.    Despite this clear instruction, it appears that Mostaque may have spoliated critical

28   documents. Specifically, on March 8, 2023, Mostaque posted a tweet acknowledging that his

WhatsApp account had recently been deleted:



127.    On or about April 24, 2023, Hodes, through counsel, alerted Stability AI and Mostaque's counsel of this Tweet and the potential spoliation of critical evidence by Mostaque. Hodes's letter asked: "please advise us immediately whether Mr. Mostaque's WhatsApp messages between 2020 and March 2023 have been spoliated, and whether your firm and/or Stability AI secured an image of Mr. Mostaque's WhatsApp prior to deletion."

128.    Tellingly, Stability AI and Mostaque's counsel have not responded to Hodes's counsel's letter at all or otherwise denied any spoliation of evidence.

129.    On information and belief, Mostaque's WhatsApp was not deleted by accident, as Mostaque's Tweets appears to suggest, but was intentionally deleted by Mostaque in order to destroy evidence that would have been highly favorable to Hodes and detrimental to Mostaque's defenses.

**COUNT ONE**
**FRAUD IN THE INDUCEMENT**
**(Against All Defendants)**

130.    Plaintiff incorporates each and every allegation above, as if stated here in full.

131.    As set forth above, Defendants intentionally made material misrepresentations, misstatements, and omissions with the intention of causing Plaintiff to sell his 15% equity interest in Stability AI to Mostaque for woefully inadequate consideration of merely $100.00. More specifically, in his role as CEO of Stability AI, Mostaque falsely stated that that Stability

AI's core business involved climate change and working with a non-profit research group.  He further failed to disclose to Hodes that Stability AI was actively engaged in fundraising prior to the sale (in May 2022) of the final portion of Hodes's shares, omitting material information about Stability AI's engagement with venture capital firms and others that resulted shortly after the May 2022 SPA in a seed round that raised $101 million at a post-money valuation of $1 billion.

132.    At the time that Mostaque made these misrepresentations and omissions, he was the CEO of Stability AI and he purported to speak on behalf of the company sharing information that he could only have as an officer and director of the company.

133.    Mostaque relied on resources of Stability AI in entering into the October 2021 SPA and the May 2022 SPA, including cash from Stability AI Ltd.'s bank account and a form stock purchase agreement that Stability AI's outside counsel had prepared in connection with the formation of the company.

134.    Defendants' misrepresentations and omissions fraudulently induced Hodes to enter into the October 2021 SPA and the May 2022 SPA, by which he sold to Mostaque 1,000,000 shares of Stability AI.

135.    Defendants' material misstatements and omissions led Hodes to believe—wrongly—that Stability AI was uneconomic and lacked any path to successful fundraising and share value enhancement.  As a result, in connection with Hodes's sale of Stability AI shares to Mostaque, Hodes remained willing to sell his shares in Stability AI at the same price that he purchased them without demanding additional information or an independent valuation of the company.

136.    Defendants' material misrepresentation and omissions benefitted Mostaque by permitting him to purchase another 15% of Stability AI's stock for a mere $100.00.

137.    Defendants' material misrepresentation and omissions also benefitted Stability AI.  As a result of Mostaque's purchase of Hodes's shares, Stability AI was able to show venture capital firms a clean cap table without "dead equity," which was more attractive to venture capital firms and likely increased the valuation of the company.

138.   At the time that Mostaque made misrepresentations and omissions to Hodes, both Mostaque and Stability AI knew that the statements were false and that his omissions were misleading.  Defendants made such misstatements and omissions with the intent to induce Hodes to enter into the October 2021 SPA and the May 2022 SPA.

139.   Hodes justifiably relied upon Defendants' misstatements and omissions in deciding to enter into the October 2021 SPA and the May 2022 SPA.

140.   As the direct and proximate result of Defendants' fraud in the inducement, Hodes has sustained actual damages in an amount to be proven at trial.

141.   The aforementioned acts were intentional, fraudulent, malicious, and part of a pattern of wrongdoing and misconduct by Mostaque and Stability AI.  Hodes is therefore entitled to punitive damages.  Defendants have acted in bad faith and Hodes is entitled to attorneys' fees.

## COUNT TWO
## NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

142.   Plaintiff incorporates each and every allegation above, as if stated here in full.

143.   As the majority shareholder and a director of Stability AI, Mostaque had a duty to disclose to Hodes, a minority shareholder in Stability AI, all material facts and information relevant to Hodes's decision whether to sell his shares in Stability AI to Mostaque, and if so, at what price.  This duty required Mostaque to act and speak with complete candor.

144.   Stability AI similarly had a duty to speak truthfully when it speaks to shareholders and not to omit material information when making statements about the company's business, valuation and fundraising efforts.

145.   As set forth above, Mostaque made material misstatements and omissions that caused Plaintiff to sell his 15% equity interest in Stability AI to Mostaque for woefully inadequate consideration of merely $100.00.  More specifically, in his role as CEO of Stability AI, Mostaque falsely stated that that Stability AI's core business involved climate change and working with a non-profit research group.  He further failed to disclose to Hodes that Stability AI was actively engaged in fundraising prior to the sale (in May 2022) of the final portion of Hodes's shares, omitting material information about Stability AI's engagement with venture

capital firms and others that resulted shortly after the May 2022 SPA in a seed round that raised $101 million at a post-money valuation of $1 billion.

146.    At the time that Mostaque made these material misstatements and omissions, he was the CEO of Stability AI and he purported to speak on behalf of the company sharing information that he could only have as an officer and director of the company.

147.    In making these material misstatements and omissions regarding the business of Stability AI, its valuation, and its fundraising efforts, Mostaque failed to exercise reasonable care as both a majority shareholder and the CEO of Stability AI.

148.    Mostaque relied on resources of Stability AI in entering into the October 2021 SPA and the May 2022 SPA, including a form stock purchase agreement that Stability AI's outside counsel had prepared in connection with the formation of the company.

149.    Defendants' misstatements and omissions caused Hodes to enter into the October 2021 SPA and the May 2022 SPA, by which he sold to Mostaque 1,000,000 shares of Stability AI for a mere $100.00.

150.    Defendants' material misstatements and omissions led Hodes to believe— wrongly—that Stability AI was uneconomic and lacked any path to successful fundraising and share value enhancement.  As a result, in connection with Hodes's sale of Stability AI shares to Mostaque, Hodes remained willing to sell his shares in Stability AI at the same price that he purchased them without demanding additional information or an independent valuation of the company.

151.    Defendants' material misstatements and omissions benefitted Mostaque by permitting him to purchase another 15% of Stability AI's stock for a mere $100.00.

152.    Defendants' material misstatements and omissions also benefitted Stability AI. As a result of Mostaque's purchase of Hodes's shares, Stability AI was able to show venture capital firms a clean cap table without "dead equity," which was more attractive to venture capital firms and likely increased the valuation of the company.

153.    Hodes justifiably relied upon Mostaque's misstatements and omissions in deciding to enter into the October 2021 SPA and the May 2022 SPA.

154.    As the direct and proximate result of Mostaque's misstatements and omissions, Hodes has sustained actual damages in an amount to be proven at trial.

### COUNT THREE
### BREACH OF FIDUCIARY DUTY
**(Against Mostaque)**

155.    Plaintiff incorporates each and every allegation above, as if stated here in full.

156.    As the CEO and a director on the board of Stability AI, and a majority shareholder of Stability AI, Mostaque owed a fiduciary duty to Hodes as a matter of law.

157.    Mostaque's duties to Hodes included a duty of loyalty, care, and candor.  Among other things, Mostaque had a duty to disclose to Hodes all material facts and information relevant to Hodes's decision whether to sell his shares in Stability AI to Mostaque, and if so, at what price.  This fiduciary duty required Mostaque to act and speak with complete candor.

158.    Because Hodes lacked visibility into the operations of Stability AI after the summer of 2021, he relied on Mostaque's duty of candor and disclosure in deciding whether to enter into the October 2021 SPA and the May 2022 SPA.

159.    Mostaque knowingly breached his fiduciary duties to Hodes by making misrepresentations and material omissions to him in order to cause Hodes to sell to Mostaque hundreds of millions of dollars' worth of Stability AI stock for the inadequate price of $100.00.

160.    Mostaque has acted with the specific intent to profit from the abuse of his fiduciary duties and did so knowingly, unlawfully, and with malice.  Hodes is therefore entitled to punitive damages.

161.    As a direct and proximate result of Mostaque's actions, Hodes has sustained actual damages in an amount to be proven at trial and punitive damages.  Mostaque acted in bad faith and Hodes is entitled to attorneys' fees.

### COUNT FOUR
### UNJUST ENRICHMENT
**(Against All Defendants)**

162.    Plaintiff incorporates each and every allegation above, as if stated here in full.

163.    Plaintiff conferred a valuable benefit on Defendants through his hard work launching and developing Stability AI, and enhancing its and Mostaque's international

credibility and reputation in the field of AI.  Plaintiff worked full time for approximately eighteen months on Stability AI, turned down other opportunities for employment, and committed his substantial skillset, reputation, and professional network to promote Stability AI and Mostaque.

164.    In recognition of his tremendous efforts and work on behalf of Stability AI, Hodes was awarded a 15% equity interest in Stability AI.

165.    Defendants have been unjustly enriched by the fraudulent purchase by Mostaque of Hodes's stock in Stability AI.  Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.  As explained above, Mostaque unjustly obtained very valuable shares of Stability AI, at the expense of Hodes.  Stability AI was also unjustly enriched.  By cleaning up the cap table and preventing "dead equity" to remain with Hodes, Stability AI was able to attract substantial venture capital funding, with a billion dollar valuation, at Hodes's expense.

166.    Hodes thus has a right to recoup damages from Defendants Stability AI and Mostaque in an amount to be determined at trial, together with pre- and post-judgment interest and costs.

167.    Injustice would result from the continued retention by Stability AI and Mostaque of the benefits of Hodes's stock sales to Mostaque.

168.    Moreover, Hodes is entitled to recover an amount to be proven at trial for the reasonable value of the work he performed and services provided to Stability AI.

**COUNT FIVE**
**QUANTUM MERUIT – IN THE ALTERNATIVE**
**(Against All Defendants)**

169.    Plaintiff incorporates each and every allegation above, as if stated here in full.

170.    At the direction of Defendants, Hodes performed work and provided services to Stability AI from at least January 2020 through at least the summer of 2021.

171.    Defendants authorized or requested the work and services Hodes provided to Stability AI, including but not limited to, engaging in business development, fundraising,

sourcing strategic partnerships, enhancing the global awareness of Stability AI, government relations, and public policy.

172.   Hodes's work and services to Stability AI was valuable to Stability AI, including to the creation of a business involving a text-to-image generator.

173.   Hodes's work and services to Stability AI were based on the reasonable expectation that he would be compensated fully for the shares in Stability AI that he was awarded upon a liquidation event or strategic transaction.

174.   Defendants knew or reasonably should have known that Hodes expected to and was entitled to reasonable compensation for the shares he earned in Stability AI.

175.   Defendants accepted and retained the benefit of Hodes's work and services.

176.   Defendants wrongfully and intentionally cheated Hodes out of the value of the 15% equity interest he owned in Stability AI.

177.   Consequently, Hodes is entitled to recover in *quantum meruit* from Defendants in an amount to be proven at trial.

**WHEREFORE**, Plaintiff Hodes respectfully requests the following relief:

a.   Judgment in Plaintiff Hodes's favor against Defendants Stability AI and Mostaque on the causes of action alleged herein;

b.   Rescission of, or in the alternative, an award of rescissory damages for, the October 2021 SPA and the May 2022 SPA;

c.   An award of monetary damages in an amount to be determined at trial, together with pre- and post-judgment interest and costs;

d.   An award of punitive damages in an amount to be determined at trial;

e.   An Order directing Defendants to disgorge any profits or unjust enrichments based on their misconduct;

f.   An award of attorneys' fees and costs;

g.   An award of pre- and post-judgment interest at the statutory rate; and

h.   Such other relief as the Court may deem equitable and just.

1   Dated:  July 13, 2023                     Respectfully submitted,

2

3                                             By

4                                             Avi Weitzman
                                               (*pro hac vice* application forthcoming)
5                                             Jennifer Conn
                                               (*pro hac vice* application forthcoming)
6                                             PAUL HASTINGS LLP
                                              200 Park Avenue
7                                             New York, NY 10166
                                              Telephone: 1(212) 318-6000
8                                             Facsimile: 1(212) 230-7689
                                              aviweitzman@paulhastings.com
9                                             jenniferconn@paulhastings.com

10                                            Peter C. Meier
                                              PAUL HASTINGS LLP
11                                            101 California Street, Forty-Eighth Floor
                                              San Francisco, CA 94111
12                                            Telephone: 1(415) 856-7000
                                              Facsimile: 1(415) 856-7100
13                                            petermeier@paulhastings.com

14                                            *Attorneys for Plaintiff Cyrus Hodes*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT