Michael C. Keats (*pro hac vice*)
Samuel M. Light (*pro hac vice*)
Nicholas D. Winkley (*pro hac vice*)
**Fried Frank Harris Shriver
   & Jacobson LLP**
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Email: michael.keats@friedfrank.com
           samuel.light@friedfrank.com
           nicholas.winkley@friedfrank.com

Jeffrey G. Knowles (State Bar No. 129754)
Christopher J. Weiner (State Bar No. 280476)
Bina G. Patel (State Bar No. 315352)
**Coblentz Patch Duffy & Bass LLP**
One Montgomery Street, Suite 3000
San Francisco, California 94104-5500
Telephone: 415.391.4800
Facsimile: 415.989.1663
Email:      ef-jgk@cpdb.com
            ef-cjw@cpdb.com
            ef-bgp@coblentzlaw.com

*Counsel for Defendants Mohammad Emad Mostaque;
Stability AI Inc.; and Stability AI Ltd.*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| CYRUS HODES,<br><br>       Plaintiff,<br><br>       v.<br><br>MOHAMMAD EMAD MOSTAQUE,<br>STABILITY AI INC., a Delaware<br>Corporation, and STABILITY AI LTD., a<br>UK Corporation,<br><br>       Defendants. | CASE NO. 3:23-cv-03481-MMC<br><br>**DECLARATION OF MICHAEL C.<br>KEATS IN SUPPORT OF DEFENDANTS'<br>MOTION TO DISMISS**<br><br>Date:      December 1, 2023<br>Time:      9:00 am<br>Place:     Courtroom 7, 19th Floor<br>Before:    Hon. Maxine M. Chesney |

## DECLARATION OF MICHAEL C. KEATS

I, Michael C. Keats, declare as follows:

1.      I am an attorney duly admitted to practice *pro hac vice* before this Court.  I am a partner of Fried, Frank, Harris, Shriver & Jacobson LLP, attorneys of record for Defendants Mohammad Emad Mostaque ("Mostaque"), Stability AI, Inc. ("Stability US"), and Stability AI Ltd. ("Stability UK," and together with Mostaque and Stability US, "Defendants").  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.      Attached as **Exhibit A** is a true and correct copy of the Stability AI, Inc. Consulting Agreement, dated October 2020 ("Consulting Agreement"), under which Plaintiff Cyrus Hodes ("Hodes") was retained as a consultant and independent contractor for Stability US.  The Consulting Agreement granted Hodes 1,000,000 shares of Stability US's common stock in compensation for services Hodes performed as a consultant and independent contractor.

3.      Attached as **Exhibit B** is a true and correct copy of the Stability AI, Inc. Common Stock Purchase Agreement, dated October 2020 between Stability US and Hodes ("2020 SPA").  The 2020 SPA transferred 1,000,000 shares of Stability US's common stock to Hodes for $100.

4.      Attached as **Exhibit C** is a true and correct copy of the Stability AI, Inc. Common Stock Purchase Agreement, dated October 4, 2021 between Mostaque and Hodes (the "October 2021 SPA").  Under the October 2021 SPA, Hodes sold 800,000 Stability US shares directly to Mostaque, in his personal capacity, for $80.  The October 2021 SPA indicates that Hodes executed the agreement from Boca Raton, Florida and that Mostaque executed the agreement from London, England.

5.       Attached as **Exhibit D** is a true and correct copy of the Stability AI, Inc. Common Stock Purchase Agreement, dated May 21, 2022, between Mostaque and Hodes (the "May 2022 SPA").  Under the May 2022 SPA, Hodes sold 200,000 Stability US shares directly to Mostaque, in his personal capacity, for $20.   The May 2022 SPA indicates that Hodes executed the agreement from Boca Raton, Florida and that Mostaque executed the agreement from London, England.

6.       Attached as **Exhibit E** is a true and correct copy of a letter from counsel for Hodes to Defendants, dated December 27, 2022, outlining potential claims against Defendants and demanding that they retain documents.

7.       Attached as **Exhibit F** is a true and correct copy of a letter I sent on behalf of Defendants to counsel for Hodes, dated January 18, 2023, explaining why Hodes's claims failed as a matter of fact and law.  Hodes never responded to this letter.

8.       Attached as **Exhibit G** is a true and correct copy of an excerpt from Defendants Stability AI, Ltd and Stability AI, Inc.'s Amended Notice of Motion, Motion to Dismiss, and Memorandum of Points and Authorities in Support of Motion to Dismiss in *Anderson v. Stability AI, Ltd., et al.*, Case No. 3:23-cv-00210-WHO (N.D. Cal.).

9.       Attached as **Exhibit H** is a true and correct copy of the *In re Wayport, Inc. Litig.*, 76 A.3d 296 (Del. Ch. 2013) opinion.

1

2   I declare under penalty of perjury that the foregoing is true and correct.

3   Executed on this 16th day of October 2023.

4

5

6

7   _____
                    Michael C. Keats
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MICHAEL C. KEATS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# EXHIBIT A

**STABILITY AI, INC.**

**CONSULTING AGREEMENT**

**Effective Date: October __, 2020**

This Consulting Agreement (the "*Agreement*") is made as of the Effective Date set forth above by and between Stability AI, Inc., a Delaware corporation ("*Client*") and the consultant named on the signature page hereto ("*Consultant*").

1.     **Engagement of Services.**  Client may issue Project Assignments to Consultant in the form attached to this Agreement as **Exhibit A** (each, a "*Project Assignment*").  Subject to the terms of this Agreement, Consultant will render the services set forth in Project Assignment(s) accepted by Consultant (the "*Services*") by the completion dates set forth therein.  Except as otherwise provided in the applicable Project Assignment, Consultant will be free of control and direction from the Client (other than general oversight and control over the results of the Services), and will have exclusive control over the manner and means of performing the Services, including the choice of place and time.  Consultant will provide, at Consultant's own expense, a place of work and all equipment, tools and other materials necessary to complete the Services; however, to the extent necessary to facilitate performance of the Services, Client may, in its discretion, make certain of its equipment or facilities available to Consultant at Consultant's request.  While on the Client's premises, Consultant agrees to comply with Client's then-current access rules and procedures, including those related to safety, security and confidentiality.  Consultant agrees and acknowledges that Consultant has no expectation of privacy with respect to Client's telecommunications, networking or information processing systems (including stored computer files, email messages and voice messages) and that Consultant's activities, including the sending or receiving of any files or messages, on or using those systems may be monitored, and the contents of such files and messages may be reviewed and disclosed, at any time, without notice.

2.     **Compensation.**  Client will pay Consultant the fee set forth in each Project Assignment for Services rendered pursuant to this Agreement as Consultant's sole compensation for such Services.  Consultant will be reimbursed only for expenses that are expressly provided for in a Project Assignment or that have been approved in advance in writing by Client, provided Consultant has furnished such documentation for authorized expenses as Client may reasonably request.  Payment of Consultant's fees and expenses will be in accordance with the applicable Project Assignment.  Upon termination of this Agreement for any reason, Consultant will be paid fees on the basis stated in the Project Assignment(s) for work that has been completed.  Unless otherwise provided in a Project Assignment, payment to Consultant of undisputed fees will be due 30 days following Client's receipt of an invoice that contains accurate records of the work performed that are sufficient to substantiate the invoiced fees.

3.     **Ownership of Work Product.**  Consultant hereby irrevocably assigns to Client all right, title and interest worldwide in and to any deliverables specified in a Project Assignment and to any ideas, concepts, processes, discoveries, developments, formulae, information, materials, improvements, designs, artwork, content, software programs, other copyrightable works, and any other work product created, conceived or developed by Consultant (whether alone or jointly with others) for Client during or before the term of this Agreement, including all copyrights, patents, trademarks, trade secrets, and other intellectual property rights therein (collectively, the "*Work Product*").  Consultant retains no rights to use the Work Product and agrees not to challenge the validity of Client's ownership of the Work Product.  Consultant agrees to execute, at Client's request and expense, all documents and other instruments necessary or desirable to confirm such assignment, including without limitation, any copyright assignment or patent assignment provided by the Client.  Consultant hereby irrevocably appoints Client as Consultant's attorney-in-fact for the purpose of executing such documents on Consultant's behalf, which appointment is

1.

coupled with an interest.  At Client's request, Consultant will promptly record any such patent assignment with the United States Patent and Trademark Office.  Client will reimburse Consultant for any reasonable out-of-pocket expenses actually incurred by Consultant in fulfilling its obligations under this section. Consultant will deliver each item of Work Product specified in each Project Assignment and disclose promptly in writing to Client all other Work Product.

**4.      Other Rights.**  If Consultant has any rights, including without limitation "artist's rights" or "moral rights," in the Work Product that cannot be assigned, Consultant hereby unconditionally and irrevocably grants to Client an exclusive (even as to Consultant), worldwide, fully paid and royalty-free, irrevocable, perpetual license, with rights to sublicense through multiple tiers of sublicensees, to use, reproduce, distribute, create derivative works of, publicly perform and publicly display the Work Product in any medium or format, whether now known or later developed.  In the event that Consultant has any rights in the Work Product that cannot be assigned or licensed, Consultant unconditionally and irrevocably waives the enforcement of such rights, and all claims and causes of action of any kind against Client or Client's customers.

**5.      License to Preexisting IP.**  Consultant agrees not to use or incorporate into Work Product any intellectual property developed by any third party or by Consultant other than in the course of performing services for Client ("***Preexisting IP***") unless the Preexisting IP has been specifically identified and described in the applicable Project Assignment.  In the event Consultant uses or incorporates Preexisting IP into Work Product, Consultant hereby grants to Client a non-exclusive, worldwide, fully-paid and royalty-free, irrevocable, perpetual license, with the right to sublicense through multiple tiers of sublicensees, to use, reproduce, distribute, create derivative works of, publicly perform and publicly display in any medium or format, whether now known or later developed, such Preexisting IP incorporated or used in Work Product.

**6.      Representations and Warranties.**  Consultant represents and warrants that: (a) the Services will be performed in a professional manner and in accordance with the industry standards and the Work Product will comply with the requirements set forth in the applicable Project Assignment, (b) the Work Product will be an original work of Consultant, (c) Consultant has the right and unrestricted ability to assign the ownership of Work Product to Client as set forth in Section 3 (including without limitation the right to assign the ownership of any Work Product created by Consultant's employees or contractors), (d) neither the Work Product nor any element thereof will infringe upon or misappropriate any copyright, patent, trademark, trade secret, right of publicity or privacy, or any other proprietary right of any person, whether contractual, statutory or common law, (e) Consultant has an unqualified right to grant to Client the license to Preexisting IP set forth in Section 5, (f) none of the Work Product incorporates any software code licensed under the GNU General Public License or Lesser General Public License or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing, or distribution of any source code owned or licensed by Client, except as expressly agreed by the Client in writing, and (g) Consultant will comply with all applicable federal, state, local and foreign laws governing self-employed individuals, including laws requiring the payment of taxes, such as income and employment taxes, and social security, disability, and other contributions.  Consultant further represents and warrants that Consultant is self-employed in an independently established trade, occupation, or business; maintains and operates a business that is separate and independent from Client's business; holds himself or herself out to the public as independently competent and available to provide applicable services similar to the Services; has obtained and/or expects to obtain clients or customers other than Client for whom Consultant performs services; and will perform work for Client that Consultant understands is outside the usual course of Client's business.  Consultant agrees to indemnify and hold Client harmless from any and all damages, costs, claims, expenses or other liability (including reasonable attorneys' fees) arising from or relating to the breach or alleged breach by Consultant of the representations and warranties set forth in this Section 6.

2.

7.     **Independent Contractor Relationship.**  Consultant's relationship with Client is that of an independent contractor, and nothing in this Agreement is intended to, or should be construed to, create a partnership, agency, joint venture or employment relationship between Client and any of Consultant's employees or agents.  Consultant is not authorized to make any representation, contract or commitment on behalf of Client.  Consultant (if Consultant is an individual) and Consultant's employees will not be entitled to any of the benefits that Client may make available to its employees, including, but not limited to, group health or life insurance, profit-sharing or retirement benefits.  Because Consultant is an independent contractor, Client will not withhold or make payments for social security, make unemployment insurance or disability insurance contributions, or obtain workers' compensation insurance on behalf of Consultant.  Consultant is solely responsible for, and will file, on a timely basis, all tax returns and payments required to be filed with, or made to, any federal, state or local tax authority with respect to the performance of Services and receipt of fees under this Agreement.  Consultant is solely responsible for, and must maintain adequate records of, expenses incurred in the course of performing Services under this Agreement.  No part of Consultant's compensation will be subject to withholding by Client for the payment of any social security, federal, state or any other employee payroll taxes.  Client will regularly report amounts paid to Consultant by filing Form 1099-MISC with the Internal Revenue Service as required by law.  If, notwithstanding the foregoing, Consultant is reclassified as an employee of Client, or any affiliate of Client, by the U.S. Internal Revenue Service, the U.S. Department of Labor, or any other federal or state or foreign agency as the result of any administrative or judicial proceeding, Consultant agrees that Consultant will not, as the result of such reclassification, be entitled to or eligible for, on either a prospective or retrospective basis, any employee benefits under any plans or programs established or maintained by Client.

8.     **Confidential Information.**  During the term of this Agreement and thereafter Consultant (i) will not use or permit the use of Client's Confidential Information in any manner or for any purpose not expressly set forth in this Agreement, (ii) will hold such Confidential Information in confidence and protect it from unauthorized use and disclosure, and (iii) will not disclose such Confidential Information to any third parties except as set forth in this section and in Section 9 below.  Consultant will protect Client's Confidential Information from unauthorized use, access or disclosure in the same manner as Consultant protects its own confidential information of a similar nature, but in no event will it exercise less than reasonable care.  Notwithstanding the foregoing or anything to the contrary in this Agreement or any other agreement between Client and Consultant, nothing in this Agreement shall limit Consultant's right to report possible violations of law or regulation with any federal, state, or local government agency.  "***Confidential Information***" as used in this Agreement means all information disclosed by Client to Consultant, whether during or before the term of this Agreement, that is not generally known in the Client's trade or industry and will include, without limitation:  (a) concepts and ideas relating to the development and distribution of content in any medium or to the current, future and proposed products or services of Client or its subsidiaries or affiliates; (b) trade secrets, drawings, inventions, know-how, software programs, and software source documents; (c) information regarding plans for research, development, new service offerings or products, marketing and selling, business plans, business forecasts, budgets and unpublished financial statements, licenses and distribution arrangements, prices and costs, suppliers and customers; (d) existence of any business discussions, negotiations or agreements between the parties; and (e) any information regarding the skills and compensation of employees, contractors or other agents of Client or its subsidiaries or affiliates.  Confidential Information also includes proprietary or confidential information of any third party who may disclose such information to Client or Consultant in the course of Client's business.  Confidential Information does not include information that (x) is or becomes a part of the public domain through no act or omission of Consultant, (y) is disclosed to Consultant by a third party without restrictions on disclosure, or (z) was in Consultant's lawful possession without obligation of confidentiality prior to the disclosure and was not obtained by Consultant either directly or indirectly from Client.  In addition, this section will not be construed to prohibit disclosure of Confidential Information to the extent that such disclosure is required by law or valid order of a court or other governmental authority; *provided, however*, that Consultant will first have given notice to Client and will have made a reasonable effort to obtain a protective order requiring

3.

that the Confidential Information so disclosed be used only for the purposes for which the order was issued. All Confidential Information furnished to Consultant by Client is the sole and exclusive property of Client or its suppliers or customers.  Upon request by Client, Consultant agrees to promptly deliver to Client the original and any copies of the Confidential Information.  Notwithstanding the foregoing nondisclosure obligations, pursuant to 18 U.S.C. Section 1833(b), Consultant will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

8.1     **Personal Information**.  With respect to any Confidential Information that constitutes personal data, personal information, personally identifiable information or similar information under applicable privacy or data security laws (collectively, "**Personal Information**"), Consultant shall not (i) sell Personal Information or (ii) retain, use or disclose Personal Information for any purpose other than the specific purpose of providing the Services.  For the avoidance of doubt, the foregoing prohibits Consultant from "selling" Personal Information, as defined in the California Consumer Privacy Act of 2018 (as amended, the "**CCPA**"), and from retaining, using, or disclosing Personal Information outside of the direct business relationship between Consultant and Company or for a "commercial purpose" (as defined in the CCPA).  Consultant hereby certifies that it understands the obligations under this Section 8.1 and will comply with them.

(a)     Consultant shall use reasonable security measures appropriate to the nature of any Personal Information in its possession or control to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure.

(b)     The parties acknowledge and agree that Consultant's access to Personal Information is not part of the consideration exchanged by the parties in respect of the Agreement.

(c)     If any individual contacts Consultant to make a request pertaining to their Personal Information, Consultant shall promptly forward the request to the Company and shall not respond to the individual except as instructed by Company.  Consultant shall promptly take such actions and provide such information as Company may request to help Company fulfill requests of individuals to exercise their rights under the applicable privacy or data security laws, including, without limitation, requests to access, delete, opt-out of the sale of, or receive information about the processing of, Personal Information pertaining to them.  Consultant agrees to cooperate with Company to further amend the Agreement as may be necessary to address compliance with applicable privacy or data security laws.

9.     **Consultant's Employees, Consultants and Agents.**  Consultant shall have the right to disclose Confidential Information only to those of its employees, consultants, and agents who have a need to know such information for the purpose of performing Services and who have entered into a binding written agreement that is expressly for the benefit of Client and protects Client's rights and interests in and to the Confidential Information to at least the same degree as this Agreement.  Client reserves the right to refuse or limit Consultant's use of any employee, consultant or agent or to require Consultant to remove any employee, consultant or agent already engaged in the performance of the Services.  Client's exercise of such right will in no way limit Consultant's obligations under this Agreement.

10.     **Term and Termination.**

10.1     **Term.**  The initial term of this Agreement is for [**1 year**] from the Effective Date set forth above, unless earlier terminated as provided in this Agreement.  [Thereafter, this Agreement will

4.

automatically renew on its anniversary date, for **1 year** terms, unless Client provides 15 days' written notice prior to any such anniversary date that the Agreement will not renew.]

       **10.2**    **Termination Without Cause.**  Client may terminate this Agreement with or without cause, at any time upon 5 days' prior written notice to Consultant.  Consultant may terminate this Agreement without cause, at any time when no Project Assignment is in effect upon 15 days' prior written notice to Client.

       **10.3**    **Termination for Cause.**  Either party may terminate this Agreement immediately in the event the other party has materially breached the Agreement and failed to cure such breach within 3 days after notice by the non-breaching party is given.

       **10.4**    **Survival.**  The rights and obligations contained in Sections 3 ("***Ownership of Work Product***"), 4 ("***Other Rights***"), 5 ("***License to Preexisting IP***"), 6 ("***Representations and Warranties***"), 8 ("***Confidential Information***") and 12 ("***Non-solicitation***") will survive any termination or expiration of this Agreement.

     **11.**    **No Conflicts.**  Consultant will refrain from any activity, and will not enter into any agreement or make any commitment, that is inconsistent or incompatible with Consultant's obligations under this Agreement, including Consultant's ability to perform the Services.  Consultant represents and warrants that Consultant is not subject to any contract or duty that would be breached by Consultant's entering into or performing Consultant's obligations under this Agreement or that is otherwise inconsistent with this Agreement.

     **12.**    **Non-solicitation.**  Consultant agrees that during the Term of this Agreement, and for one year thereafter, Consultant will not either directly or indirectly, solicit or attempt to solicit any employee, independent contractor, or consultant of Client to terminate his, her or its relationship with Client in order to become an employee, consultant, or independent contractor to or for any other person or entity.

     **13.**    **Successors and Assigns.**  Consultant may not subcontract or otherwise delegate or assign this Agreement or any of its obligations under this Agreement without Client's prior written consent.  Any attempted assignment in violation of the foregoing will be null and void.  Subject to the foregoing, this Agreement will be for the benefit of Client's successors and assigns, and will be binding on Consultant's assignees.

     **14.**    **Notices.**  Any notice required or permitted by this Agreement will be in writing and will be delivered as follows with notice deemed given as indicated:  (i) by personal delivery when delivered personally; (ii) by overnight courier upon written verification of receipt; (iii) by telecopy or facsimile transmission upon acknowledgment of receipt of electronic transmission; or (iv) by certified or registered mail, return receipt requested, upon verification of receipt.  Notice will be sent to the addresses set forth below or such other address as either party may specify in writing.

     **15.**    **Governing Law.**  This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Delaware, without giving effect to any conflicts of laws principles that require the application of the law of a different jurisdiction.

     **16.**    **Severability.**  Should any provisions of this Agreement be held by a court of law to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected or impaired thereby.

**17.     Waiver.**  The waiver by Client of a breach of any provision of this Agreement by Consultant will not operate or be construed as a waiver of any other or subsequent breach by Consultant.

**18.     Injunctive Relief for Breach.**  Consultant's obligations under this Agreement are of a unique character that gives them particular value; breach of any of such obligations will result in irreparable and continuing damage to Client for which there will be no adequate remedy at law; and, in the event of such breach, Client will be entitled to injunctive relief and/or a decree for specific performance, and such other and further relief as may be proper (including monetary damages if appropriate).

**19.     Entire Agreement.**  This Agreement constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or contemporaneous oral or written agreements concerning such subject matter.  The terms of this Agreement will govern all services undertaken by Consultant for Client; *provided, however*, that in the event of any conflict between the terms of this Agreement and any Project Assignment, the terms of the applicable Project Assignment will control, provided that the Project Assignment specifically calls out the applicable Section number of this Agreement to be superseded and has been signed by an authorized officer of Client.  This Agreement may only be changed or amended by mutual agreement of authorized representatives of the parties in writing.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Remainder of page intentionally left blank]*

6.

The parties have executed this Agreement as of the Effective Date.

**CLIENT:**

**Stability AI, Inc.**

By: _____ *Mohammad Emad Mostaque*

       Name:   Mohammad Emad Mostaque
       Title:    Chief Executive Officer

Email:   emad@stability.ai

<u>Address</u>:     Tarmac Building, 20 Rede Place
              London, W2 4TU
              United Kingdom

**CONSULTANT:**

Cyrus Hodes
_____
Name of Consultant (Please Print)

_____
Signature

_____
Title (if applicable)

cyrus@stability.ai
_____
Email

<u>Address</u>:   1170 Payne Drive
          Los Altos, CA 94024
_____

*For copyright registration purposes only, Consultant must provide the following information:*

Date of Birth:_____

Nationality or domicile:_____

7.

**EXHIBIT A**

**Project Assignment #1 Under Consulting Agreement**

**Dated: October __, 2020**

**Project:**

Consultant will render the following services to Client as Client may from time to time request:

_____

**Schedule Of Work:**

_____

**Fees And Reimbursement:**

Equity Fee: The Client has issued 1,000,000 shares of the Client's common stock (the "***Grant***") to Consultant.  The Grant will be governed by the terms and conditions of the Common Stock Purchase Agreement between the Client and the Consultant.

Consultant will be reimbursed for third party expenses (at cost) if approved in writing in advance by Client.

Consultant will invoice Client monthly for services and expenses and will provide such reasonable receipts or other documentation of expenses as Client might request, including copies of time records.

Payment terms: Client will be invoiced on the first day of each month for services rendered and expenses incurred during the previous month.

The parties have executed this Project Assignment as of the date first written above.

**CLIENT:**

**STABILITY AI, INC.**

By: _Mohammad Emad Mostaque_____

Name:  Mohammad Emad Mostaque
Title:   Chief Executive Officer

**CONSULTANT:**

_____Cyrus Hodes_____
Name of Consultant (Please Print)

_____
Signature

_____
Title (if applicable)

EXHIBIT B

**STABILITY AI, INC.**

**COMMON STOCK PURCHASE AGREEMENT**

This **Common Stock Purchase Agreement** (the "*Agreement*") is made as of October __, 2020 by and between **Stability AI, Inc.**, a Delaware corporation (the "*Company*") and **Cyrus Hodes** ("*Purchaser*"). Certain capitalized terms used below are defined in the terms and conditions set forth in **Exhibit A** attached to this Agreement, which are incorporated by reference.

| | |
|---|---|
| **Total shares of Stock purchased:** | 1,000,000 shares of Common Stock of the Company (the "*Stock*") |
| **Purchase Price per share:** | $0.0001 |
| **Total Purchase Price:** | $100.00 |
| **Form of Payment:** | Cash: $50.00 |
| | Transfer of intellectual property rights pursuant to the Assignment Agreement attached as **Exhibit B** in an amount equal to $50.00. |

*[Remainder of page intentionally left blank]*

**Additional Terms/Acknowledgements:** The undersigned Purchaser acknowledges receipt of, and understands and agrees to, this Common Stock Purchase Agreement, including the terms and conditions set forth in **Exhibit A** attached to this Agreement, which are incorporated by reference.

**COMPANY:**

**Stability AI, Inc.**

By:  _____*Mohammad Emad Mostaque*_____

              Name:   Mohammad Emad Mostaque
              Title:    Chief Executive Officer

E-mail:    emad@stability.ai

Address:   Tarmac Building, 20 Rede Place
             London, W2 4TU
             United Kingdom

**PURCHASER:**

**Cyrus Hodes**

_____
(Signature)

E-mail:    cyrus@stability.ai

Address:   1170 Payne Drive
         Los Altos, California 94024

**EXHIBIT A**

**TERMS AND CONDITIONS INCORPORATED INTO
COMMON STOCK PURCHASE AGREEMENT**

**1.      Purchase and Sale of Stock**.  Purchaser agrees to purchase from the Company, and the Company agrees to sell to Purchaser, the number of shares of Stock for the consideration set forth in the cover page to this Agreement.  The closing of the transactions contemplated by this Agreement, including payment for and delivery of the Stock, will occur at the offices of the Company immediately following the execution of this Agreement, or at such other time and place as the parties may mutually agree.

**2.      Investment Representations**.  In connection with the purchase of the Stock, Purchaser represents to the Company the following:

        **(a)**      Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Stock.  Purchaser is purchasing the Stock for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "***Act***").

        **(b)**      Purchaser understands that the Stock has not been registered under the Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed in this Agreement.

        **(c)**      Purchaser further acknowledges and understands that the Stock must be held indefinitely unless the Stock is subsequently registered under the Act or an exemption from such registration is available.  Purchaser further acknowledges and understands that the Company is under no obligation to register the Stock.  Purchaser understands that the certificate evidencing the Stock will be imprinted with a legend that prohibits the transfer of the Stock unless the Stock is registered or such registration is not required in the opinion of counsel for the Company.

        **(d)**      Purchaser is familiar with the provisions of Rule 144 under the Act as in effect from time to time, that, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of such securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.

        **(e)**      Purchaser further understands that at the time Purchaser wishes to sell the Stock there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, Purchaser may be precluded from selling the Stock under Rule 144 even if the minimum holding period requirement had been satisfied.

        **(f)**      Purchaser further warrants and represents that Purchaser has either (i) preexisting personal or business relationships, with the Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect Purchaser's own interests in connection with the purchase of the Stock by virtue of the business or financial expertise of Purchaser or of professional advisors to Purchaser who are unaffiliated with and who are not compensated by the Company or any of its affiliates, directly or indirectly.

        **(g)**      Purchaser acknowledges that Purchaser has read all tax related sections and further acknowledges Purchaser has had an opportunity to consult Purchaser's own tax, legal and financial advisors regarding the purchase of common stock under this Agreement.

(h)      Purchaser acknowledges and agrees that in making the decision to purchase the common stock under this Agreement, Purchaser has not relied on any statement, whether written or oral, regarding the subject matter of this Agreement, except as expressly provided in this Agreement and in the attachments and exhibits to this Agreement.

(i)      If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), the Purchaser has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Stock or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Stock, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Stock. The Purchaser's subscription and payment for and continued beneficial ownership of the Stock will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

3.      **Restrictive Legends**.  All certificates representing the Stock will have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties to this Agreement):

(a)      "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED."

(b)      "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE CORPORATION AND/OR ITS ASSIGNEE(S) AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

(c)      "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A TRANSFER RESTRICTION, AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

(d)      "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN OBLIGATIONS WITH RESPECT TO FUTURE SECURITYHOLDERS' AGREEMENTS SET FORTH IN AN AGREEMENT BETWEEN THE CORPORATION AND THE REGISTERED HOLDER, OR SUCH HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION."

(e)      Any legend required by applicable blue sky laws.

4.      **Market Stand-Off Agreement**.  Purchaser will not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale of, any Common Stock or other securities of the Company held by Purchaser (other than those included in the registration), including the Stock (the "*Restricted Securities*"), during the 180-day period following the effective date of the Company's first firm commitment underwritten public offering of its Common Stock (or such longer period as the underwriters or the Company will request in order to facilitate compliance with applicable FINRA rules).  Purchaser agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the managing underwriters that are consistent with the foregoing or that are necessary to give further effect to the foregoing provision.  In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect

to Purchaser's Restricted Securities until the end of such period.  The underwriters of the Company's stock are intended third party beneficiaries of this Section 4 and have the right, power and authority to enforce the provisions hereof as though they were a party to this Agreement.  The obligations contained in this Section 4 shall also, if so determined by the Company's Board of Directors, apply in the Company's initial listing of its Common Stock on a national securities exchange by means of a registration statement on Form S-1 under the Act (or any successor registration form under the Act subsequently adopted by the Securities and Exchange Commission) filed by the Company with the Securities and Exchange Commission that registers shares of existing capital stock of the Company for resale (a "***Direct Listing***"), provided that all holders of at least 5% of the Company's outstanding Common Stock (after giving effect to the conversion into Common Stock of any outstanding Preferred Stock) are subject to substantially similar obligations with respect to such Direct Listing.

5.      **Miscellaneous**.

(a)      **Waiver of Information Rights**.  Purchaser hereby acknowledges and agrees that, except for such information as required to be delivered to Purchaser by the Company pursuant to any other agreement by and between the Company and Purchaser, Purchaser has no right to receive any information from the Company by virtue of such Purchaser's purchase of the Stock, ownership of the Stock, or as a result of Purchaser being a holder of record of stock of the Company.  Without limiting the foregoing, to the fullest extent permitted by law, Purchaser hereby waives Purchaser's inspection rights under Section 220 of the Delaware General Corporation Law and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company, the Company's capital stock or the Stock (the "***Inspection Rights***").  Purchaser hereby covenants and agrees never to directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights.

(b)      **Notices**.  All notices required or permitted hereunder will be in writing and will be deemed effectively given: (i) upon personal delivery to the party to be notified; (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not sent during normal business hours of the recipient, then on the next business day; (iii) five calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications will be sent to the other party to this Agreement at such party's address hereinafter set forth on the signature page hereof, or at such other address as such party may designate by 10 days' advance written notice to the other party hereto.

(c)      **Successors and Assigns**.  This Agreement will inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, be binding upon Purchaser, Purchaser's successors, and assigns.

(d)      **Attorneys' Fees**.  The prevailing party in any suit or action hereunder will be entitled to recover from the losing party all costs incurred by it in enforcing the performance of, or protecting its rights under, any part of this Agreement, including reasonable costs of investigation and attorneys' fees.

(e)      **Governing Law; Venue**.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware.  The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement will be brought in, and each party agrees to, and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing the Company's principal place of business.

     **(f)**     **Further Execution**.  The parties agree to take all such further actions as may reasonably be necessary to carry out and consummate this Agreement as soon as practicable, and to take whatever steps may be necessary to obtain any governmental approval in connection with or otherwise qualify the issuance of the securities that are the subject of this Agreement.  Purchaser agrees that, at the request of the Company at any time, Purchaser shall execute and deliver any applicable securityholders' agreement, investor rights agreement, voting agreement, drag along agreement, right of first refusal and co-sale agreement or similar agreement (or a joinder to any existing agreement) that the Company and/or the holders of its securities may enter into or that otherwise that may be in effect from time to time (and which may contain, among other provisions, additional restrictions on transfer and/or rights of repurchase in favor of the Company).

     **(g)**     **Independent Counsel**.  Purchaser acknowledges that this Agreement has been prepared on behalf of the Company by Cooley LLP, counsel to the Company and that Cooley LLP does not represent, and is not acting on behalf of, Purchaser in any capacity.  Purchaser has been provided with an opportunity to consult with his, her or its own counsel with respect to this Agreement.

     **(h)**     **Entire Agreement; Amendment**.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes and merges all prior agreements or understandings, whether written or oral, with respect to the subject matter hereof.  This Agreement may not be amended, modified or revoked, in whole or in part, except by an agreement in writing signed by each of the parties hereto.

     **(i)**     **Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision will be excluded from this Agreement, (ii) the balance of the Agreement will be interpreted as if such provision were so excluded and (iii) the balance of the Agreement will be enforceable in accordance with its terms.

     **(j)**     **Counterparts**.  This Agreement (including any schedules and/or exhibits hereto or thereto) may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

***[End of Exhibit A to Common Stock Purchase Agreement]***

**EXHIBIT B**

**ASSIGNMENT AGREEMENT**

## ASSIGNMENT AGREEMENT

**This Assignment Agreement** (the "*Agreement*") is entered into as of October __, 2020, by and between **Cyrus Hodes** ("*Assignor*") and **Stability AI, Inc.**, a Delaware corporation (the "*Company*").  The parties hereto agree as follows:

### AGREEMENT

**1.**     In consideration of the Company's agreement to issue Company stock to Assignor, Assignor hereby irrevocably assigns, sells, transfers and conveys to the Company all right, title and interest, on a worldwide basis, in and to the technology, property, and/or assets described in **Schedule 1** attached hereto and all applicable intellectual property rights, on a worldwide basis, related thereto, including, without limitation, copyrights, trademarks, trade secrets, patents, patent applications, moral rights, contract and licensing rights (the "*Property*").  In consideration for such transfer of the Property, the Company shall grant to Assignor shares of its Common Stock.  Assignor hereby acknowledges that Assignor retains no right to use the Property and agrees not to challenge the validity of the Company's ownership of the Property.

**2.**     Upon each request by the Company, without additional consideration, Assignor agrees to promptly execute documents, testify and take other actions at the Company's expense as the Company may deem necessary or desirable to procure, maintain, perfect, and enforce the full benefits, enjoyment, rights, title and interest, on a worldwide basis of the Property assigned hereunder, and render all necessary assistance in making application for and obtaining original, continuing, divisional, renewal, or reissued utility and design patents, copyrights, mask works, trademarks, trade secrets, and all other technology and intellectual property rights throughout the world related to any of the Property, in the Company's name and for its benefit.  In the event the Company is unable for any reason, after reasonable effort, to secure Assignor's signature on any document needed in connection with the actions specified herein, Assignor hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as its agent and attorney in fact, which appointment is coupled with an interest, to act for and in its behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this paragraph with the same legal force and effect as if executed by Assignor.  Assignor hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which Assignor now or may hereafter have for infringement of any Property assigned hereunder.

**3.**     Assignor shall deliver to the Company upon execution of this Agreement any and all tangible manifestations of the Property, including, without limitation, all notes, records, files and tangible items of any sort in its possession or under its control relating to the Property.  Such delivery shall include all present and predecessor versions.  In addition, Assignor agrees to provide to the Company from and after the execution of this Agreement and at the expense of the Company competent and knowledgeable assistance to facilitate the transfer of all information, know-how, techniques, processes and the like related to such tangible manifestation and otherwise comprising the intangible aspects of the Property.

**4.**     Assignor represents and warrants to the Company that (a) Assignor is the sole owner of the Property and has full and exclusive right to assign the rights assigned herein, (b) Assignor has full right and power to enter into and perform this Agreement without the consent of any third party, (c) all of the Property is free and clear of all claims, liens, encumbrances and the like of any nature whatsoever, (d) the Property is an original work of Assignor, (e) none of the Property infringes, conflicts with or violates any patent or other intellectual property right of any kind (including, without limitation, any trade secret) or similar rights of any third party, (f) Assignor was not acting within the scope of employment or other service arrangements with any third party when conceiving, creating or otherwise performing any activity with respect to the

Property, (g) the execution, delivery and performance of this Agreement does not conflict with, constitute a breach of, or in any way violate any arrangement, understanding or agreement to which Assignor is a party or by which Assignor is bound and (h) Assignor has maintained the Property in confidence and has not granted, directly or indirectly, any rights or interest whatsoever in the Property to any third party.

     **5.**     Assignor further represents and warrants to the Company that no claim, whether or not embodied in an action past or present, of any infringement, of any conflict with, or of any violation of any patent, trade secret or other intellectual property right or similar right, has been made or is pending or threatened against Assignor relative to the Property.  Assignor agrees to promptly inform the Company of any such claim arising or threatened in the future with respect to the Property or any part thereof.

     **6.**     Assignor will indemnify and hold harmless the Company, from any and all claims, losses, liabilities, damages, expenses and costs (including attorneys' fees and court costs) which result from a breach or alleged breach of any representation or warranty of Assignor (a "***Claim***") set forth in this Agreement, provided that the Company gives Assignor written notice of any such Claim and Assignor has the right to participate in the defense of any such Claim at its expense.

     **7.**     This Agreement and the Schedule attached hereto constitute the entire, complete, final and exclusive understanding and agreement of the parties hereto with respect to the subject matter hereof, and supersedes any other prior or contemporaneous oral understanding or agreement or any other prior written agreement.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the parties hereto.

     **8.**     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

     **9.**     This Agreement will be governed and construed in accordance with the laws of the State of Delaware, as such laws are applied by Delaware courts to contracts made and to be performed entirely in Delaware by residents of that state.  Assignor hereby expressly consents to the personal jurisdiction of the state and federal courts located in the county in which the Company has its principal offices for any lawsuit filed there against Assignor by the Company arising from or related to this Agreement.

     **10.**     If any provision of this Agreement is found invalid or unenforceable, in whole or in part, the remaining provisions and partially enforceable provisions will, nevertheless, be binding and enforceable.

     **11.**     Failure by either party to exercise any of its rights hereunder shall not constitute or be deemed a waiver or forfeiture of such rights.

     **12.**     The provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

*[Remainder of page intentionally left blank]*

The undersigned have executed this **Assignment Agreement** as of the date set forth above.

**COMPANY:**

**Stability AI, Inc.**

By:      *Mohammad Emad Mostaque*

          Name:    Mohammad Emad Mostaque
          Title:     Chief Executive Officer

Email:    emad@stability.ai

**ASSIGNOR:**

**Cyrus Hodes**

_____
(Signature)

cyrus@stability.ai
_____
Email

**SCHEDULE 1 TO ASSIGNMENT AGREEMENT**

**DESCRIPTION OF TECHNOLOGY, PROPERTY AND/OR ASSETS**

All Assignor's discoveries, ideas, business plans, concepts, improvements, domain names, social media handles, inventions (whether patentable or not), knowledge, know-how, processes, information, data, data collections, procedures, processes, techniques, designs, drawings, flow charts, software code (in any form including source code and executable or object code), user interface, wire frames, formulae, computer programs, trade secrets, works of authorship and trademarks used in connection with or related to the business of the Company, including brand names, product names, logos and slogans, and associated goodwill.

EXHIBIT C

**STABILITY AI, INC.**

**COMMON STOCK PURCHASE AGREEMENT**

      **This Common Stock Purchase Agreement** (the "*Agreement*") is made as of October 4th , 2021 by and between **Cyrus Hodes** (the "*Seller*") and **Mohammad Emad Mostaque** ("*Purchaser*").  Certain capitalized terms used below are defined in the terms and conditions set forth in **Exhibit A** attached to this Agreement, which are incorporated by reference.

| | |
|---|---|
| **Total shares of Stock purchased:** | 800,000 shares of Common Stock of the Company (the "***Stock***") |
| **Purchase Price per share:** | $0.0001 |
| **Total Purchase Price:** | $80.00 |
| **Form of Payment:** | Cash: $80.00 |

*[Remainder of page intentionally left blank]*

Doc ID: 59c5b5d88f4f7c562d73e7f37e0328fb4570e69b

**Additional Terms/Acknowledgements:** The undersigned Purchaser acknowledges receipt of, and understands and agrees to, this Common Stock Purchase Agreement, including the terms and conditions set forth in **Exhibit A** attached to this Agreement, which are incorporated by reference.

**SELLER:**

**Cyrus Hodes**

By: _Cyrus Hodes_
_____

      Name:   Cyrus Hodes

E-mail: _cyrus@hodes.ai_
_____

Address: _17156 Bermuda Village Dr_
_____
_Boca Raton, FL 33487_
_____
_USA_
_____

**PURCHASER:**

**Mohammad Emad Mostaque**

_Emad Mostaque_
_____
             (Signature)

E-mail: _emad@stability.ai_
_____

Address:   Tarmac Building, 20 Rede Place
           London, W2 4TU, UK

Doc ID: 59c5b5d88f4f7c562d73e7f37e0328fb4570e69b

**EXHIBIT A**

**TERMS AND CONDITIONS INCORPORATED INTO**
**COMMON STOCK PURCHASE AGREEMENT**

**1.      Purchase and Sale of Stock**.  Purchaser agrees to purchase from the Company, and the Company agrees to sell to Purchaser, the number of shares of Stock for the consideration set forth in the cover page to this Agreement.  The closing of the transactions contemplated by this Agreement, including payment for and delivery of the Stock, will occur at the offices of the Company immediately following the execution of this Agreement, or at such other time and place as the parties may mutually agree.

**2.      Investment Representations**.  In connection with the purchase of the Stock, Purchaser represents to the Company the following:

        **(a)**      Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Stock.  Purchaser is purchasing the Stock for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "*Act*").

        **(b)**      Purchaser understands that the Stock has not been registered under the Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed in this Agreement.

        **(c)**      Purchaser further acknowledges and understands that the Stock must be held indefinitely unless the Stock is subsequently registered under the Act or an exemption from such registration is available.  Purchaser further acknowledges and understands that the Company is under no obligation to register the Stock.  Purchaser understands that the certificate evidencing the Stock will be imprinted with a legend that prohibits the transfer of the Stock unless the Stock is registered or such registration is not required in the opinion of counsel for the Company.

        **(d)**      Purchaser is familiar with the provisions of Rule 144 under the Act as in effect from time to time, that, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of such securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.

        **(e)**      Purchaser further understands that at the time Purchaser wishes to sell the Stock there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, Purchaser may be precluded from selling the Stock under Rule 144 even if the minimum holding period requirement had been satisfied.

        **(f)**      Purchaser further warrants and represents that Purchaser has either (i) preexisting personal or business relationships, with the Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect Purchaser's own interests in connection with the purchase of the Stock by virtue of the business or financial expertise of Purchaser or of professional advisors to Purchaser who are unaffiliated with and who are not compensated by the Company or any of its affiliates, directly or indirectly.

        **(g)**      Purchaser acknowledges that Purchaser has read all tax related sections and further acknowledges Purchaser has had an opportunity to consult Purchaser's own tax, legal and financial advisors regarding the purchase of common stock under this Agreement.

**(h)**    Purchaser acknowledges and agrees that in making the decision to purchase the common stock under this Agreement, Purchaser has not relied on any statement, whether written or oral, regarding the subject matter of this Agreement, except as expressly provided in this Agreement and in the attachments and exhibits to this Agreement.

**(i)**    If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), the Purchaser has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Stock or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Stock, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Stock. The Purchaser's subscription and payment for and continued beneficial ownership of the Stock will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

**3.**    **Restrictive Legends**. All certificates representing the Stock will have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties to this Agreement):

**(a)**    "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED."

**(b)**    "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE CORPORATION AND/OR ITS ASSIGNEE(S) AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

**(c)**    "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A TRANSFER RESTRICTION, AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

**(d)**    "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN OBLIGATIONS WITH RESPECT TO FUTURE SECURITYHOLDERS' AGREEMENTS SET FORTH IN AN AGREEMENT BETWEEN THE CORPORATION AND THE REGISTERED HOLDER, OR SUCH HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION."

**(e)**    Any legend required by applicable blue sky laws.

**4.**    **Market Stand-Off Agreement**. Purchaser will not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale of, any Common Stock or other securities of the Company held by Purchaser (other than those included in the registration), including the Stock (the "*Restricted Securities*"), during the 180-day period following the effective date of the Company's first firm commitment underwritten public offering of its Common Stock (or such longer period as the underwriters or the Company will request in order to facilitate compliance with applicable FINRA rules). Purchaser agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the managing underwriters that are consistent with the foregoing or that are necessary to give further effect to the foregoing provision. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect

to Purchaser's Restricted Securities until the end of such period.  The underwriters of the Company's stock are intended third party beneficiaries of this Section 4 and have the right, power and authority to enforce the provisions hereof as though they were a party to this Agreement.  The obligations contained in this Section 4 shall also, if so determined by the Company's Board of Directors, apply in the Company's initial listing of its Common Stock on a national securities exchange by means of a registration statement on Form S-1 under the Act (or any successor registration form under the Act subsequently adopted by the Securities and Exchange Commission) filed by the Company with the Securities and Exchange Commission that registers shares of existing capital stock of the Company for resale (a "***Direct Listing***"), provided that all holders of at least 5% of the Company's outstanding Common Stock (after giving effect to the conversion into Common Stock of any outstanding Preferred Stock) are subject to substantially similar obligations with respect to such Direct Listing.

**5.      Miscellaneous**.

  **(a)      Waiver of Information Rights**.  Purchaser hereby acknowledges and agrees that, except for such information as required to be delivered to Purchaser by the Company pursuant to any other agreement by and between the Company and Purchaser, Purchaser has no right to receive any information from the Company by virtue of such Purchaser's purchase of the Stock, ownership of the Stock, or as a result of Purchaser being a holder of record of stock of the Company.  Without limiting the foregoing, to the fullest extent permitted by law, Purchaser hereby waives Purchaser's inspection rights under Section 220 of the Delaware General Corporation Law and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company, the Company's capital stock or the Stock (the "***Inspection Rights***").  Purchaser hereby covenants and agrees never to directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights.

  **(b)      Notices**.  All notices required or permitted hereunder will be in writing and will be deemed effectively given: (i) upon personal delivery to the party to be notified; (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not sent during normal business hours of the recipient, then on the next business day; (iii) five calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications will be sent to the other party to this Agreement at such party's address hereinafter set forth on the signature page hereof, or at such other address as such party may designate by 10 days' advance written notice to the other party hereto.

  **(c)      Successors and Assigns**.  This Agreement will inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, be binding upon Purchaser, Purchaser's successors, and assigns.

  **(d)      Attorneys' Fees**.  The prevailing party in any suit or action hereunder will be entitled to recover from the losing party all costs incurred by it in enforcing the performance of, or protecting its rights under, any part of this Agreement, including reasonable costs of investigation and attorneys' fees.

  **(e)      Governing Law; Venue**.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware.  The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement will be brought in, and each party agrees to, and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing the Company's principal place of business.

**(f)     Further Execution**.  The parties agree to take all such further actions as may reasonably be necessary to carry out and consummate this Agreement as soon as practicable, and to take whatever steps may be necessary to obtain any governmental approval in connection with or otherwise qualify the issuance of the securities that are the subject of this Agreement.  Purchaser agrees that, at the request of the Company at any time, Purchaser shall execute and deliver any applicable securityholders' agreement, investor rights agreement, voting agreement, drag along agreement, right of first refusal and co-sale agreement or similar agreement (or a joinder to any existing agreement) that the Company and/or the holders of its securities may enter into or that otherwise that may be in effect from time to time (and which may contain, among other provisions, additional restrictions on transfer and/or rights of repurchase in favor of the Company).

**(g)     Independent Counsel**.  Purchaser acknowledges that this Agreement has been prepared on behalf of the Company by Cooley LLP, counsel to the Company and that Cooley LLP does not represent, and is not acting on behalf of, Purchaser in any capacity.  Purchaser has been provided with an opportunity to consult with his, her or its own counsel with respect to this Agreement.

**(h)     Entire Agreement; Amendment**.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes and merges all prior agreements or understandings, whether written or oral, with respect to the subject matter hereof.  This Agreement may not be amended, modified or revoked, in whole or in part, except by an agreement in writing signed by each of the parties hereto.

**(i)     Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision will be excluded from this Agreement, (ii) the balance of the Agreement will be interpreted as if such provision were so excluded and (iii) the balance of the Agreement will be enforceable in accordance with its terms.

**(j)     Counterparts**.  This Agreement (including any schedules and/or exhibits hereto or thereto) may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[End of Exhibit A to Common Stock Purchase Agreement]*

 **HELLOSIGN**

Audit trail

| | |
|---|---|
| **TITLE** | Stability share transfer agreement |
| **FILE NAME** | Stability AI, Inc... Cyrus Hodes.DOCX |
| **DOCUMENT ID** | 59c5b5d88f4f7c562d73e7f37e0328fb4570e69b |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document history

**SENT**
**10 / 07 / 2021**
18:26:43 UTC

Sent for signature to Emad Mostaque (emad@stability.ai) and Cyrus Hodes (cyrus@hodes.ai) from emad@stability.ai
IP: 95.144.138.172

**VIEWED**
**10 / 07 / 2021**
18:27:39 UTC

Viewed by Emad Mostaque (emad@stability.ai)
IP: 95.144.138.172

**SIGNED**
**10 / 07 / 2021**
18:27:55 UTC

Signed by Emad Mostaque (emad@stability.ai)
IP: 95.144.138.172

**VIEWED**
**10 / 07 / 2021**
18:30:45 UTC

Viewed by Cyrus Hodes (cyrus@hodes.ai)
IP: 193.36.224.183

**SIGNED**
**10 / 07 / 2021**
18:31:37 UTC

Signed by Cyrus Hodes (cyrus@hodes.ai)
IP: 193.36.224.183

**COMPLETED**
**10 / 07 / 2021**
18:31:37 UTC

The document has been completed.

EXHIBIT D

**STABILITY AI, INC.**

**COMMON STOCK PURCHASE AGREEMENT**

**This Common Stock Purchase Agreement** (the "*Agreement*") is made as of May 21st 2022 by and between **Cyrus Hodes** (the "*Seller*) and **Emad Mostaque** ("*Purchaser*").  Certain capitalized terms used below are defined in the terms and conditions set forth in **Exhibit A** attached to this Agreement, which are incorporated by reference.

| | |
|---|---|
| **Total shares of Stock purchased:** | 200,000 shares of Common Stock of the Company (the "***Stock***") |
| **Purchase Price per share:** | $0.0001 |
| **Total Purchase Price:** | $20.00 |
| **Form of Payment:** | Cash: $20.00 |

*[Remainder of page intentionally left blank]*

Doc ID: 82fa4d14b5588f114ddc2edc1cf228bad98770f3

**Additional Terms/Acknowledgements:** The undersigned Purchaser acknowledges receipt of, and understands and agrees to, this Common Stock Purchase Agreement, including the terms and conditions set forth in **Exhibit A** attached to this Agreement, which are incorporated by reference.

**SELLER:**

**Cyrus Hodes**

By:        *Cyrus Hodes*
_____

        Name:   Cyrus Hodes

E-mail:    cyrus@hodes.ai
_____

Address:   17156 Bermuda Village Drive
           Boca Raton, FL 33487
           USA
_____

**PURCHASER:**

**Emad Mostaque**

*Emad Mostaque*
_____
              (Signature)

E-mail:    emad@stability.ai
_____

Address:   Tarmac Building, 20 Rede Place
           London, W2 4TU, UK

**EXHIBIT A**

**TERMS AND CONDITIONS INCORPORATED INTO
COMMON STOCK PURCHASE AGREEMENT**

**1.      Purchase and Sale of Stock**.  Purchaser agrees to purchase from the Company, and the Company agrees to sell to Purchaser, the number of shares of Stock for the consideration set forth in the cover page to this Agreement.  The closing of the transactions contemplated by this Agreement, including payment for and delivery of the Stock, will occur at the offices of the Company immediately following the execution of this Agreement, or at such other time and place as the parties may mutually agree.

**2.      Investment Representations**.  In connection with the purchase of the Stock, Purchaser represents to the Company the following:

        **(a)**      Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Stock.  Purchaser is purchasing the Stock for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "*Act*").

        **(b)**      Purchaser understands that the Stock has not been registered under the Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed in this Agreement.

        **(c)**      Purchaser further acknowledges and understands that the Stock must be held indefinitely unless the Stock is subsequently registered under the Act or an exemption from such registration is available.  Purchaser further acknowledges and understands that the Company is under no obligation to register the Stock.  Purchaser understands that the certificate evidencing the Stock will be imprinted with a legend that prohibits the transfer of the Stock unless the Stock is registered or such registration is not required in the opinion of counsel for the Company.

        **(d)**      Purchaser is familiar with the provisions of Rule 144 under the Act as in effect from time to time, that, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of such securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.

        **(e)**      Purchaser further understands that at the time Purchaser wishes to sell the Stock there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, Purchaser may be precluded from selling the Stock under Rule 144 even if the minimum holding period requirement had been satisfied.

        **(f)**      Purchaser further warrants and represents that Purchaser has either (i) preexisting personal or business relationships, with the Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect Purchaser's own interests in connection with the purchase of the Stock by virtue of the business or financial expertise of Purchaser or of professional advisors to Purchaser who are unaffiliated with and who are not compensated by the Company or any of its affiliates, directly or indirectly.

        **(g)**      Purchaser acknowledges that Purchaser has read all tax related sections and further acknowledges Purchaser has had an opportunity to consult Purchaser's own tax, legal and financial advisors regarding the purchase of common stock under this Agreement.

Doc ID: 82fa4d14b5588f114ddc2edc1cf228bad98770f3

**(h)**      Purchaser acknowledges and agrees that in making the decision to purchase the common stock under this Agreement, Purchaser has not relied on any statement, whether written or oral, regarding the subject matter of this Agreement, except as expressly provided in this Agreement and in the attachments and exhibits to this Agreement.

**(i)**      If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), the Purchaser has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Stock or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Stock, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Stock. The Purchaser's subscription and payment for and continued beneficial ownership of the Stock will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

**3.**      **Restrictive Legends**. All certificates representing the Stock will have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties to this Agreement):

**(a)**      "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED."

**(b)**      "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE CORPORATION AND/OR ITS ASSIGNEE(S) AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

**(c)**      "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A TRANSFER RESTRICTION, AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

**(d)**      "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN OBLIGATIONS WITH RESPECT TO FUTURE SECURITYHOLDERS' AGREEMENTS SET FORTH IN AN AGREEMENT BETWEEN THE CORPORATION AND THE REGISTERED HOLDER, OR SUCH HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION."

**(e)**      Any legend required by applicable blue sky laws.

**4.**      **Market Stand-Off Agreement**.  Purchaser will not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale of, any Common Stock or other securities of the Company held by Purchaser (other than those included in the registration), including the Stock (the "*Restricted Securities*"), during the 180-day period following the effective date of the Company's first firm commitment underwritten public offering of its Common Stock (or such longer period as the underwriters or the Company will request in order to facilitate compliance with applicable FINRA rules).  Purchaser agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the managing underwriters that are consistent with the foregoing or that are necessary to give further effect to the foregoing provision.  In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect

Doc ID: 82fa4d1b5588f114ddc2edc1cf228bad98770f3

to Purchaser's Restricted Securities until the end of such period.  The underwriters of the Company's stock are intended third party beneficiaries of this Section 4 and have the right, power and authority to enforce the provisions hereof as though they were a party to this Agreement.  The obligations contained in this Section 4 shall also, if so determined by the Company's Board of Directors, apply in the Company's initial listing of its Common Stock on a national securities exchange by means of a registration statement on Form S-1 under the Act (or any successor registration form under the Act subsequently adopted by the Securities and Exchange Commission) filed by the Company with the Securities and Exchange Commission that registers shares of existing capital stock of the Company for resale (a "**_Direct Listing_**"), provided that all holders of at least 5% of the Company's outstanding Common Stock (after giving effect to the conversion into Common Stock of any outstanding Preferred Stock) are subject to substantially similar obligations with respect to such Direct Listing.

5.     **Miscellaneous**.

(a)     **Waiver of Information Rights**.  Purchaser hereby acknowledges and agrees that, except for such information as required to be delivered to Purchaser by the Company pursuant to any other agreement by and between the Company and Purchaser, Purchaser has no right to receive any information from the Company by virtue of such Purchaser's purchase of the Stock, ownership of the Stock, or as a result of Purchaser being a holder of record of stock of the Company.  Without limiting the foregoing, to the fullest extent permitted by law, Purchaser hereby waives Purchaser's inspection rights under Section 220 of the Delaware General Corporation Law and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company, the Company's capital stock or the Stock (the "**_Inspection Rights_**").  Purchaser hereby covenants and agrees never to directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights.

(b)     **Notices**.  All notices required or permitted hereunder will be in writing and will be deemed effectively given: (i) upon personal delivery to the party to be notified; (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not sent during normal business hours of the recipient, then on the next business day; (iii) five calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications will be sent to the other party to this Agreement at such party's address hereinafter set forth on the signature page hereof, or at such other address as such party may designate by 10 days' advance written notice to the other party hereto.

(c)     **Successors and Assigns**.  This Agreement will inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, be binding upon Purchaser, Purchaser's successors, and assigns.

(d)     **Attorneys' Fees**.  The prevailing party in any suit or action hereunder will be entitled to recover from the losing party all costs incurred by it in enforcing the performance of, or protecting its rights under, any part of this Agreement, including reasonable costs of investigation and attorneys' fees.

(e)     **Governing Law; Venue**.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware.  The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement will be brought in, and each party agrees to, and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing the Company's principal place of business.

(f)     **Further Execution**.  The parties agree to take all such further actions as may reasonably be necessary to carry out and consummate this Agreement as soon as practicable, and to take whatever steps may be necessary to obtain any governmental approval in connection with or otherwise qualify the issuance of the securities that are the subject of this Agreement.  Purchaser agrees that, at the request of the Company at any time, Purchaser shall execute and deliver any applicable securityholders' agreement, investor rights agreement, voting agreement, drag along agreement, right of first refusal and co-sale agreement or similar agreement (or a joinder to any existing agreement) that the Company and/or the holders of its securities may enter into or that otherwise that may be in effect from time to time (and which may contain, among other provisions, additional restrictions on transfer and/or rights of repurchase in favor of the Company).

(g)     **Independent Counsel**.  Purchaser acknowledges that this Agreement has been prepared on behalf of the Company by Cooley LLP, counsel to the Company and that Cooley LLP does not represent, and is not acting on behalf of, Purchaser in any capacity.  Purchaser has been provided with an opportunity to consult with his, her or its own counsel with respect to this Agreement.

(h)     **Entire Agreement; Amendment**.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes and merges all prior agreements or understandings, whether written or oral, with respect to the subject matter hereof.  This Agreement may not be amended, modified or revoked, in whole or in part, except by an agreement in writing signed by each of the parties hereto.

(i)     **Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision will be excluded from this Agreement, (ii) the balance of the Agreement will be interpreted as if such provision were so excluded and (iii) the balance of the Agreement will be enforceable in accordance with its terms.

(j)     **Counterparts**.  This Agreement (including any schedules and/or exhibits hereto or thereto) may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[End of Exhibit A to Common Stock Purchase Agreement]*

Doc ID: 82fa4d14b5588f114ddc2edc1cf228bad98770f3

Doc ID: 82fa4d14b5588f114ddc2edc1cf228bad98770f3

Assignment Agreement
Cyrus Hodes
Signature Page

Doc ID: 82fa4d14b5588f114ddc2edc1cf228bad98770f3

 **HELLOSIGN**

Audit trail

| | |
|---|---|
| **TITLE** | Stability AI Reconciliation |
| **FILE NAME** | Stability AI, Inc...odes balance.docx |
| **DOCUMENT ID** | 82fa4d14b5588f114ddc2edc1cf228bad98770f3 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

## Document history

**SENT**
**05 / 21 / 2022**
11:19:48 UTC
Sent for signature to Emad Mostaque (emad@stability.ai) and Cyrus Hodes (cyrus@hodes.ai) from emad@stability.ai
IP: 85.255.232.159

**VIEWED**
**05 / 21 / 2022**
11:19:53 UTC
Viewed by Emad Mostaque (emad@stability.ai)
IP: 85.255.232.159

**SIGNED**
**05 / 21 / 2022**
11:20:05 UTC
Signed by Emad Mostaque (emad@stability.ai)
IP: 85.255.232.159

**VIEWED**
**05 / 21 / 2022**
11:57:06 UTC
Viewed by Cyrus Hodes (cyrus@hodes.ai)
IP: 136.144.19.177

**SIGNED**
**05 / 21 / 2022**
11:57:28 UTC
Signed by Cyrus Hodes (cyrus@hodes.ai)
IP: 136.144.19.177

**COMPLETED**
**05 / 21 / 2022**
11:57:28 UTC
The document has been completed.

EXHIBIT E



1(212) 318-6920
aviweitzman@paulhastings.com

December 27, 2022

**VIA OVERNIGHT DELIVERY AND E-MAIL**

**CONFIDENTIAL SETTLEMENT DISCUSSIONS
PROTECTED PURSUANT TO RULE 408**

Mr. James O'Shaughnessy
Executive Chair, Board of Directors
Stability AI, Inc.
874 Walker Road, Suite C
Dover, DE 19904
jim.oshaughnessy@osam.com

Mr. Mohammad Emad Mostaque
Stability AI, Inc.
874 Walker Road, Suite C
Dover, DE 19904
emad@stability.ai

Re:     Demand Letter and Preservation Notice on behalf of Cyrus Hodes

Dear Sirs:

We serve as litigation counsel to Mr. Cyrus Hodes, and write to advise you that he is prepared to commence litigation against Stability AI, Inc. ("Stability AI" or the "Company") and Mr. Mostaque to seek redress for the fraudulent purchase of Mr. Hodes's shares in the Company for a price grossly below market value.  More specifically, in inducing Mr. Hodes to sell his 15% interest in Stability AI (1 million shares) for a mere $100.00 shortly before Stability AI sold a 10% interest in the Company for $101 million, Stability AI and Mr. Mostaque intentionally or recklessly made material misrepresentations and omissions that violated federal and state securities laws, breached fiduciary duties owed to Mr. Hodes, and unjustly enriched themselves and others at the expense of Mr. Hodes.  Mr. Hodes believes that it would be most efficient to resolve this matter privately through a confidential settlement, but reserves all rights to pursue litigation should it be necessary.[1]

---

[1] The recitation of facts in this letter is not intended to be a complete summary of all relevant facts supporting Mr. Hodes's claims.  Among other things, in hope of resolving this dispute, we refrain



Messrs. O'Shaughnessy and Mostaque
Page 2

As you know, Mr. Hodes is a world renown expert in artificial intelligence ("AI") technology, and the co-founder of the AI Initiative of The Future Society, a think and do tank incubated at the Harvard John F. Kennedy School of Government, where he led global governance of AI projects. He also served as an Advisor to the UAE Minister of Artificial Intelligence, where he convened the Global Governance of AI Roundtable at the World Government Summit. In that capacity, Mr. Hodes came to know Mr. Mostaque, and thereafter, in about October 2020, they co-founded Stability AI. In his role as co-founder, Mr. Hodes managed operational, financial, and strategic initiatives for the Company, including, but not limited to, developing and executing funding plans, spearheading networking and collaboration efforts, and developing talent management and business development processes for the Company. As a co-founder of Stability AI, Mr. Hodes was issued 1 million shares of common stock for a total price of $100.00, reflecting a 15% ownership interest in the Company.

Mr. Hodes was responsible for achieving numerous key milestones in the development of Stability AI. For example, Mr. Hodes was responsible for obtaining necessary funding for Stability AI and securing the contracts for Stability AI's two flagship projects with the Stanford Institute for Human-Centered Artificial Intelligence and The Trinity Challenge. Mr. Hodes also authored and coordinated the publication of articles promoting Stability AI in *The Wall Street Journal* and the influential AI policy blog for the Organisation for Economic Co-Operation and Development. Mr. Hodes leveraged his expansive network to create a platform to present Stability AI to government officials in the United Arab Emirates, the Kingdom of Saudi Arabia, and the United States, as well as to other leaders in the technology and AI industries. Mr. Hodes's involvement as a co-founder of Stability AI was critical to the Company's growth and present success in developing AI technology.

Over time, Mr. Hodes grew worried about Mr. Mostaque's performance (or lack thereof) at the Company. More specifically, Mr. Mostaque repeatedly failed to comply with deadlines and satisfy project objectives, which tarnished not only the Company's reputation, but also Mr. Hodes's hard-earned international reputation as a leading expert in AI. Mr. Hodes raised concerns regarding these setbacks and failures to achieve project goals to Mr. Mostaque. As a result, on or about July 19, 2021, Mr. Hodes provided email notice of his intention to end his consulting arrangement with the Company. He subsequently sold to Mr. Mostaque 800,000 shares of Stability AI on October 4, 2021 in exchange for $80.00, and another 200,000 shares on May 21, 2022 in exchange for $20.00. These transactions were executed pursuant to two stock purchase agreements with Mr. Mostaque.

---

at this time from detailing the litany of misstatements and prior wrongful conduct that Mr. Mostaque engaged in at Stability AI and other business ventures.



Messrs. O'Shaughnessy and Mostaque
Page 3

It is now apparent that, in advance of and during the period that Mr. Hodes sold his shares of the Company, Mr. Mostaque and Stability AI deceived Mr. Hodes and intentionally or recklessly misled him and omitted to inform him about material information regarding the Company, including, but not limited to, information regarding the strategy for the Company, the status of the development of AI technology projects, and short- and long-term objectives and financial projections and developments for Stability AI.  For example, Mr. Mostaque and Stability AI failed to disclose, as required, that the Company had pivoted its focus and resources to use open-source AI to develop image-generating models for consumer and enterprise use cases globally.  Indeed, in August 2022, just a few months after the purchase of Mr. Hodes's shares, the Company publicly launched Stable Diffusion, its open-source text-to-image generator.  Clearly that project began well before the sale of Mr. Hodes's shares in Stability AI to Mr. Mostaque, but the project never was disclosed to Mr. Hodes, despite his status as a co-founder and large minority shareholder of the Company.  And the September 7, 2022 issue of Forbes Magazine reported that Stability AI was in discussion to raise venture capital funds at a $1 billion valuation; in fact, $101 million of fundraising for Stability AI was secured from venture capital firms in October 2022 in exchange for approximately 10% of the Company's shares.  Again, at no point in time prior to the sale of Mr. Hodes's shares did Stability AI or Mr. Mostaque disclose an intention to negotiate additional fundraising with venture capital firms, despite how material that information would have been to Mr. Hodes's decision to sell Stability AI stock.  These are just some of the numerous material misrepresentations and omissions that Mr. Mostaque and Stability AI made prior to Mr. Hodes's sale of stock for a mere $100.00, when in truth and in reality, those same shares were valued at $150 million around the same time as the sale of stock.  The fact that Mr. Hodes agreed to sell $150 million worth of stock to Mr. Mostaque for a mere $100 shocks the conscience, and on its own proves that Mr. Hodes was misled about Stability AI's business, prospects, and value.

It appears, based on these and other facts, that Stability AI and Mr. Mostaque engaged in securities fraud in violation of both federal law (Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5) and Delaware law, and in common law fraud and negligent misrepresentation.[2]  In addition, Mr. Mostaque, the controlling shareholder of Stability AI, clearly owed fiduciary duties to Mr. Hodes, its minority shareholder.  *See, e.g.*, *Blaustein v. Lord Balt. Capital Corp.*, 2013 WL 1810956, at *16 (Del. Ch. Apr. 30, 2013) (under Delaware law, "the fiduciary duties that a controlling stockholder owes to minority stockholders are those duties that the directors of a publicly-held corporation owe to all shareholders generally").  Mr. Mostaque breached the fiduciary duties he owed to Mr. Hodes when he misled Mr. Hodes about Stability AI

---

[2] *See Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 538 F.2d 532, 537 (3d. Cir. 1976) (Section 10b-5 claim may be asserted for failure to disclose material information in connection with a repurchase of securities in a privately-held company); *see also Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 814–15 (Del. Ch. 2014) (elements of securities fraud claim under Delaware law).



Messrs. O'Shaughnessy and Mostaque
Page 4

in order to induce Mr. Hodes to sell his shares of the Company.[3]  In addition, as a result of this wrongful course of conduct, Stability AI, Mr. Mostaque, and others have been unjustly enriched at Mr. Hodes's expense.

Mr. Hodes is well within his rights to seek rescission as a remedy for this wrongful conduct.  *See e.g.*, *Strassburger v. Earley*, 752 A.2d 557, 578 (Del. Ch. 2000) (providing for rescission remedy to restore parties to the position they occupied before the challenged transaction); *Craft v. Bariglio*, 1984 WL 8207, at *8, *12 (Del. Ch. Mar. 1, 1984) (rescission remedy warranted to redress fraudulent misrepresentations); *Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 499–500 (Del. 1982) (rescission appropriate as remedy for breach of fiduciary duty).  In the alternative, Mr. Hodes is entitled to substantial damages, which at a minimum is the value of the shares fraudulently purchased from Mr. Hodes in 2021, which we believe to be in excess of $150 million based on the last venture capital funding round.  *See Strassburger*, 752 A.2d at 579–81.

Mr. Hodes is willing to resolve this dispute privately.  Please have legal counsel for Stability AI and Mr. Mostaque reach out to me no later close of business on January 6, 2023 to advise whether they are willing to engage in pre-litigation settlement discussions.  While Mr. Hodes prefers to resolve this matter swiftly without commencement of litigation, if no agreement is reached, Mr. Hodes intends to file a lawsuit to seek all appropriate recourse in a court of law.

* * *

Because litigation against Stability AI and Mr. Mostaque may be imminent, we hereby demand that Stability AI and Mr. Mostaque, as well as its officers, directors and investors, **preserve and not destroy**, and suspend any automatic deletion or records management procedures affecting, all documents and information, whether in hardcopy or electronic or other format (including all notes, e-mails, phone logs, calendars, office applications, text messages, WhatsApp, ephemeral messaging, instant message, chat and collaboration applications, including associated metadata), beginning January 1, 2020 concerning Stability AI, including all documents and communications regarding: (1) Mr. Mostaque's and Mr. Hodes's roles at and contributions to Stability AI; (2) Stability AI's business model and plans, board of directors, corporate leadership structure, capital structure, and financial condition; (3) Mr. Hodes (including in both business and personal communications); (4) the valuation of the Company or its products and offerings, including both

---

[3] *See Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998) ("Delaware law [] protects shareholders who receive false communications from directors even in the absence of a request for shareholder action. *When the directors are not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty.*  That violation may result in . . . a cause of action for damages. There may also be a basis for equitable relief to remedy the violation.") (emphasis added).



Messrs. O'Shaughnessy and Mostaque
Page 5

communications with any Stability AI director or prospective director, employee, and with or about banks, venture capital firms, and strategic advisors or investment bankers; (5) the conceptualization, training, and development of AI models; (6) the right of first refusal of Stability AI to repurchase its shares; (7) the capital structure of the Company, as well as the stock registers and records reflecting the purchase of Mr. Hodes's shares in October 2021 and May 2022; and (8) the payment for and purchase of shares from Mr. Hodes.

All rights, in law and equity, are hereby expressly reserved.

We appreciate your attention to this important matter.

Sincerely,

Avi Weitzman
of PAUL HASTINGS LLP

cc:     Peter Schwartz, Esq.
        Navi Dhillon, Esq.

EXHIBIT F

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP



January 18, 2023

Avi Weitzman
Paul Hastings LLP
200 Park Avenue
New York, New York 10166

Re:  Cyrus Hodes

Dear Mr. Weitzman:

We represent Stability AI, Inc. ("Stability AI") and Mohammed Emad Mostaque and write in response to your letter dated December 27, 2022 on behalf of Mr. Cyrus Hodes.  We are not moved by the allegations you make, nor the paucity of support you provide for them.

Mr. Hodes clearly suffers from seller's remorse.  Mr. Hodes claims he is entitled to the return of his Stability AI shares because Stability AI and Mr. Mostaque were obligated to disclose that Stability AI was considering pivoting its business to focus on using artificial intelligence to make images and art, after two public health projects that Mr. Hodes was working on failed.  There was no such obligation as a matter of law.  Moreover, in the wake of such failure, the record is clear that in an effort to protect his reputation, Mr. Hodes demanded that Mr. Mostaque fashion a solution that would allow Mr. Hodes to exit Stability AI completely so that he may avoid being associated with a failed start-up company.  As a result, the company offered to repurchase his shares for $100 (his original purchase price).  That Mr. Hodes expediently prioritized his reputation over choosing to work alongside Mr. Mostaque towards an uncertain outcome is not a basis for a securities fraud claim.

As you know, Mr. Hodes was a consultant to Stability AI under a written Consulting Agreement, dated October 2020 (the "Consulting Agreement"), and retained to work on the Collective and Augmented Intelligence Against COVID-19 ("CAIAC") and Trinity Challenge projects.  In connection with the Consulting Agreement, Stability AI sold Mr. Hodes 1,000,000 shares for the nominal purchase price of $100.  By July 2021, however, the CAIAC and Trinity Challenge projects had failed and Stability AI was functionally insolvent.  Mr. Hodes, of his own volition, thereupon demanded a full exit, including that his Consulting Agreement be terminated; that Stability AI repurchase his shares at their initial cost; and, emphasizing his reputational concerns, further demanded that *Stability AI not utilize Mr. Hodes' name or credentials* going forward.  No one at Stability AI asked Mr. Hodes to sell his shares, let alone "induced" him to do so, as your letter insinuates.  Mr. Mostaque even urged Mr. Hodes to at least retain some shares in the event Stability AI was ultimately successful.  In the face of Mr. Hodes' insistence, Stability AI complied with his requests, and thereafter repurchased his shares at their original cost of $100.  Mr. Hodes simply wanted "out."  Today, Mr. Hodes is no longer a Stability AI shareholder, and he is entitled to nothing more for his shares.

Turning to the legal infirmities of Mr. Hodes' position, your letter asserts that Stability AI and Mr. Mostaque had some unspecified obligation in October 2021 (or even as late as May 2022, when Mr. Mostaque had already disclosed the open source machine learning model to Mr. Hodes) to disclose that Stability AI might pursue a new and entirely different business opportunity, and to somehow foresee that the opportunity will ultimately turn into a success. As you well know, it is black letter law that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Nor is there any obligation for a private company to disclose its internal research and development efforts. *See, e.g.*, *Friedman v. Endo Int'l PLC*, No. 16-CV-3912 (JMF), 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018) ("It is . . . well established that a company has no such duty to disclose changes to its business plans"). Your letter identifies no independent disclosure obligation, because there was none.[1] Accordingly, neither Stability AI nor Mr. Mostaque was under any affirmative duty to disclose any material facts regarding Stability AI's business.[2]

Even assuming Stability AI or Mr. Mostaque had any disclosure obligation (and they did not), there was also nothing for Stability AI or Mr. Mostaque to disclose in the wake of Stability AI's CAIAC and Trinity Challenge failures. At that time, Stability AI was indisputably insolvent, and the potential to create a generative AI was no more than a highly theoretical concept in July 2021. Stability AI's generative imaging technology remained a theoretical concept as late as May 2022, prior to Stable Diffusion's training, when Mr. Hodes sold the balance of his shares back to Stability AI. A corporation has no general duty to disclose internal research and development programs, especially when they remain in a nascent stage. *See Weston Fam. P'ship LLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) ("[C]ompanies do not have an obligation to offer an instantaneous update of every internal development, especially when it involves the oft-tortuous path of product development").[3]

---

[1] Mr. Hodes actually *waived* any affirmative information rights when he acquired his shares pursuant to the Common Stock Purchase Agreement, dated October 2020:

> Purchaser hereby acknowledges and agrees that, except for such information as required to be delivered to Purchaser by the Company pursuant to any other agreement by and between the Company and Purchaser, *Purchaser has no right to receive any information from the Company by virtue of such Purchaser's purchase of the Stock, ownership of the Stock, or as a result of Purchaser being a holder of record of stock of the Company*.

10/2022 SPA, ¶ 5 (a) (emphasis added).

[2] The stock purchase agreements pursuant to which Mr. Hodes sold his shares do not contain any representations or warranties about Stability AI's business fundamentals.

[3] Mr. Hodes also has had nothing to do with Stability AI's recent success in developing generative imaging technology. That business was developed after Mr. Hodes parted ways with Stability AI. Nonetheless, your letter goes to great lengths to tout Mr. Hodes' credentials in artificial intelligence and falsely asserts that Mr. Hodes' involvement was "critical to the Company's growth and present success in developing AI technology." The business that Mr. Hodes unsuccessfully sought to develop with Stability AI solely related to the CAIAC and Trinity Challenge projects. The technology from those failed projects has nothing to do with the generative imaging technology that Stability AI subsequently developed.

Mr. Hodes' securities fraud claims fail for additional reasons.  First, as Mr. Hodes demanded to sell his Stability AI shares back at cost based solely on his own reputational concerns, he will be unable to establish reliance or loss causation in connection with any securities fraud claim.  Mr. Mostaque's recommendation that Mr. Hodes not to sell all of his Stability AI shares also undercuts any inference of scienter.  Accordingly, Mr. Hodes cannot establish *any* of the mandatory elements of a fraud claim.  That Mr. Hodes now believes that Stability AI should have predicted its ultimate success back in July 2021—the depth of its failures—is little more than an attempt to argue fraud by hindsight, which the courts have flatly rejected.  *See Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) ("The Second Circuit has firmly rejected this 'fraud by hindsight' approach.").[4]

Should your client nonetheless choose to pursue these frivolous claims, Stability AI and Mr. Mostaque will defend against them vigorously and seek sanctions in the amount of any attorneys' fees and expenses they are required to incur.  *See* Fed. R. Civ. P. 11(b) & (c).

All of Stability AI and Mr. Mostaque's rights, defenses, claims, and remedies are expressly preserved and not waived.

Very truly yours,

Michael C. Keats

---

[4] To the extent Mr. Hodes alleges breach of fiduciary duty and unjust enrichment, those claims fail for the additional reason that Mr. Hodes no longer has standing to bring such claims because he sold his shares.  *See Urdan v. WR Cap. Partners, LLC*, No. CV 2018-0343-JTL, 2019 WL 3891720, at *7 (Del. Ch. Aug. 19, 2019) ("[T]he right to maintain a direct [or derivative] claim for breach of fiduciary duty is a property right associated with the shares that passes to the buyer in a sale, such that by selling their shares, the plaintiffs divested their right to assert both types of claims."), *aff'd*, 244 A.3d 668 (Del. 2020).

EXHIBIT G

1

Mark A. Lemley (State Bar No. 155830)

2

**LEX LUMINA PLLC**
745 Fifth Avenue, Suite 500

3

New York, NY 10151
Telephone: (646) 898-2055

4

Facsimile: (646) 906-8657
Email: mlemley@lex-lumina.com

5

6

Nicole M. Jantzi (*pro hac vice*)
Paul M. Schoenhard (*pro hac vice*)

7

**FRIED, FRANK, HARRIS, SHRIVER**
   **& JACOBSON LLP**

8

801 17th Street NW
Washington, DC 20006

9

Telephone: (202) 639-7254
Email: nicole.jantzi@friedfrank.com

10

       paul.schoenhard@friedfrank.com

11

(Additional counsel on signature page)

12

***Counsel for Defendant Stability AI, Inc. and Stability AI Ltd.***

13

14

**UNITED STATES DISTRICT COURT**

15

**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

16

17

SARAH ANDERSEN, an individual;
KELLY MCKERNAN, an individual;

18

KARLA ORTIZ, an individual,

19

     Individual and Representative Plaintiffs,

20

     v.

21

STABILITY AI, LTD., a UK corporation;

22

STABILITY AI, INC., a Delaware
corporation;

23

MIDJOURNEY, INC., a Delaware
corporation;

24

DEVIANTART, INC., a Delaware

25

corporation,

26

     Defendants.

27

28

CASE NO. 3:23-cv-00201-WHO

**DEFENDANTS STABILITY AI, LTD AND
STABILITY AI, INC.'S AMENDED
NOTICE OF MOTION, MOTION TO
DISMISS, AND MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS**

Date:     July 19, 2023
Time:    2:00 p.m.
Place:    Courtroom 2 - 17th Floor
Before:   Hon. William H. Orrick

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

      **PLEASE TAKE NOTICE** that on July 19, 2023, at 2:00 p.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, Courtroom 2, 17th Floor, located at 450 Golden Gate Ave., San Francisco, CA 94102, Defendants Stability AI Ltd. and Stability AI, Inc., through their undersigned counsel, will, and hereby do, move to dismiss Plaintiffs' Class Action Complaint ("Compl." or "Complaint") pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6).

      Stability AI Ltd. and Stability AI Inc.'s Motion to Dismiss ("Motion") is based on this Notice, the supporting Memorandum of Points and Authorities, Request for Judicial Notice, Declaration of Paul M. Schoenhard and exhibits thereto, the complete files and records in this action, and any additional material and arguments as may be considered in connection with the hearing on the Motion.

**ISSUES TO BE DECIDED:**

1. Whether Plaintiffs' claims of direct and vicarious copyright infringement (Counts I and II) should be dismissed for any works that do not comply with 17 U.S.C. § 411(a);

2. Whether Plaintiffs' claim of direct copyright infringement (Count I) should be dismissed to the extent that it is based on output images for failure to identify the allegedly infringing works and for lack of substantial similarity;

3. Whether Plaintiffs' claim of vicarious copyright infringement (Count II) should be dismissed for failure to identify an act of direct infringement or plead any elements of the claim;

4. Whether Plaintiffs' Digital Millennium Copyright Act claim (Count III) should be dismissed for failure to plead facts to satisfy the elements of the claim;

5. Whether Plaintiffs' statutory and common-law right of publicity claims (Counts IV and V) should be dismissed because they are preempted by Section 301(a) of the Copyright Act and otherwise fail to state a claim upon which relief can be granted;

6. Whether Plaintiffs' unfair competition claim (Count VI) should be dismissed because it is preempted by federal copyright law; and

1    7.    Whether Plaintiffs' declaratory relief claim (Count VII) is improper and should be dismissed

2          in its entirety because it is duplicative or otherwise be dismissed to the extent Plaintiffs have

3          failed to state the underlying claims.

4    **RELIEF SOUGHT**:  Stability AI Ltd. and Stability AI, Inc. seek an order dismissing all claims

5    against them under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

6    Dated: April 18, 2023                          Respectfully submitted,

7

8                                                   *s/ Paul M. Schoenhard*

9
                                                    Mark A. Lemley (State Bar No. 155830)
10                                                  **LEX LUMINA PLLC**
                                                    745 Fifth Avenue, Suite 500
11                                                  New York, NY 10151
                                                    Telephone: (646) 898-2055
12                                                  Facsimile: (646) 906-8657
                                                    Email: mlemley@lex-lumina.com
13

14                                                  Nicole M. Jantzi (*pro hac vice*)
                                                    Paul M. Schoenhard (*pro hac vice*)
15                                                  **FRIED, FRANK, HARRIS, SHRIVER
                                                        & JACOBSON LLP**
16                                                  801 17th Street NW
                                                    Washington, DC 20006
17                                                  Telephone: (202) 639-7254
                                                    Email: nicole.jantzi@friedfrank.com
18                                                          paul.schoenhard@friedfrank.com

19
                                                    Michael C. Keats (*pro hac vice*)
20                                                  Amir R. Ghavi (*pro hac vice*)
                                                    **FRIED, FRANK, HARRIS, SHRIVER
21                                                      & JACOBSON LLP**
                                                    One New York Plaza
22                                                  New York, NY 10004
                                                    Telephone: (212) 859-8000
23                                                  Email: michael.keats@friedfrank.com
                                                            amir.ghavi@friedfrank.com
24

25                                                  *Counsel for Defendants Stability AI, Inc.*
                                                    *and Stability AI Ltd.*
26

27

28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    PRELIMINARY STATEMENT

Defendant Stability AI Ltd.[1] ("Stability AI") is at the forefront of the burgeoning generative artificial intelligence ("AI") industry, rapidly expanding the boundaries of human creativity and capability while maintaining a commitment to make its technology available to all.  Stable Diffusion, meanwhile, is an open-source generative AI text-to-image model that has rapidly become a base model for developers and artists around the world.  Users of Stable Diffusion (and Stability AI's DreamStudio) can input prompts of their choosing to generate creative, entirely novel images.

To enable this functionality, Stable Diffusion was trained on **billions** of images that were publicly available on the Internet.  To be clear, training a model does not mean copying or memorizing images for later distribution.  Indeed, ***Stable Diffusion does not "store" any images***.  Rather, training involves development and refinement of millions of parameters that collectively define—in a learned sense—what things look like.  Lines, colors, shades, and other attributes associated with innumerable subjects and concepts.  The purpose of doing so is not to enable the models to reproduce copies of training images.  If someone wanted to engage in wholesale copying of images from the Internet, there are far easier methods to do so, including cutting and pasting an image and perhaps using tools like Photoshop to edit them.

Nor is Stable Diffusion a "collage tool."  Instead, Stable Diffusion enables users to create entirely new and unique images utilizing simple word prompts.  As the Complaint concedes, ***"none of the Stable Diffusion output images provided in response to a particular Text Prompt is likely to be a close match for any specific image in the training data."***  (Compl. ¶ 93.)

So if and when this Court is forced to address any of Plaintiffs' copyright claims involving Stable Diffusion on the merits, Stability AI is confident that only one conclusion can be reached: ***Stability AI enables creation; it is not a copyright infringer***.

---

[1]    Stability AI consents to personal jurisdiction in this District solely for purposes of this action and any others raising substantially similar claims arising under the Copyright Act, DMCA and/or Lanham Act. Stability AI's participation in this litigation should not be construed as consent to personal jurisdiction in this District for any other purpose or as a waiver of its right to contest personal jurisdiction in any other action.

EXHIBIT H

⚑ KeyCite Yellow Flag - Negative Treatment

Distinguished by   New Enterprise Associates 14, L.P. v. Rich,   Del.Ch.,
March 9, 2023

76 A.3d 296
Court of Chancery of Delaware.

In re WAYPORT, INC. LITIGATION.

Consol. C.A. No. 4167–VCL
|
Submitted: Jan. 31, 2013.
|
Decided: May 1, 2013.

**Synopsis**

**Background:** Shareholder, who was corporation's original
chief executive officer (CEO), brought action against buyer
of shares that he sold, corporation, and its general counsel,
and existing outside shareholder for breach of fiduciary duty,
and fraud, among other claims.

**Holdings:** The Court of Chancery, Laster, Vice Chancellor,
held that:

[1] corporation's efforts to monetize its patent portfolio were
not a special fact that buying shareholders were required to
disclose;

[2] existence of proposal under which potential buyer would
have obtained corporation's patent was not a special fact;

[3] patent sale agreement that called for corporation to receive
net proceeds of $7.6 million and increased its year-end cash
position by 22% was not a special fact;

[4] by stating that it was not aware of any bluebirds
of happiness in corporation's world, buying shareholder
assumed a duty to update its statement to selling
shareholder to the extent that subsequent events rendered its
representation materially misleading;

[5] selling shareholder was induced to sell by buying
shareholder's failure to correct bluebirds statement as required
to satisfy inducement, reliance, and causation elements of
fraud claim; and

[6] evidence was sufficient for scienter element of fraud
claim.

Judgment entered.

See also ⚑ 2009 WL 2246793.

West Headnotes (37)

**[1]** **Corporations and Business
Organizations** 🔑 Duty of care in general

**Corporations and Business
Organizations** 🔑 Loyalty

Directors of a Delaware corporation owe two
fiduciary duties: care and loyalty.

9 Cases that cite this headnote

**[2]** **Corporations and Business
Organizations** 🔑 Disclosure of information
to corporation and shareholders or members

Corporation director's duty of disclosure is not an
independent duty, but derives from the duties of
care and loyalty.

11 Cases that cite this headnote

**[3]** **Corporations and Business
Organizations** 🔑 Disclosure of information
to corporation and shareholders or members

Corporate board of directors' duty of disclosure
arises because of the application in a specific
context of the board's fiduciary duties.

4 Cases that cite this headnote

**[4]** **Corporations and Business
Organizations** 🔑 Disclosure of information
to corporation and shareholders or members

Scope and requirements of duty of disclosure
of corporation's board of directors depends on
context; the duty does not exist in a vacuum.

2 Cases that cite this headnote

**[5]**  Corporations and Business
Organizations 🔑 Disclosure of information
to corporation and shareholders or members

When confronting a disclosure claim against a
corporation, a court must engage in a contextual
specific analysis to determine the source of the
duty, its requirements, and any remedies for
breach.

5 Cases that cite this headnote

**[6]**  Corporations and Business
Organizations 🔑 Disclosure and ratification

If a director or officer has a personal interest
in a transaction that conflicts with the interests
of the corporation or its stockholders generally,
and if the board of directors asks stockholders
to ratify the transaction, then the directors have
a duty to disclose all facts that are material to
the stockholders' consideration of the transaction
and that are or can reasonably be obtained
through their position as directors. 8 West's
Del.C. § 144.

4 Cases that cite this headnote

**[7]**  Corporations and Business
Organizations 🔑 Disclosure and ratification

If a director or officer has a personal interest in a
transaction that conflicts with the interests of the
corporation or its stockholders generally, and if
the board of directors asks stockholders to ratify
the transaction, the failure to disclose material
information will eliminate any effect that a
favorable stockholder vote otherwise might have
for the validity of the transaction or for the
applicable standard of review. 8 West's Del.C. §
144.

2 Cases that cite this headnote

**[8]**  Corporations and Business
Organizations 🔑 Duties of directors and
officers in general;  business judgment rule

When directors submit to the stockholders a
transaction that requires stockholder approval,
such as a merger, sale of assets, or charter

amendment, or which requires a stockholder
investment decision, such as tendering shares
or making an appraisal election, but which
is not otherwise an interested transaction, the
directors have a duty to exercise reasonable care
to disclose all facts that are material to the
stockholders' consideration of the transaction or
matter and that are or can reasonably be obtained
through their position as directors.

8 Cases that cite this headnote

**[9]**  Corporations and Business
Organizations 🔑 Duties of directors and
officers in general;  business judgment rule

Injunction 🔑 Management of affairs or
business in general

A failure to disclose material information when
directors submit to the stockholders a transaction
that requires stockholder approval, such as a
merger, sale of assets, or charter amendment,
or which requires a stockholder investment
decision, such as tendering shares or making an
appraisal election, but which is not otherwise an
interested transaction, may warrant an injunction
against, or rescission of, the transaction, but
will not provide a basis for damages from
defendant directors absent proof of: (1) a
culpable state of mind or non-exculpated gross
negligence, (2) reliance by the stockholders on
the information that was not disclosed, and (3)
damages proximately caused by that failure.

12 Cases that cite this headnote

**[10]**  Corporations and Business
Organizations 🔑 Disclosure of information
to corporation and shareholders or members

When a corporate fiduciary speaks outside
of the context of soliciting or recommending
stockholder action, such as through public
statements made to the market, statements
informing shareholders about the affairs of
the corporation, or public filings required by
the federal securities laws, directors owe a
fiduciary duty to stockholders not to speak
falsely, to exercise due care, good faith,
and loyalty; it follows a fortiori that when

directors communicate publicly or directly with shareholders about corporate matters the sine qua non of directors' fiduciary duty to shareholders is honesty.

7 Cases that cite this headnote

**[11]    Corporations and Business Organizations** 🔑 Disclosure of information to corporation and shareholders or members

Directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances.

2 Cases that cite this headnote

**[12]    Corporations and Business Organizations** 🔑 Purchase or Sale of Stock to or from Director, Officer, or Agent

Under the special facts doctrine, a director has a fiduciary duty to disclose information in the context of a private stock sale only when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them.

5 Cases that cite this headnote

**[13]    Corporations and Business Organizations** 🔑 Purchase or Sale of Stock to or from Director, Officer, or Agent

Under the special facts doctrine, when a director is possessed of special knowledge of future plans or secret resources relating to private stock sale and deliberately misleads a stockholder who is ignorant of them, director has a duty to speak, and the director's failure to disclose material information is evaluated within the framework of common law fraud.

2 Cases that cite this headnote

**[14]    Corporations and Business Organizations** 🔑 Purchase or Sale of Stock to or from Director, Officer, or Agent

If special facts doctrine standard, under which a director has a fiduciary duty to disclose information in the context of a private stock sale when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them, is not met, then the director does not have a duty to speak and is liable only to the same degree as a non-fiduciary would be.

4 Cases that cite this headnote

**[15]    Corporations and Business Organizations** 🔑 Purchase or Sale of Stock to or from Director, Officer, or Agent

Under the special facts doctrine, a director has a duty of disclosure only in special circumstances where otherwise there would be a great and unfair inequality of bargaining position by the use of inside information.

**[16]    Corporations and Business Organizations** 🔑 Purchase or sale of stock

Under the special facts doctrine, shareholders were free to purchase shares from other stockholders, without any fiduciary duty to disclose information about the corporation or its prospects, unless the information related to an event of sufficient magnitude to constitute a special fact.

2 Cases that cite this headnote

**[17]    Corporations and Business Organizations** 🔑 Purchase or sale of stock

To satisfy the special facts requirement of the special fact doctrine, which imposes a duty on shareholders to speak if they know of a special fact, a plaintiff generally must point to knowledge of a substantial transaction, such as an offer for the whole company.

1 Case that cites this headnote

**[18]    Corporations and Business Organizations** 🔑 Purchase or sale of stock

Case 3:23-cv-03481-MMC   Document 54-1   Filed 10/16/23   Page 64 of 88

In re Wayport, Inc. Litigation, 76 A.3d 296 (2013)
38 Del. J. Corp. L. 1077

Corporation's efforts to monetize its patent portfolio were not special facts that buying shareholders were required to disclose in action by shareholder against buyer of shares, corporation, and its general counsel, and existing outside shareholder for breach of fiduciary duty, and fraud, among other claims, where selling shareholder discussed the corporation's plans and expressed his views about them to his fellow shareholders.

2 Cases that cite this headnote

**[19]** **Corporations and Business Organizations** 🔑 **Purchase or sale of stock**

The existence of preliminary negotiations regarding a transaction generally becomes material such that they must be disclosed under the special facts doctrine once the parties have agreed on the price and structure of the transaction.

1 Case that cites this headnote

**[20]** **Corporations and Business Organizations** 🔑 **Purchase or sale of stock**

Existence of proposal under which potential buyer would have obtained corporation's patent was not a special fact that buying shareholders were required to disclose in action by shareholder against buyer of shares, corporation, and its general counsel, and existing outside shareholder for breach of fiduciary duty, and fraud, among other claims, where potential buyer never accepted, there was never an agreement on price and structure, and the transaction was not otherwise sufficiently firm to be material.

**[21]** **Corporations and Business Organizations** 🔑 **Purchase or sale of stock**

Patent sale agreement that called for corporation to receive net proceeds of $7.6 million and increased its year-end cash position by 22% was not a special fact that buying shareholders were required to disclose in action by shareholder against buyer of shares, corporation, and its general counsel, and existing outside shareholder

for breach of fiduciary duty, and fraud, among other claims, although it was material, where sale did not substantially affect the value of the stock.

1 Case that cites this headnote

**[22]** **Corporations and Business Organizations** 🔑 **Fiduciary Duties as to Management of Corporate Affairs in General**

The fiduciary duties of officers are the same as those of directors.

7 Cases that cite this headnote

**[23]** **Corporations and Business Organizations** 🔑 **Purchase or sale of stock**

**Corporations and Business Organizations** 🔑 **Disclosure of information to corporation and shareholders or members**

Corporate officer's duty to speak as a transactional facilitator did not exceed that of fiduciaries who were actual participants in stock sale transaction and only had a duty to speak if they knew of a special fact.

**[24]** **Corporations and Business Organizations** 🔑 **Duty of corporation to shareholders**

Corporation did not owe fiduciary duty to its stockholders in stock sale transaction.

7 Cases that cite this headnote

**[25]** **Fraud** 🔑 **Elements of Actual Fraud**

To establish a claim for fraud, a plaintiff must prove (1) a false representation, (2) a defendant's knowledge or belief of its falsity or his reckless indifference to its truth, (3) a defendant's intention to induce action, (4) reasonable reliance, and (5) causally related damages.

18 Cases that cite this headnote

**[26]** **Fraud** 🔑 **Fraudulent Concealment**

In re Wayport, Inc. Litigation, 76 A.3d 296 (2013)
38 Del. J. Corp. L. 1077

Case 3:23-cv-03481-MMC   Document 54-1   Filed 10/16/23   Page 65 of 88

Fraud does not consist merely of overt misrepresentations; it may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.

4 Cases that cite this headnote

[27]   **Fraud** 🔑 **Duty to disclose facts**

The fact that a statement was true when it was made by a party to a business transaction does not enable the speaker to stand silent if the speaker subsequently learns of new information that renders the earlier statement materially misleading.

1 Case that cites this headnote

[28]   **Corporations and Business Organizations** 🔑 **Purchase or sale of stock**

By stating that it was not aware of any bluebirds of happiness in corporation's world, buying shareholder assumed a duty to update its statement to selling shareholder to the extent that subsequent events rendered its representation materially misleading, where corporation later entered patent sale agreement that called for corporation to receive net proceeds of $7.6 million and increased its year-end cash position by 22%.

[29]   **Corporations and Business Organizations** 🔑 **Purchase or sale of stock**

Buying shareholder's statement to other shareholder who was selling his shares, that it was not aware of any bluebirds of happiness in the corporation's world, became materially misleading, as required to support selling shareholder's fraud claim, when chief executive officer (CEO) informed the board via e-mail of patent sale that called for corporation to receive net proceeds of $7.6 million and increased its year-end cash position by 22%.

[30]   **Corporations and Business Organizations** 🔑 **Purchase or sale of stock**

Once corporation sold patents and was set to receive net proceeds of $7.6 million and thereby increase its year-end cash position by 22%, and shareholder learned of it, shareholder had a duty to notify selling shareholder that its prior e-mail stating that it was not aware of any bluebirds of happiness in corporation's world was no longer true.

[31]   **Fraud** 🔑 **Reliance on Representations and Inducement to Act**

To be liable for fraud, the party that was the recipient of the information must in fact have acted or not acted in justifiable reliance on the representation. Restatement of Torts § 548A.

3 Cases that cite this headnote

[32]   **Fraud** 🔑 **Injury and causation**

To be liable for fraud, the fraudulent misrepresentation must actually cause harm. Restatement of Torts § 548A.

3 Cases that cite this headnote

[33]   **Corporations and Business Organizations** 🔑 **Purchase or sale of stock**

Selling shareholder was induced to sell by buying shareholder's failure to correct statement that there were no bluebirds of happiness in corporation's world after corporation subsequently sold patents and was set to receive net proceeds of $7.6 million and thereby increase its year-end cash position by 22% as required to satisfy inducement, reliance, and causation elements of selling shareholder's common law fraud claim against buying shareholder, where the bluebirds statement was made when selling shareholder was complaining about information asymmetry, statement was made to mollify selling shareholder's concerns, selling shareholder took the statement seriously and expected that, if there was any unexpected good news, buying shareholder would either abstain from the transaction or disclose.

1 Case that cites this headnote

Case 3:23-cv-03481-MMC   Document 54-1   Filed 10/16/23   Page 66 of 88

In re Wayport, Inc. Litigation, 76 A.3d 296 (2013)
38 Del. J. Corp. L. 1077

**[34]   Fraud** 🔑 **Knowledge of defendant**

Scienter element of common law fraud can be proven by establishing that the defendant acted with knowledge of the falsity of a statement or with reckless indifference to its truth.

12 Cases that cite this headnote

**[35]   Corporations and Business Organizations** 🔑 **Purchase or sale of stock**

Evidence was sufficient for scienter element of selling shareholder's common law fraud claim on the basis that partner in buying shareholder decided not to correct earlier representation, which had become false because of a patent sale, that there were no bluebirds of happiness in corporation's world, although evidence was circumstantial, where it would have been evident to partner that if buying shareholder disclosed patent sale to selling shareholder, the stock transaction would not have gone forward as planned, partner knew that selling shareholder was a volatile and combative fellow who was deeply interested in corporation's patents and monetization efforts, if partner told selling shareholder, he would have demanded information, the process would have been unpleasant, and selling shareholder could have been expected to indulge his penchant for eloquent accusations, but if he partner failed to mention the sale, there was a good chance that selling shareholder might never find out, or would find out too late for it to matter.

**[36]   Corporations and Business Organizations** 🔑 **Damages or amount of recovery**

The best measure of the quantum of selling shareholder's damages from common law fraud in buyer's failure to disclose patent sale was approximately $470,000, or $4.70 per share, calculated as the difference between the $7.20 per share selling shareholder would have received in merger that followed patent sale and the $2.50 per share that he received in the final stock sale.

**[37]   Fraud** 🔑 **Fiduciary or confidential relations**

The principal factor distinguishing constructive fraud from actual fraud is the existence of a special relationship between the plaintiff and the defendant, such as where the defendant is a fiduciary for the plaintiff.

8 Cases that cite this headnote

**Attorneys and Law Firms**

**\*300** Bruce E. Jameson, Marcus E. Montejo, Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Attorneys for Plaintiffs.

**\*301** Gregory V. Varallo, John D. Hendershot, Rudolf Koch, Scott W. Perkins, Richards, Layton & Finger, P.A.; Attorneys for Defendants Wayport, Inc. and Gordon P. Williams, Jr.

M. Duncan Grant, James H.S. Levine, Pepper Hamilton LLP, Wilmington, Delaware; Roger A. Lane, Courtney Worcester, Foley & Lardner LLP, Boston, Massachusetts; Attorneys for Defendants New Enterprise Associates VIII L.P. and New Enterprise Associates 8A L.P.

Michael F. Bonkowski, Cole, Schotz, Meisel, Forman & Leonard, P.A., Wilmington, Delaware; John J. McKetta III, Graves Dougherty Hearon & Moody, P.C., Austin, Texas; Attorneys for Defendant Trellis Partners Opportunity Fund, L.P.

*OPINION*

LASTER, Vice Chancellor.

The plaintiffs sued for damages arising out of their sales of stock in Wayport, Inc. ("Wayport" or the "Company"). Vice Chancellor Lamb granted the defendants' motion to dismiss in part, and his rulings represent law of the case. *See* 🚩 *Latesco, L.P. v. Wayport, Inc.,* 2009 WL 2246793 (Del.Ch. July 24, 2009) (the "🚩Dismissal Opinion"). The litigation proceeded to trial against the remaining defendants on claims for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, common law fraud, and equitable fraud. Judgment is entered in favor of plaintiff Brett Stewart

and against defendant Trellis Partners Opportunity Fund, L.P. ("Trellis Opportunity Fund") in the amount of $470,000, subject to an adjustment to be calculated by the parties in accordance with this opinion, plus pre- and post-judgment interest at the legal rate, compounded quarterly. Judgment otherwise is entered against the plaintiffs and in favor of the defendants.

# I. FACTUAL BACKGROUND

The case was tried on September 17–20, 2012. The parties introduced over 400 exhibits, submitted deposition testimony from nineteen witnesses, and adduced live testimony from ten fact witnesses and one expert witness. The burden of proof rested on the plaintiffs. Having evaluated live witness testimony, weighed credibility, and considered the evidence as a whole, I make the following factual findings.

## A. Wayport's Early Days

Wayport was a privately held Delaware corporation with its principal place of business in Austin, Texas. Founded in 1996, the Company was a pioneer in designing, developing, and enabling Wi–Fi hotspots, which use a wireless router to offer internet access within the immediate vicinity. Stewart was Wayport's original CEO, a member of its board of directors (the "Board"), and a named inventor on most of its patents. Plaintiffs Dirk Heinen and Brad Gray were the Company's vice president of operations and vice president of sales, respectively.

Early on, Heinen introduced Stewart to John Long, who was a partner in a venture capital firm known as Trellis Partners. [1] In 1998, Trellis purchased Series A Preferred Stock in Wayport and obtained (i)  **\*302**  the right to designate a director, (ii) the right to receive financial information, and (iii) a right of first refusal ("ROFR") on plaintiffs' shares. Long joined the Board as the Trellis designee. He had primary responsibility for Trellis's investment in Wayport, but often discussed the Company's progress with Broeker, one of his partners at Trellis.

In 1999, Wayport sought additional funding. Trellis introduced Wayport to Richard Kramlich, a partner in the venture capital firm New Enterprise Associates ("NEA"). [2] NEA purchased Series B Preferred Stock in Wayport and obtained (i) the right to designate a Board observer, (ii) the right to receive financial information, and (iii) a ROFR on

plaintiffs' shares. Kramlich became NEA's Board observer and had primary responsibility for NEA's investment.

## B. The Bursting Of The Technology Bubble

In 2000, the technology bubble burst, and Wayport's business prospects soured. Wayport's struggles led the Board to consider a management transition. According to the defendants, Stewart was forced to step aside. Stewart testified that he did not oppose the change. He considered himself a "technology and analysis" buff, and once fundraising and cash flow issues became all-consuming, Stewart felt he was out of his "comfort zone." Tr. 90.

In fall 2000, Dave Vucina took over as CEO, and Stewart received the title of President. Stewart soon became disenchanted with his new role, which he felt was "ambiguous," "uncomfortable," and "poorly defined." Tr. 91. In late 2001, Stewart resigned from all positions with the Company. He nominated Heinen to serve as a director in his stead, and Heinen continued as a director until May 2005.

## C. Wayport's Prospects Revive.

Under Vucina's leadership, Wayport reduced its cash burn and began to turn around its business. Over four years, thanks in part to a rebounding economy and the advent of smart phones, the Company went from operating at a loss on little revenue to generating $90–100 million in sales with positive cash flow and a healthy balance sheet.

In 2005, Wayport began exploring an initial public offering. In preparation, Vucina hired defendant Gordon P. Williams, Jr. as Wayport's new general counsel. In the trial record, Gordon Williams is referred to frequently as Chuck Williams. Another Wayport employee, Greg Williams, plays a smaller part in the case. To distinguish between the two, and because Gordon Williams has the more prominent role, I refer to him as "Williams." When his colleague enters the frame, I refer to him as "Greg Williams."

Williams took steps to "prepare [Wayport] for an IPO" by implementing what he believed were "best practices" with respect to sharing financial and other information about the Company. Tr. 874–75. Wayport previously shared information freely with directors and stockholders alike. Williams worried that sharing unaudited financial information posed a risk of misleading investors and could lead to violations of securities laws. He therefore instituted a policy that required any common stockholder who wanted

information **\*303** to make a formal books and records demand pursuant to Section 220 of the Delaware General Corporation Law (the "DGCL"), 8 *Del. C.* § 220, and sign a nondisclosure agreement (collectively, the "Section 220 Policy"). The Section 220 Policy did not affect Trellis or NEA, because they had contractual information rights and representatives in the boardroom.

Also in 2005, Wayport management began to explore whether the Company could better utilize its intellectual property. As an initial step, Wayport hired Craig Yudell, a patent attorney with the firm Dillon & Yudell, to clean up the portfolio. Yudell's firm also served as a patent broker, and Wayport anticipated that Yudell might serve in that role. Over the next twelve to eighteen months, Yudell organized a patent inventory, assessed the portfolio's potential value, and determined which patents required the filing of amendments with the U.S. Patent and Trademark Office ("USPTO").

**D. Stewart Offers His Two Cents On Patents.**

In spring 2005, as part of the patent cleanup process, Yudell reached out to Stewart to obtain his signature on certain patent amendments. Stewart "hadn't really thought about Wayport for several years," but Yudell's inquiry sparked his interest. Tr. 98. On May 17, Stewart sent an email to the Board and management containing a lengthy and unsolicited strategic manifesto about how Wayport could monetize its patent portfolio.

> I have seen no evidence of any attempt by Wayport to enforce [its] ever increasingly valuable patent assets. Indeed, I would be surprised if the ability to enforce the patents [was] not to some extent already limited by either direct licenses, covenants not to sue, or implicit licenses under the patent exhaustion doctrine as a part of other deals Wayport has done with [carriers].
>
> ....
>
> However, there is more to IP strategy than waiting defensively to be sued, or offensively suing someone. I would like here to propose a set of strategic actions in this regard. Four years ago, [Vucina] asked me to make such a proposal, and I could not think of a good one. But today, many things have changed. So I herewith have two trivial and one significant patent asset management strategies to propose. My credentials for these proposals are threefold: I am a significant shareholder with a desire to see Wayport maximize value of all assets, I am a named inventor on

all of Wayport's system and method patents, and I pretty much only did technology IP strategy and deals globally for AMD during the five years prior to starting Wayport....

I can quickly dispose of the trivial:

1. Abandon any investment, including fees, in [patent A] if you have not already done so....

2. Offer to sell [patent] 6732176 to Cisco.... The cash benefit to Wayport could be relatively immediate and significant. However, I don't see how Wayport would need to continue to invest in this patent over time—it is about gear, and not about service.... Regarding value of this patent, I would propose you start at 5% of actual or forecast[ed] sales, and settle for 2% or some NPV equivalent of 2%. This could be many hundreds of thousands of dollars....

3. Far more interesting is the profound component of strategy I would like to propose regarding the remaining system and method patents.

The big change in the environment from 2000/2001 is the presence of municipalities **\*304** operating wifi networks. Some or all of these will infringe [patent B] and its progeny. But you can enforce patents against a government with a degree of impunity not available when contemplating enforcement against customers, suppliers, or competitors.

....

As I see it there are three approaches:

— [D]o nothing, wait for more infringement

— [D]o the 'little fish/big fish' dance, well known to technology IP strategists. Under this approach Wayport would find a small municipality somewhere (the little fish) operating a municipal wifi network, approach them, say 'hey you know what? You infringe my patents. But [don't] worry, I am not trying to shut you down. Why [don't] you just give me $500 and I'll give you this license. Then you never have to worry about this again.'

Next, find a slightly bigger fish, and repeat at a slightly higher price, saying 'municipality A needed a license, and so do you.' Repeat. Repeat. Repeat....

— The third approach is my personal favorite. If you know who you'd do this with, and [carrier A] or [carrier B] come directly to mind, ... just go to their IP section and lay out

the strategy, and use the NPV of the strategy to add to valuation discussions either with private or public markets. The neat thing about this approach is that you can directly get valuation from a carrier who would like to control the patent assets....

The courtesy of a response to these suggestions would be greatly appreciated.

JX 8 (the "Patent Strategy Memo"). As these excerpts indicate, the tone of the Patent Strategy Memo was not entirely complimentary towards Wayport management. But for Stewart's emails, which tend toward the prickly and condescending, it was relatively subdued. The 6,732,176 patent referenced in the Patent Strategy Memo was one of the chief patents in a family (the "MSSID Patents") that Wayport would sell to Cisco Systems, Inc. ("Cisco") in a transaction that serves as the foundation for much of the plaintiffs' case.

On the same day he received the Patent Strategy Memo, Wayport's then-general counsel, Bob Kroll, sent a brief email thanking Stewart "for [his] time and for sharing [his] thoughts." JX 9. He then referred to a patent monetization strategy and team:

> We are aggressively pursuing a patent monetization strategy and will give due consideration to the suggestions you have set forth below. No doubt many ideas for deep consideration are contained in it, but time constraints limit my ability to fully consider them right now. They will be shared with the patent monetization team once it is in place, which should be within the near future.
>
> Again, thank you for your continuing interest in Wayport's success.

*Id.* Kroll copied Stewart, Vucina, Heinen, other members of the Board, and Yudell.

Wayport's Chief Technology Officer at the time, Dr. James Keeler, also replied to Stewart, but cautioned that any patent strategy would take time.

> Thank you for your thoughts. We view the patent portfolio as being a valuable asset and I have been nurturing this asset in the U.S. and in selected international locations....
>
> The actual strategy of what to do with [the patents] is a complex one that tends to move slowly—when I was involved in licensing the patent portfolio at Pavilion ... it took about 4 to 5 years from start to finish, $5 million of

investment, and  **\*305**  resulted in about $30Million [sic] licensing fees after 2 lawsuits....

Under [Kroll's] leadership we are engaging several firms regarding our strategy for how to monetize this asset and we expect to have a plan put in place within the next six months or so. However, it will be a multi-year process to actually monetize....

I will say that the value of your patents has not gone unnoticed by me, the board or our lawyers. It is being worked on and strategies are being developed.... There is a lot of work to do to tap into that mine, however, and it takes a lot of time for these things to become monetized.

... [W]e are approaching this in a very structured and professional manner that we expect will optimize the value of the good work that you have done in the past.

JX 10.

Long also responded to Stewart:

> Thanks for prodding us on this, and for laying out the issue more clearly. It's clear to all of us that Wayport's patents have value, but as you know the issue has been how and when to best realize that value. Your idea is interesting and worth examining closely.

JX 15.

To me, these communications appear professional and courteous. To Stewart, they were disingenuous, and he concluded that the Board had no concept of the patent portfolio's value. In an email to Heinen, Stewart summarized his reaction. "As a person literate in the English language, it is safe to assume there is no patent monetization activity underway, just glib lip service." JX 15. At trial, Stewart testified to the same effect. He believed that Wayport had brushed aside the Patent Strategy Memo and had no alternative patent strategy. *See* Tr. 176–77 (Stewart agreeing that "regardless of what the company was telling [him] through several different voices, [he] made a decision personally simply not to give credit to that information").

38 Del. J. Corp. L. 1077

Despite what Stewart perceived to be a dismissal of his recommendations, Long and Stewart continued discussing the Company's patents. In summer 2005, they met for lunch, but the meeting ended badly when Long became "annoyed at what [he] took as [Stewart's] zings against Wayport and its board...." JX 27. After this difficult encounter, Long reached out to Stewart again in fall 2005. Yudell was nearing the end of his housekeeping efforts and starting to develop a formal marketing plan, and Long hoped to tap Stewart's expertise. On October 21, Long emailed Stewart:

> I would like to follow up with you about your ideas on how Wayport can best exploit its IP portfolio. This has become a higher priority for [Vucina] and the board, and [Vucina] acknowledges that you are uniquely qualified by background and talent to help with these efforts. The company has not been completely idle here, although I know we have not moved as quickly as you would have liked or followed your suggestions around IP strategy. The board is scheduled to hear presentations in a couple of weeks from two outside IP experts to get their assessments of the Wayport portfolio and their thoughts around exploitation strategies.

*Id.* Long asked whether Stewart would "be willing to look into this matter and help us" and suggested that there appeared to be "a real opportunity to drive meaningful value to Wayport...." *Id.* He suggested that Stewart and the Company "look past [their] disagreements and frictions...." *Id.*

**\*306** Stewart replied the same day and reiterated his criticisms of Vucina and the Company, including what he described as its failures to honor his requests for information even when he complied with the Section 220 Policy. While acknowledging Wayport's efforts, Stewart denigrated the strategy of using brokers to market and sell the patents.

> Indeed, I view the process you describe, of outside law firms presenting ("pay me fees and I will go ask for licenses in the following way") as one where I could hardly add value, likely to have the prospect of consuming inordinate

amounts of my (uncompensated) time, and unlikely to do anything significant for shareholder value in the time frame of interest. I have seen this movie and I know how it ends.

JX 27. In subsequent emails, Stewart offered more heated assessments of how Wayport had treated him and whether its patent strategy was likely to succeed.

On November 11, 2005, Long again informed Stewart that Wayport was taking his suggestions seriously and would soon act.

> While [Vucina] may not have moved as quickly as you would have liked, and may not have the technology background to understand the issues, opportunities and strategies as completely as you would like, I can assure you that he now has a sense of urgency on this topic and is marshalling resources to move quickly.

JX 33. In the same email, Long asked Stewart to be more constructive and suggested that he stop any independent efforts to reach out to industry contacts about Wayport's patents. Long expressed concern that a dual track sales process, one managed by Wayport and one conducted independently by Stewart, would undermine the Company's efforts.

> I believe that your proposed independent activities with potential partners risk greater potential harm than potential gain. I am confident that the value of Wayport's IP will get communicated to the appropriate people.... In pursuing this course you would also be taking a position that the company could only view as adversarial, an outcome I think would be very unfortunate.

*Id.* Stewart reserved his right to do whatever he wanted, and the discussions between Stewart and Long stopped.

## E. The First Stock Sale

In November 2005, Max Chee, a principal at Millennium Technology Value Partners, L.P. ("Millennium") contacted Stewart and Gray about their shares of Wayport common stock. Millennium is a venture capital fund that invests in founders' shares. Chee asked whether Stewart and Gray might be interested in liquidating a portion of their Wayport common stock.

Stewart was initially suspicious. Coming on the heels of his exchanges with Long about the patents, he thought there was "zero chance [Chee] [did] not have Wayport's hand up his back." JX 37. But less than a month later, Stewart, Heinen, and Gray signed letters of intent to sell a portion of their Wayport common stock to Millennium at $3.00 per share. Stewart, Heinen, and Gray initially agreed to sell 184,000 shares. In January 2006, plaintiff Paul Koffend, formerly Wayport's CFO during Stewart's tenure as CEO, caught wind of the opportunity and asked to sell some of his shares to Millennium on the same terms.

The contemplated sales could not close immediately because of the ROFRs held by Wayport, Trellis, and NEA. When the sellers gave notice of their intent to sell, **\*307** Wayport and NEA declined to exercise their rights, but Trellis sought to buy.

A dispute then ensued between Stewart and Trellis. Stewart's shares ostensibly were covered by multiple iterations of a stockholder agreement that contained various other ROFRs, but the parties to the iterations were different and Stewart was not a signatory to the later versions, including the version that Trellis believed was operative. To Trellis's dismay, Stewart began sending ROFR notices to parties under the last version of the stockholder agreement that he signed, including parties that Trellis believed were not entitled to notice. Stewart also objected to the shares being purchased by a Trellis fund that was not a signatory to the agreement he deemed controlling and therefore, in his view, did not have a ROFR.

After much wrangling and considerable delay, Williams came up with a solution. Each version of the ROFR permitted the affected seller, the Company, and a supermajority of the preferred stockholders to waive any provision of the agreement. As long as the necessary votes could be obtained, the ROFRs could be waived, avoiding the need to determine which version of the stockholder agreement was actually controlling. The parties followed this course.

Everything was proceeding towards a closing until March 9, 2006, when Trellis backed out. According to Broeker, Trellis decided to invest in other portfolio companies. Trellis's decision did not affect the plaintiffs because Millennium stepped in to buy their shares. In late March, Millennium acquired 527,500 shares from the plaintiffs.

## F. Wayport Markets The MSSID Patents.

At some point in 2006, Wayport Executive Vice President Greg Williams assumed responsibility for executing Wayport's patent strategy. In the fall, Greg Williams told Vucina that he wanted Wayport to be in good faith negotiations for a license to the MSSID Patents by April 1, 2007.

Consistent with this goal, Wayport began marketing the MSSID Patents in February 2007. Yudell distributed offering materials to approximately sixty potential buyers and asked for initial indications of interest by the end of March. Only two parties submitted indications of interest: Cisco and Intellectual Ventures Management, LLC ("Intellectual Ventures"), an investment firm focused on intellectual property.

## G. The Second Stock Sale Begins.

In December 2006, shortly before the auction for the MSSID Patents commenced, Stewart contacted Wayport about selling more stock to Millennium. The transaction was anticipated to close on substantially similar terms, including a $3.00 sale price. Stewart asked if Williams wanted to handle the ROFR issues through the waiver process. On December 13, Stewart followed up with an email in which he informed Williams that the selling stockholders preferred the waiver approach. The same day, Stewart and Williams spoke by phone, and Williams suggested that Trellis and NEA would likely agree to waive their ROFRs if plaintiffs made enough shares available such that Trellis and NEA could participate. Stewart alluded to this conversation in an email to Williams on December 14:

> I was thinking over our conversation yesterday, and after a few discussions among the [plaintiffs], I would like to indicate to you the potential flexibility to increase the number of shares available, should one of the [preferred

stockholders] have an interest in taking an additional position. I don't have a number, I **\*308** just want to communicate receptivity to discussing this, *should it turn out that one of the issues in getting a waiver ... is, as you anticipated, the desire for one of the [preferred stockholders] to co-buy.*

JX 145 (emphasis added). Williams responded: "Thanks [Stewart]. It does help." *Id.* Later that week, Williams confirmed that Wayport was willing to proceed by waiver, but he still needed to coordinate with Trellis and NEA.

On December 20, 2006, Long emailed the Board and noted that there were two directors, Katzen and McCormick, who wanted to purchase shares. Long described how Williams planned to satisfy everyone's desires.

> [Williams] has concluded it doesn't make sense to intervene in the current proposed sale, but rather to see if the [plaintiffs] would sell an additional 200–250k shares directly to [Katzen and McCormick]. [Williams] also learned from Greg Williams that he would be interested in selling 100k of his shares, which would reduce the request to the [plaintiffs].

JX 149. Caught off-guard, Vucina emailed Williams and asked why he made this "formal recommendation." JX 150. Williams downplayed the idea of a "formal recommendation" but did not dispute that requesting additional shares from the plaintiffs was his idea.

> I had originally been thinking of this as a two step (company buys and then sells to directors) approach as well. Different approach of facilitating the sales directly came into the discussion yesterday and has the appeal of keeping the Company out of the transaction.... I was still forming my thinking around that yesterday but it

is settling in as a better simpler [sic] approach.

*Id.* Under Williams's structure, the plaintiffs and Greg Williams would sell directly to Katzen and McCormick.

Williams conveyed his proposal to Stewart, who agreed. On January 25, 2007, Williams supplied the parties with a draft stock purchase agreement. Around this time, Trellis and NEA decided not to participate in the second stock sale, at least while the going-rate was $3.00 per share.

## H. Millennium Lowers Its Bid.

On January 31, 2007, Millennium asked Wayport for financial information to help evaluate the proposed transactions. The record does not contain direct evidence of what Millennium received or learned, but on February 13, Millennium told Stewart that it was dropping its price to $2.50. Stewart vented to Williams: "I learned yesterday evening that ... [Millennium] received new information from Wayport that was unavailable to the [plaintiffs], and that as a consequence of that information and subsequent questioning of management, [Millennium] would decline to perform the stock transfer [at $3.00 per share]." JX 171. Stewart asked Williams to give him the same information to "restore [the] balance of information available." *Id.*

Williams forwarded Stewart's email directly to Millennium, remarking that Stewart's communication was his "morning surprise." JX 171. Williams and Millennium spoke by phone twenty minutes later. Williams also gave a heads up to Vucina, who was upset that Millennium had acted without warning the Company. Vucina commented:

> One of the things I don't understand is the need for [Millennium] to share this level of information with [Stewart]. I don't feel like we should have any more of these conversations with [Millennium] if they are going to turn around and **\*309** communicate back to [Stewart] in this manner.... [T]hey have put us in a tough position.

JX 173.

Williams did not respond to Stewart until after his communications with both Millennium and Vucina. On February 15, 2007, Williams decided that Stewart would get "exactly what [Millennium] got." JX 174. Wayport sent Stewart the additional information and set up a call between Stewart and Wayport's CFO, Ken Kieley, which took place on February 27.

Meanwhile, Williams continued acting as an intermediary for the stock sales. On February 16, 2007, Williams facilitated the exchange of draft stock purchase agreements between Stewart and McCormick. On February 21, Stewart asked Williams whether Trellis and NEA were interested in buying stock at the new price, and Williams responded "definitely." JX 186. On February 28, Stewart confirmed to Williams and Millennium that plaintiffs would still sell at $2.50 per share. To generate the same proceeds, Gray increased the number of shares he would make available by 20,000 shares. On March 1, Williams reported on these developments to the Board.

On March 2, 2007, Greg Williams learned that Millennium had lowered the price from $3.00 to $2.50. He declined to sell at the new price. On March 7, Stewart and Williams worked out a ledger reflecting Greg Williams's withdrawal.

Because the price had changed, the revised stock sales at $2.50 per share required a new ROFR waiver. On March 8, Wayport waived the Company's ROFR, but Trellis and NEA now indicated that they wanted to buy.

To keep everyone happy, Williams stepped in. He first determined the preferred stockholders' investment appetites. Once this figure was known, Williams asked Stewart whether the plaintiffs would make additional shares available to accommodate both the preferred stockholders and Millennium, indicating that it would enable him to procure the ROFR waivers. When Stewart agreed, Williams contacted Trellis and NEA to confirm that if the plaintiffs made additional shares available, the extra shares could go to Millennium. When they agreed, Williams believed he had a transaction in which the ROFRs could be waived, and Trellis, NEA, and Millennium would be able to participate.

## I. The Auction Generates Two Bidders.

While Williams and Stewart were putting together the stock sales, the auction results came in for the MSSID Patents. On March 30, 2007, Cisco submitted a "non-binding indication of interest" suggesting a transaction price in a "range" of $1–

10 million, subject to "Cisco's evaluation of relevant market factors," "due diligence," and negotiation of a "definitive agreement." JX 211. Attached to the indication of interest was an extensive list of due diligence requests. Greg Williams understood Cisco to be closer to the $1 million figure.

On April 3, 2007, Intellectual Ventures submitted a "preliminary, non-binding indication of interest" suggesting a transaction price "between $1.5 and $2.25 million." JX 212. Intellectual Ventures also asked about purchasing an additional patent for $500,000. *Id.* The Intellectual Ventures indication of interest was subject to "due diligence" including "the review of complete file histories, relevant prior art, [and] pre-existing licenses...." *Id.*

Yudell tried to negotiate the bidders up. Cisco balked at his initial counteroffer of $12–17 million, so he proposed a "non-exclusive license" requiring an "up-front payment" of $8 million. JX 234. On May **\*310** 17, 2007, Yudell sent Cisco's counsel a non-binding term sheet reflecting Wayport's counteroffer. Cisco went silent, and Greg Williams thought Yudell had overplayed his hand.

Negotiations with Intellectual Ventures progressed more smoothly. By June 8, 2007, Intellectual Ventures had proposed a transaction that included a $5 million upfront payment and future royalties. Wayport countered with a new term: the deal would be conditioned on a license for "a large networking equipment manufacturer," namely Cisco. JX 252. Greg Williams's contemporaneous emails suggest he thought the condition might cause Intellectual Ventures to believe it faced competition and increase its bid. But Intellectual Ventures never agreed to the condition and never raised its price.

Meanwhile, Greg Williams reached out to Cisco to restart negotiations. On June 14, 2007, he reported to the Board on his efforts, and the directors formally authorized him to reopen discussions. After the meeting, Greg Williams offered to sell the MSSID Patents to Cisco for $10 million, subject "to Cisco's sole satisfaction with its due diligence...." JX 257.

On June 18, 2007, Greg Williams sent Cisco a proposed sale agreement. Cisco rejected Wayport's form of the agreement and supplied its own, without specifying a price. On June 20, Wayport began providing Cisco with due diligence. Eight days later, on June 28, Cisco finally named a price: $9 million. Greg Williams countered, and Cisco and Wayport reached

agreement at a price of $9.5 million. The agreement was executed on June 29.

The sale of the MSSID Patents was a major achievement for Wayport. After paying Yudell's success fee, Wayport received $7.6 million in cash. The proceeds increased the Company's year-end cash position by 22%, and the gain on sale represented 77% of the Company's year-end operating income. On July 2, 2007, Vucina notified the Board. The directors received detailed materials about the Cisco sale on July 20 and gathered for a Board meeting on July 25 where Greg Williams provided a formal update. No one at Wayport said anything about the sale of the MSSID Patents to the plaintiffs.

**J. The Second Stock Sale Closes.**

In late March 2007, as bids for the MSSID Patents arrived, Stewart was growing increasingly frustrated with the delays in closing the second stock sale caused by Trellis and NEA deciding how many shares to purchase. On April 9, NEA indicated that it would purchase 200,000 shares. Trellis originally indicated that it would purchase 400,000 shares, but reduced its ask to approximately 300,000 shares as a courtesy to NEA. Katzen and McCormick would purchase 270,000 shares in the aggregate. Millennium would purchase the balance. On April 24, with the transaction structure finalized, Wayport waived its ROFR.

On April 25, 2007, Stewart and Koffend sold shares to Millennium. On May 9, a sufficient number of preferred stockholders executed ROFR waivers to facilitate the remainder of the transactions. The same day, Williams's paralegal circulated Wayport's draft stock purchase agreement.

For the sales to the directors, Williams negotiated the terms of the stock purchase agreement with Williams's paralegal. Stewart asked that certain buyer-friendly language be removed, and Williams agreed. Stewart had more difficulty with Trellis. Trellis's outside counsel tried to add language to the stock purchase agreement reciting that the parties were operating with equal information, but Stewart **\*311** objected. On June 8, 2007, after Stewart and Trellis's counsel reached an impasse, Broeker weighed in:

> We cannot have a one sided representation.... I think [Trellis's

counsel] has outlined a number of solutions which are attempting to address comfort so we can have symmetry in the [representations]. He indicated we'd be happy to [represent] a number of items. *We are not aware of any bluebirds of happiness in the Wayport world right now and have graciously offered to [represent] that.* But what happens if Google walks in in 30 days and says "we'd like to buy [Wayport]". [sic] The way the [representation] is worded, you would come to us and say foul—you should have told me. I think we can address this but we need to focus on solutions that will meet [Wayport's] guidance for existing investors and [B]oard members and our counsel.

JX 248 (emphasis added). In response, Stewart emailed Broeker, saying that "[i]f you know of a Google deal in play, perhaps you ought to refrain from this transaction, or arrange for us to be on a level information playing field." JX 246.

At trial, this "bluebirds" email was hotly disputed. Stewart testified that he understood "bluebirds" to mean any unspecified good news. Broeker testified that it meant an acquisition. Having heard the witnesses and considered the email in context, I agree with Stewart. Broeker's reference to an acquisition was just one example of a potential bluebird. During his deposition, Greg Williams volunteered an example of another "great big bluebird"—a patent sale in the range of the Cisco sale. Greg Williams Dep. Tr. 64–65.

Later that day on June 8, 2007, Broeker attempted to break the logjam with Stewart by providing him with a copy of a stock purchase agreement that Trellis entered into with Dave Hampton, a former Wayport employee. Broker pointed out that Hampton was "no longer at the company and doesn't receive financial information," but he agreed to the "mutual representations" that Trellis wanted. JX 247. Broeker offered: "If you feel you do not have the correct information to make an informed selling decision, we stand by ready to provide whatever we can to help you make an informed decision." *Id.* Neither the agreement nor the offer mollified Stewart, who remained concerned about being at an information disadvantage. Ultimately Trellis and Stewart executed a stock

38 Del. J. Corp. L. 1077

purchase agreement that did not contain any representations about information.

On June 13, 2007, Stewart closed his sale of stock with NEA. On June 14, Katzen and McCormick backed out of their purchases, leaving Stewart with 270,000 shares that he had planned on liquidating. On June 20, Stewart, Heinen, and Gray closed their sales with Trellis.

### K. The Third Stock Sale

On June 26, 2007, Stewart emailed Williams and stated that he was "contemplating asking for [William's] assistance in mitigating the effect of [Katzen and McCormick] bolting." JX 272. First, though, he asked for "a copy of the 11–months to date" current fiscal year unaudited financial statements. *Id.* Williams sent the materials the following day. Recall that at the time, Greg Williams had reengaged with Cisco. On June 28, Cisco offered $9 million for the MSSID Patents, and on June 29, the parties executed a patent sale agreement at a price of $9.5 million. Williams never informed Stewart of these developments.

On July 2, 2007, Stewart confirmed that he wanted to sell additional shares and asked Williams for his "assistance in recovering **\*312** from the 11th-hour departure of [Katzen and McCormick]." JX 281. Williams initially suggested that Stewart reach out to Trellis and NEA directly. Stewart wrote back:

> If you would like to change the flow of communication over the last six months, where the company interposed itself between the preferred [stockholders] and the [plaintiffs] until the actual transfer was about to occur, that is OK by me. I am happy to contact Trellis and NEA, but I suspect we will quickly be back to where we are now.

JX 290. Williams then contacted Trellis and NEA and advised them that Stewart wanted to sell additional shares at a price of $2.50 per share. After several weeks of internal discussions, Trellis and NEA decided to purchase 100,000 and 150,000 shares, respectively. The parties agreed to use the same versions of the stock purchase agreement previously used. On September 27 and 28, the transactions closed.

### L. Stewart Learns Of The Patent Sale.

On October 1, 2007, just days after the final stock sale, Stewart asked Williams for a copy of Wayport's audited financials. On October 30, Williams provided them. Buried in the notes was the following three sentence disclosure:

> In June 2007, Wayport completed the sale of certain of its patents related to a distributed network communication system which enables multiple network providers to use a common distributed network infrastructure. Cash proceeds of $7.6 million, net of expenses related to the transaction, were received in June 2007. The Company has no ongoing obligations under the patent sale agreement and was granted a royalty-free, nontransferable license to the related patents sold.

JX 316. This was the first time Stewart learned of the patent sale.

At his deposition, Williams testified that he was upset that even this limited disclosure was included in the financial statements. Williams opposed making any disclosure about the sale, citing the need to respect Cisco's confidentiality. Williams also testified that he ultimately agreed to the disclosure only because Wayport's auditors told him that they "really didn't have an alternative...." Williams Dep. Tr. 207–08. If the auditors had not insisted on following GAAP, Stewart might never have learned about the sale.

On November 6, 2007, Stewart asked Williams about the purchase, including "who bought them?" JX 318. Williams refused to divulge anything, citing a confidentiality agreement between Cisco and Wayport. Stewart then pared back his request, agreed to forego the name of the buyer, and asked for only (i) whether one or more patents were sold, (ii) whether any pending patents were sold, (iii) the date of the sale, and (iv) the gross sale proceeds. Williams would not budge, and Wayport provided nothing.

On December 21, 2007, Stewart made formal demand under Section 220. When Wayport failed to respond, he filed a books and records action on January 3, 2008. On March 10, Wayport provided Stewart with a list of its *currently held* patents, which enabled Stewart to deduce which patents were sold. Wayport did not disclose the gross proceeds, the timing, or the purchaser. Wayport continued to withhold this information even after Cisco filed a patent amendment with the USPTO that publicly identified Cisco as the purchaser of the MSSID Patents.

**M. AT & T Purchases Wayport.**

On November 6, 2008, Wayport announced that it would be acquired by AT **\*313** & T Inc. and its common stock would be converted into the right to receive $7.20 per share. The plaintiffs were informed of the transaction upon announcement. The discussions with AT & T began just months after Stewart completed his final stock sale. The AT & T transaction closed on December 11, 2008.

**N. The Plaintiffs Sue.**

On November 17, 2008, Stewart filed this litigation. As amended, his complaint contained seven counts:

- Count I—Breach of the fiduciary duty of disclosure;

- Count II—Breach of the fiduciary duty of loyalty;

- Count III—Common law fraud;

- Count IV—Civil conspiracy;

- Count V—Aiding and abetting a breach of fiduciary duty;

- Count VI—Unjust enrichment;

- Count VII—Breach of the implied covenant of good faith and fair dealing.

In the 🚩 Dismissal Opinion, Vice Chancellor Lamb dismissed all claims with respect to any stock sales that took place before 2007. He also dismissed Counts I, IV, VI, and VII with respect to the 2007 stock sales. The motion to dismiss Counts II and III was denied as to defendants Wayport, Williams, Trellis, and NEA. The motion to dismiss Count V was denied as to Wayport. 🚩 Dismissal Op. at *8–10.

After discovery, the plaintiffs moved to amend their complaint to add a claim for equitable fraud. Leave was granted on the grounds that all of the elements of equitable fraud are subsumed within the elements of common law fraud and therefore were already at issue in the case. *See* Ct. Ch. R. 15(a) ("leave [to amend] shall be freely given when justice so requires"); 🚩 *Ikeda v. Molock,* 603 A.2d 785, 788 (Del.1991) (finding reversible error and ordering new trial where trial court failed to permit amendment of the pleadings on the morning of trial); *see also* 🚩 *Bellanca Corp. v. Bellanca,* 169 A.2d 620, 622 (Del.1961) (affirming grant of leave to amend mid-trial under Ct. Ch. R. 15(b) where additional theory of liability did not require "additional evidence" and thereby posed "no possible prejudice").

## II. LEGAL ANALYSIS

The 🚩 Dismissal Opinion located this case at "an interesting intersection of contract, fiduciary duty, and fraud." 🚩 Dismissal Op. at *8. In making this comment, Vice Chancellor Lamb assumed based on the allegations of the complaint that the ROFRs would play a significant role and that only the Company had waived its ROFR. 🚩 *Id.* at *1. Trial simplified matters, because the plaintiffs proved that all of the parties waived all of their ROFRs. By executing the Waivers of Rights of First Refusal and Co–Sale that Williams prepared, Wayport, Trellis, NEA, and the plaintiffs relinquished "all rights of first refusal and co-sale" with respect to the sale transactions. JX 154; *see also* Pre-trial Order ¶¶ 65–66, 80–81. Default common law principles therefore apply. The plaintiffs have advanced two principal theories of liability: breach of fiduciary duty and fraud.

### A. The Claim For Breach Of Fiduciary Duty

The plaintiffs contended at trial that Trellis, NEA, Williams, and Wayport breached their fiduciary duties of loyalty. The plaintiffs did not carry their burden of proof, and judgment is entered in favor of the defendants on the fiduciary duty claim.

#### 1. The Nature Of The Fiduciary Duty Claim

[1] [2] [3] [4] [5] The plaintiffs contended that the defendants owed them fiduciary duties **\*314** that included a duty to disclose material information when they purchased the plaintiffs' shares. Directors of a Delaware corporation

owe two fiduciary duties: care and loyalty. 🚩*Stone ex rel. AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 370 (Del.2006). The "duty of disclosure is not an independent duty, but derives from the duties of care and loyalty."

🚩*Pfeffer v. Redstone,* 965 A.2d 676, 684 (Del.2009) (internal quotation marks omitted). The duty of disclosure arises because of "the application in a specific context of the board's fiduciary duties...." 🚩*Malpiede v. Townson,* 780 A.2d 1075, 1086 (Del.2001). Its scope and requirements depend on context; the duty "does not exist in a vacuum."

🚩*Stroud v. Grace,* 606 A.2d 75, 85 (Del.1992). When confronting a disclosure claim, a court therefore must engage in a contextual specific analysis to determine the source of the duty, its requirements, and any remedies for breach. *See* Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty,* 49 Vand. L.Rev. 1087, 1099 (1996). Governing principles have been developed for recurring scenarios, four of which are prominent.

[6]  [7]  The first recurring scenario is classic common law ratification, in which directors seek approval for a transaction that does not otherwise require a stockholder vote under the DGCL. *See* 🚩*Gantler v. Stephens,* 965 A.2d 695, 713 (Del.2009) (describing ratification in its classic form); 🚩*id.* at 713 n. 54 (distinguishing "the common law doctrine of shareholder ratification" from "the effect of an approving vote of disinterested shareholders" under 8 *Del. C.* § 144). If a director or officer has a personal interest in a transaction that conflicts with the interests of the corporation or its stockholders generally, and if the board of directors asks stockholders to ratify the transaction, then the directors have a duty "to disclose all facts that are material to the stockholders' consideration of the transaction and that are or can reasonably be obtained through their position as directors." Hamermesh, *supra,* at 1103. The failure to disclose material information in this context will eliminate any effect that a favorable stockholder vote otherwise might have for the validity of the transaction or for the applicable standard of review.

*Id.; see* 🚩*Gantler,* 965 A.2d at 713 ("With one exception, the 'cleansing' effect of such a ratifying shareholder vote is to subject the challenged director action to business judgment review, as opposed to 'extinguishing' the claim altogether (*i.e.,* obviating all judicial review of the challenged action).");🚩*id.* at 713 n. 54 ("The only species of claim that shareholder ratification can validly extinguish is a claim that

the directors lacked the authority to take action that was later ratified. Nothing herein should be read as altering the well-established principle that void acts such as fraud, gift, waste and ultra vires acts cannot be ratified by a less than unanimous shareholder vote.").

[8]  [9]  A second and quite different scenario involves a request for stockholder action. When directors submit to the stockholders a transaction that requires stockholder approval (such as a merger, sale of assets, or charter amendment) or which requires a stockholder investment decision (such as tendering shares or making an appraisal election), but which is not otherwise an interested transaction, the directors have a duty to "exercise reasonable care to disclose all facts that are material to the stockholders' consideration of the transaction or matter and that are or can reasonably be obtained through their position as directors." Hamermesh, *supra,* at 1103; *see* 🚩*Stroud,* 606 A.2d at 84 ("[D]irectors of Delaware corporations [have] a fiduciary duty to disclose fully and **\*315** fairly all material information within the board's control when it seeks shareholder action."). A failure to disclose material information in this context may warrant an injunction against, or rescission of, the transaction, but will not provide a basis for damages from defendant directors absent proof of (i) a culpable state of mind or non-exculpated gross negligence, (ii) reliance by the stockholders on the information that was not disclosed, and (iii) damages proximately caused by that failure. *See* 🚩*Loudon v. Archer–Daniels–Midland Co.,* 700 A.2d 135, 146–47 (Del.1997).

[10]  [11]  A third scenario involves a corporate fiduciary who speaks outside of the context of soliciting or recommending stockholder action, such as through "public statements made to the market," "statements informing shareholders about the affairs of the corporation," or public filings required by the federal securities laws. *See* 🚩*Malone v. Brincat,* 722 A.2d 5, 11 (Del.1998). In that context, directors owe a duty to stockholders not to speak falsely:

> Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. It

> follows *a fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.

🚩 *Id.* at 10. "[D]irectors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances." 🚩 *Id.* at 9; *see* 🚩 *id.* at 14 ("When the directors are not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty."). Breach "may result in a derivative claim on behalf of the corporation," "a cause of action for damages," or "equitable relief...." 🚩 *Id.*

**[12]** **[13]** **[14]** The fourth scenario arises when a corporate fiduciary buys shares directly from or sells shares directly to an existing outside stockholder. Hamermesh, *supra,* at 1103. Under the "special facts doctrine" adopted by the Delaware Supreme Court in *Lank v. Steiner,* 224 A.2d 242 (Del.1966), a director has a fiduciary duty to disclose information in the context of a private stock sale "only when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them." *Id.* at 244. If this standard is met, a duty to speak exists, and the director's failure to disclose material information is evaluated within the framework of common law fraud. If the standard is not met, then the director does not have a duty to speak and is liable only to the same degree as a non-fiduciary would be. It bears emphasizing that the duties that exist in this context do not apply to purchases or sales in impersonal secondary markets. *See* Hamermesh, *supra,* at 1153 & n. 296. Transactions in the public markets are distinctly different. *See, e.g.,* 🚩 *In re Am. Int'l Gp., Inc.,* 965 A.2d 763, 800 (Del.Ch.2009), *aff'd,* 11 A.3d 228 (Del.2011) (TABLE); 🚩 *In re Oracle Corp.,* 867 A.2d 904, 932–33, 953 (Del.Ch.2004), *aff'd,* 872 A.2d 960 (Del.2005); 🚩 *Guttman v. Huang,* 823 A.2d 492, 505 (Del.Ch.2003).

The current case originally raised the second, third, and fourth scenarios, but only the fourth remains. Count I of the complaint was titled "Breach of Fiduciary Duty of Disclosure." Dkt. 25 at 20. At the motion to dismiss stage, it was understood **\*316** to invoke the second scenario,

*viz.,* the duty of disclosure in the context of a request for stockholder action. Vice Chancellor Lamb dismissed Count I on the grounds that "a call for an individual stockholder to sell his shares does not, without more, qualify as a call for stockholder action." 🚩 Dismissal Op. at \*6 n. 18.

Count II of the complaint was titled "Breach of Fiduciary Duty of Loyalty." Dkt. 25 at 21. At the motion to dismiss stage, it was understood to invoke both the third scenario (the duty under 🚩 *Malone* not to engage in deliberate falsehoods) and the fourth scenario (the duty to speak that a fiduciary may have in the context of a direct purchase of shares from a stockholder). As to the former, Vice Chancellor Lamb recognized that the "corporation and its officers and directors are, of course, subject to the underlying duty of loyalty not to make false statements or otherwise materially misrepresent the facts in such a way as to defraud the stockholder in any such negotiation [over the purchase of shares]." 🚩 Dismissal Op. at \*6 n. 19 (citing 🚩 *Malone,* 722 A.2d at 10). He held, however, that the complaint pled "no facts whatsoever to suggest that the company, or its directors or officers, made any knowingly false statements...." 🚩 *Id.* He therefore dismissed Count II as to the Company and the director defendants, effectively disposing of the 🚩 *Malone* claim. As to the latter, Vice Chancellor Lamb denied the motion to dismiss, holding that Count II implicated the "normal standard of fraud, *as applied to transactions between corporate insiders* ...." 🚩 Dismissal Op. at \*5 (emphasis added). In a footnote, Vice Chancellor Lamb contrasted this variety of fraud with "the affirmative-misrepresentation or intentional concealment species of fraud (that is, the forms of fraud that do not require a duty to speak)" that applies to non-fiduciaries. 🚩 *Id.* at \*5 n. 17. This remaining aspect of Count II was litigated and tried.

### 2. The Duty Of Disclosure In A Direct Purchase By A Fiduciary

The legal principles that govern a direct purchase of shares by a corporate fiduciary from an existing stockholder have a venerable pedigree.

> As almost anyone who has opened a corporation law casebook or treatise knows, there has been for over a

century a conflict of authority as to whether in connection with a purchase of stock a director owes a fiduciary duty to disclose to the selling stockholder material facts which are not known or available to the selling stockholder but are known or available to the director by virtue of his position as a director.

Hamermesh, *supra,* at 1116. Three rules were developed: a majority rule, a minority rule, and a compromise position known as the "special facts doctrine." *Id.* at 1116–17; *see also* Robert Charles Clark, *Corporation Law* § 8.8, at 306–09 (1986); Stephen M. Bainbridge, *Incorporating State Law Fiduciary Duties into the Federal Insider Trading Prohibition,* 52 Wash. & Lee L.Rev. 1189, 1219 (1995).

The "supposedly 'majority' rule disavows the existence of any general fiduciary duty in this context, and holds that directors have no special disclosure duties in the purchase and sale of the corporation's stock, and need only refrain from misrepresentation and intentional concealment of material facts." Hamermesh, *supra,* at 1116–17. Under this rule, corporate fiduciaries may

trade like strangers at arm's length, provided they do not commit a deliberate active fraud for the purpose of procuring the shareholders' stock. They need not disclose to the shareholders important official information which they **\*317** possess, at least in the absence of inquiry. Not only the element of active misrepresentation is required, but also the reliance of the shareholders thereon as an inducement to part with their shares.

Henry Winthrop Ballantine, *Ballantine on Corporations* § 80, at 212 (1946); *accord* Clark, *supra,* § 8.9, at 311 ("[T]he majority rule appears to have been that corporate directors and officers owe their fiduciary duties to the corporation, ... so that shareholders selling to an officer who purchased on the basis of inside information would ordinarily have no

remedy."); 2 Seymour D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Corporations* § 1363, at 885 (1927) (describing majority rule under which "a director may purchase the stock of the stockholder without disclosing to him the condition of the corporation, or without giving the stockholder the benefit of any knowledge that such director may possess in relation to the corporate affairs and affecting the value of the stock"); *see also* 3A William Meade Fletcher, *Fletcher Cyc. Corp.* § 1168.1, at 321–26 (perm ed., rev. vol.2011 & supp.2013) (collecting cases exemplifying majority rule). The majority rule was "criticized as a rule of unconscionable laxity" and "condemned by almost all text writers and commentators...." Ballantine, *supra,* § 80, at 213; *see, e.g.,* Adolf A. Berle, Jr. & Gardiner C. Means, *The Modern Corporation & Private Property,* at 327–29 (1932) (criticizing majority rule). By 1937, the majority rule arguably no longer represented the rule in a majority of jurisdictions. *See* Bainbridge, *supra,* at 1120.

"The ostensibly opposing 'minority' view broadly requires directors to disclose all material information bearing on the value of the stock when they buy it from or sell it to another stockholder." Hamermesh, *supra,* at 1117. Jurisdictions taking this approach hold that a director's fiduciary duties obligate the director to make the necessary disclosures of material information or abstain from the transaction. *See* Clark, *supra,* § 8.9, at 311; Ballantine, *supra,* § 80, at 213; Berle & Means, *supra,* at 328; Thompson & Thompson, *supra,* § 1364, at 888; *see also* Fletcher, *supra,* § 1168.2, at 326–29 (collecting cases exemplifying minority rule).

 **[15]**    The special facts doctrine attempts to strike a compromise position between "the extreme view that directors and officials are always under a full fiduciary duty to the shareholders to volunteer all their information and a rule that they are always free to take advantage of their official information." Ballantine, *supra,* § 80, at 213. Under this variant, a director has a duty of disclosure only

in special circumstances ... where otherwise there would be a great and unfair inequality of bargaining position by the use of inside information. Such special circumstances or developments have been held to include peculiar knowledge of directors as to important

Case 3:23-cv-03481-MMC   Document 54-1   Filed 10/16/23   Page 80 of 88

In re Wayport, Inc. Litigation, 76 A.3d 296 (2013)
38 Del. J. Corp. L. 1077

transactions, prospective mergers, probable sales of the entire assets or business, agreements with third parties to buy large blocks of stock at a high price and impending declarations of unusual dividends.

*Id.; see id.* at 213–14 (collecting cases exemplifying special facts rule). Like the minority rule, the compromise position recognizes a duty of disclosure, but cuts back on its scope by limiting disclosure only to that subcategory of material information that qualifies as special facts or circumstances. Berle and Means criticized the "reasoning underlying [the intermediate rule as] not particularly clear...." Berle & Means, *supra,* at 329.

In 🚩 *Kors v. Carey,* 158 A.2d 136 (Del.Ch.1960), the Delaware Court of Chancery **\*318** applied the special facts doctrine. The stockholder plaintiff alleged that the defendant directors had acted inequitably by causing the corporation to purchase the plaintiff's block of stock secretly, without revealing the corporation's identity, under circumstances where the court agreed the plaintiff would not have sold if the purchaser's true identity was known. 🚩 *Id.* at 143. Then–Vice Chancellor Marvel dismissed the breach of fiduciary duty claim, explaining that

it disregards the principle that directors generally do not occupy a fiduciary position vis à vis individual stockholders in direct personal dealings as opposed to dealings with stockholders as a class, failing to recognize that it is only in *special cases* where advantage is taken of inside information and the like that the selling stockholder is afforded relief and then on the basis of fraud....

🚩 *Id.* (emphasis added) (citations omitted). In support of this proposition, Vice Chancellor Marvel relied on two leading "special facts" cases: 🚩 *Strong v. Repide,* 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909), and 🚩 *Northern Trust Co. v. Essaness Theatres Corp.,* 348 Ill.App. 134, 108 N.E.2d 493 (1952). On the facts alleged, he found that

the purchaser[ ] had no fiduciary or other duty in the transaction (there being no showing that the buyer had any special knowledge about the possibilities of appreciation in the market value of the purchased stock which was not basically available to the seller) other than to live up to its contract which it did. In other words, this is a case in which there is neither proof of fraud, nor of actionable willful concealment, but also no proof of a false statement innocently made.

🚩 *Kors,* 158 A.2d at 143 (citations omitted).

Six years later, in *Lank,* the Delaware Supreme Court identified 🚩 *Kors* as "a decision which we expressly approve...." *Lank,* 224 A.2d at 244. The high court then described 🚩 *Kors* as holding that "the special circumstance rule applies only when a director is possessed of special knowledge of future plans or secret resources *and* deliberately misleads a stockholder who is ignorant of them." *Id.* (emphasis added). By making the test conjunctive, the Delaware Supreme Court combined the *scienter* requirement of the majority rule with a disclosure duty limited to "special facts."

*Lank* involved a privately held Delaware corporation in which two stockholder-directors were responsible for its "active management" while another stockholder, the plaintiff, was largely passive. *Id.* at 243. One of the directors learned that a third party had offered to acquire the company for $600 per share. *Id.* After learning of the offer, the director purchased an option to buy the minority stockholder's shares at $270 per share. *Id.* at 244. After the minority stockholder passed away, his heirs alleged the director breached his fiduciary duty by failing to disclose the offer to the minority stockholder when securing the option. Chancellor Seitz dismissed the complaint, finding that there was no breach of duty. *See Lank v. Steiner,* 213 A.2d 848, 851 (Del.Ch.1965).

On appeal, the Delaware Supreme Court affirmed, relying on the trial court's finding that the minority stockholder "knew of the [third party] offer since he, along with all the stockholders,

Case 3:23-cv-03481-MMC   Document 54-1   Filed 10/16/23   Page 81 of 88

In re Wayport, Inc. Litigation, 76 A.3d 296 (2013)
38 Del. J. Corp. L. 1077

signed a resolution ... authorizing the sale of corporate assets" for a price equal to the offer, prior to agreeing to the option contract. *Lank,* 224 A.2d at 244. The high court agreed that there was no evidence to "justify the conclusion that [the minority stockholder] *was not aware* of the difference" between the strike price of the option contract and the offer price, and therefore the director "had breached no duty to [the minority stockholder] **\*319** as a corporate fiduciary." *Id.* (emphasis added). The reasoning of *Lank* suggests that without the finding of knowledge, the defendant's failure to disclose an offer for the whole company could have supported a claim for breach of fiduciary duty in connection with the option contract, although it appears that the plaintiff still would have had to show that the defendant took action or remained silent to deliberately mislead. *See id.* (stating *Kors* applies where a director fails to disclose special knowledge and "deliberately misleads" a stockholder).

Based on *Lank* and *Kors,* it appears to me that Delaware follows the special facts doctrine. Professor Hamermesh has argued that in *Lynch v. Vickers Energy Corp.,* 383 A.2d 278 (Del.1977), the Delaware Supreme Court reversed course and adopted the minority rule. *See* Hamermesh, *supra,* at 1121 (" *Lynch* ... aligned Delaware with jurisdictions rejecting the 'majority rule' in favor of a rule recognizing a fiduciary duty on the part of directors, officers and controlling stockholders to disclose material facts, learned through their position with the corporation, to outside stockholders when buying stock from them."). In *Lynch,* then-Chancellor Marvel, the author of *Kors,* held that a majority stockholder owed a fiduciary duty of "complete candor" when purchasing shares from the minority, and he equated that obligation with the duty owed by corporate directors:

> [I]n situations in which the holder of a majority of the voting shares of a corporation, as here, seeks to impose its will upon minority stockholders, *the conduct of such majority must be tested by those same standards of fiduciary duty which directors must observe in their relations with all their stockholders.* I take this to mean that in a situation such as the one found in the case at bar that the majority

stockholder here, namely Vickers, had a duty to exercise complete candor in its approach to the minority stockholders of TransOcean for a tender of their shares, namely a duty to make a full disclosure of all of the facts and circumstances surrounding the offer for tenders, including the consequence of acceptance and that of refusal....

*Lynch v. Vickers Energy Corp.,* 351 A.2d 570, 573 (Del.Ch.1976) (citations omitted), *aff'd in pertinent part,* 383 A.2d 278 (Del.1977). Applying this standard, Chancellor Marvel held that disclosure violations alleged by the plaintiffs were not material. *Id.* at 574–75. On appeal, the Delaware Supreme Court reversed on the factual application, but agreed with the legal standard and the existence of a "fiduciary duty ... which required 'complete candor.' " *Lynch,* 383 A.2d at 279. The high court explained that "[t]he objective, of course, is to prevent insiders from using special knowledge which they may have to their own advantage and to the detriment of the stockholders." *Id.* at 281. "Completeness, not adequacy, is both the norm and the mandate...." *Id.*

*Lynch* did not expressly overrule either *Lank* or *Kors,* nor did it discuss the minority rule. The passage in the Court of Chancery decision that described the duty of disclosure owed by a controlling stockholder equated it with the "same standards of fiduciary duty which directors must observe in their relations *with all their stockholders.*" 351 A.2d at 573 (emphasis added). It is not immediately apparent that this language refers to the duty that a director would owe when purchasing shares directly from a stockholder in a private transaction. It seems more likely to anticipate the duty of disclosure that directors owe to all stockholders when seeking stockholder action. In *Stroud,* the Delaware Supreme Court seemingly sought to clarify this very point by stating **\*320** that the "duty of candor" described in *Lynch* did not import "a unique or special rule of disclosure" but rather represented "nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully

and fairly all material information within the board's control when it seeks shareholder action." *Stroud,* 606 A.2d at 84. Subsequent Delaware Supreme Court decisions have treated the disclosure obligations of a controlling stockholder when making a tender offer or effecting a short-form merger as examples of the duty of disclosure in the context of stockholder action. *See, e.g., Berger v. Pubco Corp.,* 976 A.2d 132, 145 (Del.2009); *Glassman v. Unocal Exploration Corp.,* 777 A.2d 242, 248 (Del.2001); *Shell Petroleum, Inc. v. Smith,* 606 A.2d 112, 116 (Del.1992).

Although I agree with the policy rationales that Professor Hamermesh advances for imposing an affirmative duty to disclose material information on a director who purchases shares from or sells shares to a stockholder in a private transaction, *see* Hamermesh, *supra,* at 1151–59, it does not appear to me that the Delaware Supreme Court has endorsed this rule. Absent further guidance from the high court, the "special facts" doctrine remains the standard in this context.

### 3. No "Special Facts"

**[16]**    Under the "special facts" doctrine, Trellis and NEA were free to purchase shares from other Wayport stockholders, without any fiduciary duty to disclose information about the Company or its prospects, unless the information related to an event of sufficient magnitude to constitute a "special fact." If they knew of a "special fact," then they had a duty to speak and could be liable if they deliberately misled the plaintiffs by remaining silent.

**[17]**    To satisfy the "special facts" requirement, a plaintiff generally must point to knowledge of a substantial transaction, such as an offer for the whole company. *See Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 435 (7th Cir.1987) ("The 'special facts' doctrine developed by several courts at the turn of the century is based on the principle that insiders in closely held firms may not buy stock from outsiders in person-to-person transactions without informing them of new events that substantially affect the value of the stock."); *accord Lazenby v. Godwin,* 40 N.C.App. 487, 495, 253 S.E.2d 489 (1979) (third party purchase of corporation's assets at multiple of book value); *Weatherby v. Weatherby Lumber Co.,* 94 Idaho 504, 492 P.2d 43, 45 (1972) (ongoing negotiation over sale of assets "enhancing the value of the stock"); *Lank v. Steiner,* 213 A.2d 848, 851 (Del.Ch.1965) (third party offer to purchase corporation's

stock at multiple of book value), *aff'd,* 224 A.2d 242 (Del.1966); *Jacobson v. Yaschik,* 249 S.C. 577, 155 S.E.2d 601, 605 (1967) ("forthcoming assured sale of corporate assets," "an offer of purchase of the [corporation's] stocks," or a "fact or condition enhancing the value of the [corporation's] stocks"); *Fox v. Cosgriff,* 66 Idaho 371, 159 P.2d 224, 229 (1945) (liquidation "enhancing the value of the stock"); *Nichol v. Sensenbrenner,* 220 Wis. 165, 263 N.W. 650, 657 (1935) (plan of reorganization generating "fair" value above price paid by insider); *Buckley v. Buckley,* 230 Mich. 504, 202 N.W. 955, 956 (1925) ("assured sale, merger, or other fact or condition enhancing the value of the stock"); *see generally* Harold R. Smith, *Purchase of Shares of a Corporation by a Director From a Shareholder,* 19 Mich. L.Rev. 698, 712–17 (1921) (analyzing special facts cases).

Contrary to *Lank,* the plaintiffs argue that they need only show that the defendants **\*321** failed to disclose material information. Under Delaware law, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important" such that "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985). The standard "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote" or (in more generalized terms) act differently. *Id.* The standard of materiality is thus lower than the standard for a "special fact."

The plaintiffs have identified three allegedly material omissions. Only one—the Cisco sale—is material. Even this omission does not rise to the level of a "special fact."

**[18]**    The plaintiffs first argue that the Company's efforts to monetize Wayport's patent portfolio constituted material information that the defendants failed to disclose. According to the plaintiffs, the Company's decision to take concrete steps towards monetizing its portfolio represented a substantial change in corporate direction, and its stockholders should have been told. I need not decide whether this information was material or special, because in either event it was not omitted. Through his communications with Long and other members of Wayport management, Stewart learned as early as 2005 that Wayport was evaluating its patent portfolio and taking steps to monetize it. The Company even asked for his help. Stewart discussed the Company's plans and expressed

his views about them to his fellow plaintiffs. Stewart did not like Wayport's strategy and did not believe the Company would really execute it, but what matters for present purposes is that he fully understood its plan of action. The plaintiffs cannot maintain a claim for breach of the duty of loyalty in a direct stock sale based on information they actually knew. *Lank,* 224 A.2d at 244.

[19]   [20]   The plaintiffs next contend that the existence of the Intellectual Ventures proposal constituted material information that should have been disclosed. For purposes of Delaware law, the existence of preliminary negotiations regarding a transaction generally becomes material once the parties "have agreed on the price and structure of the transaction." *Bershad v. Curtiss–Wright Corp.,* 535 A.2d 840, 847 (Del.1987); *see also Alessi v. Beracha,* 849 A.2d 939, 945–49 (Del.Ch.2004). Under these standards, the plaintiffs did not prove that the Intellectual Ventures deal ever became material. After the Board meeting on June 14, 2007, the Intellectual Ventures transaction remained a Wayport counteroffer that was subject to a carve-out for "a large networking equipment manufacturer." JX 263. Intellectual Ventures never accepted. No agreement on price and structure was reached, and the Intellectual Ventures transaction was not otherwise sufficiently firm to be material. It therefore could not rise to the level of a "special fact."

[21]   By contrast, plaintiffs proved at trial that the Cisco sale was material. Wayport and Cisco agreed on a total price of $9.5 million on June 29, 2007, and the patent sale agreement was signed that day. Wayport's net sale proceeds of $7.6 million increased the Company's year-end cash position by 22%, and the gain on sale represented 77% of the Company's year-end operating income. Wayport's auditors concluded that the transaction was material to Wayport's financial statements and insisted that it be included over Williams's opposition because they "really didn't have an alternative...." Williams Dep. Tr. 207–08.

**\*322**  The Cisco sale was a milestone in the Company's process of monetizing its patent portfolio, and it was sufficiently large to enter into the decisionmaking of a reasonable stockholder. But the plaintiffs did not prove at trial that the Cisco sale substantially affected the value of their stock to the extent necessary to trigger the special facts doctrine. Stewart admitted that the sale of the MSSID Patents did not necessarily imply anything about the market value of the remaining patents, and he himself believed—

before and after learning of the Cisco sale—that the rest of the Company's patent portfolio was still worth hundreds of millions of dollars. Tr. 182–83, 261–65; Stewart Dep. Tr. 564–68, 576–78.

Because they did not know of any "special facts," Trellis and NEA did not have a fiduciary duty to speak when purchasing shares from the plaintiffs. Judgment is entered in their favor on the breach of fiduciary duty claim.

### 4. Williams Had No Greater Duty

[22]   [23]   Williams was an officer of Wayport, and the "fiduciary duties of officers are the same as those of directors." *Gantler,* 965 A.2d at 708–09. Although Williams did not purchase shares from the plaintiffs, I will assume for the sake of argument that Williams could have undertaken a duty to disclose based on his fiduciary status and substantial role in the transaction process. *See Arnold v. Soc'y for Sav. Bancorp, Inc.,* 678 A.2d 533, 541 (Del.1996); *Shell Petroleum,* 606 A.2d at 116. But even then, it does not seem to me that the scope of Williams's duty to speak as a transactional facilitator would exceed the duty imposed on the fiduciaries who were actual participants in the transaction. Trellis and NEA only had a duty to speak if they knew of a "special fact." For the reasons already discussed, although the Cisco sale was material information, it did not rise to the level of a special fact. Consequently, Williams did not have a duty to speak, and judgment is entered in his favor on the breach of fiduciary duty claim. [3]

### 5. The Claim Against Wayport

[24]   Wayport is not liable for breach of fiduciary duty. As a corporate entity,  **\*323**  Wayport did not owe fiduciary duties to its stockholders. *See A.W. Fin. Servs., S.A. v. Empire Res., Inc.,* 981 A.2d 1114, 1127 n. 36 (Del.2009); *Arnold,* 678 A.2d at 539. The plaintiffs asserted a separate claim against Wayport for aiding and abetting Williams's breach of fiduciary duty, but without an underlying breach, the aiding and abetting claim fails. *See Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001). Judgment is entered in favor of Wayport.

### B. The Common Law Fraud Claim

[25]   As an alternative to their breach of fiduciary duty claim, the plaintiffs alleged in Count III of their complaint and contended at trial that Trellis, NEA, and Williams were liable for common law fraud. To establish a claim for fraud, a plaintiff must prove (i) a false representation, (ii) a defendant's knowledge or belief of its falsity or his reckless indifference to its truth, (iii) a defendant's intention to induce action, (iv) reasonable reliance, and (v) causally related damages.

*See* ⚑ *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983).* The plaintiffs proved that Trellis committed fraud in connection with the September 27, 2007 stock sale. Otherwise judgment is entered in favor of defendants.

### 1. A False Representation

[26]   The plaintiffs do not ground their fraud claim on affirmative representations but rather on material omissions. "[F]raud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak."

⚑ *Stephenson,* 462 A.2d at 1074. The plaintiffs rely on the same three omissions that were previously analyzed in the context of the breach of fiduciary duty claim. For the reasons already discussed, only one was a material omission: the Cisco sale.

### 2. A Duty To Speak

The plaintiffs next contend, as the ⚑ Dismissal Opinion held, that "the duty of loyalty may give rise to a duty to speak...."

⚑ Dismissal Op. at *6. But under *Lank,* a corporate fiduciary has a duty to speak when buying or selling stock from a stockholder in a direct transaction "only when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them." 224 A.2d at 244. For the reasons discussed in Part II.A.3, none of the defendants knew about a "special fact" that gave rise to a duty to speak.

[27]   A duty to speak also can arise because of statements a party previously made. A "party to a business transaction is under a duty to ... disclose to the other [party] before the transaction is consummated ... subsequently acquired information that [the speaker] *knows will make untrue or misleading a previous representation that when made was true* ...." Restatement (Second) of Torts § 551 (1977) (emphasis added) [hereinafter Restatement of Torts]. The fact that a statement was true when made does not enable the speaker to stand silent if the speaker subsequently learns of new information that renders the earlier statement materially misleading.

> [H]aving made a representation which when made was true or believed to be so, [one who] remains silent after he has learned that [the representation] is untrue and that the person to whom [the representation was] made is relying upon it in a transaction with him, is ... in the same position as if he knew that his [representation] was false when made.

**\*324** *Id.* cmt. h. Numerous cases apply this rule to claims of securities fraud. [4]

NEA never spoke, and hence had no duty to update an earlier statement. Williams never made any representation that subsequently became untrue. He and others at the Company consistently told Stewart to assume that the Company was actively exploring options for its patent portfolio and considering a number of different alternatives, any of which might come to fruition. Williams also informed Stewart that the Company believed the stock was worth more than the price reflected in the sale transactions.

[28]   Trellis, by contrast, chose to speak, and its representation later became untrue. On June 8, 2007, Trellis's managing partner, Broeker, represented in an email to Stewart that Trellis was "not aware of any bluebirds of happiness in the Wayport world right now...." JX 248. Long was included on the email chain and knew that his partner had made the representation. Heinen emailed Long contemporaneously to call his attention to the contentious negotiations between Broeker and Stewart. When the email was sent, the representation was true. But by speaking, Trellis assumed a duty to update its statement to the extent that subsequent events rendered its representation materially misleading. *See* Restatement of Torts § 551.

[29]   Trellis's statement became materially misleading on July 2, 2007, when Vucina informed the Board via email of the Cisco sale. On July 20, Board materials were distributed which described the Cisco sale in detail. On July 25, Greg Williams gave the Board a presentation about the Cisco

sale. Long thus knew about Wayport's unexpected good news and the falsity of the "bluebirds" email. Broeker did as well, because he often spoke with Long about Wayport developments and had access to Board materials through Trellis's information rights. Their knowledge is imputed to Trellis. *See Teachers' Ret. Sys. of La. v. Aidinoff,* 900 A.2d 654, 671 n. 23 (Del.Ch.2006) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation."); *Albert v. Alex. Brown Mgmt. Servs., Inc.,* 2005 WL 2130607, at *11 (Del.Ch. Aug. 26, 2005) (imputing knowledge of member-employees to limited liability companies); *Metro Commc'n Corp. BVI, v. Advanced Mobilecomm Techs. Inc.,* 854 A.2d 121, 153–55 (Del.Ch.2004) (imputing fraud claims to corporation where it designated a manager of a limited liability company and where the manager made fraudulent statements); *Nolan v. E. Co.,* 241 A.2d 885, 891 (Del.Ch.1968) ("Knowledge of an agent acquired while acting within the scope of his authority is imputable to the principal."), *aff'd,* 249 A.2d 45 (Del.1969); *see also* 3 William Meade Fletcher, *Fletcher Cyc. Corp.* § 790, at 16–20 (perm **\*325** ed., rev. vol.2011 & supp. 2013) ("[T]he general rule is well established that a corporation is charged with constructive knowledge ... of all material facts of which its officer or agent receives notice or acquires knowledge [of] while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation." (footnote omitted)).

[30]   Once the Cisco sale occurred and Trellis learned of it, the "no bluebird" representation became materially misleading, and Trellis therefore had a duty to speak. Instead, Trellis remained silent. For purposes of fraud, the decision to remain silent placed Trellis in the same position as if Trellis knowingly made a false representation in the first instance.

### 3. Inducement, Reliance, And Causation

[31]   [32]   At this point, only Trellis is potentially liable for fraud and only in connection with the September 27, 2007 purchase. But for liability to exist, Trellis must have made its misrepresentation "with the intent to induce action or inaction by the plaintiff." *Stephenson,* 462 A.2d at 1074. "A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct." Restatement of Torts § 531, cmt. c. The party that was the recipient of the information "must in fact have acted or not acted in justifiable reliance on the representation." *NACCO Indus., Inc. v. Applica Inc.,* 997 A.2d 1, 29 (Del.Ch.2009) (internal quotation marks omitted). And the fraudulent misrepresentation must actually cause harm. *Id. at 32;* Restatement of Torts § 548A. Each of these requirements is met.

[33]   Broeker represented that he did not know of "any bluebirds of happiness in the Wayport world," JX 248, to induce Stewart to complete the sale transactions. At the time, Stewart was complaining about information asymmetry, and Broeker sought to mollify his concerns. Broeker intended for Stewart to rely on the statement, to no longer be suspicious about what Trellis knew, and to sell his shares. For his part, Stewart relied on Trellis's representation. Stewart was concerned about Trellis's insider knowledge, and Broeker's statement spoke directly to that issue. In response, Stewart emailed Broeker, saying that "[i]f you know of a Google deal in play, perhaps you ought to refrain from this transaction, or arrange for us to be on a level information playing field." JX 246. This email demonstrates that Stewart took Trellis's representation seriously and expected that if Trellis were aware of any unexpected good news, Trellis would either abstain from the transaction or disclose. After learning of the Cisco sale, Trellis did neither. Under the circumstances, Stewart's reliance on Trellis was justifiable. He knew that Broeker's partner, Long, was a member of the Board, and Stewart had spoken and emailed with Long about developments at the Company. Long received a copy of the Patent Strategy Memo and communicated extensively with Stewart about the Company's patent strategy. Stewart had reason to believe that Trellis would know if any unexpected good news was forthcoming.

Stewart also demonstrated causation. Trellis's representation and course of dealing caused Stewart to feel comfortable closing the transactions with Trellis. The defendants make much of the fact that, in their view, Stewart wanted liquidity and would have sold his shares to someone else, such as Millennium. I find that if Broeker had not made his representation, **\*326** Stewart would *not* have sold to Trellis and would have suspected that something was afoot at the Company. Having already sold a significant number of shares, Stewart would not have sold additional shares until after he had requested and received Wayport's year-end financial statements. At that point, he would have seen the note about the patent sale and demanded additional information. Once he obtained it, he would have considered it thoroughly and used it to recalibrate his sense of the Company's value.

Case 3:23-cv-03481-MMC   Document 54-1   Filed 10/16/23   Page 86 of 88

In re Wayport, Inc. Litigation, 76 A.3d 296 (2013)
38 Del. J. Corp. L. 1077

All this would have taken considerable time. Williams rarely responded quickly to Stewart's informational requests, except on the one occasion when Stewart asked for information when Williams knew Greg Williams was reengaging with Cisco. Williams was particularly resistant to providing Stewart with any information about the Cisco sale, going so far as to force Stewart to file a books and records action. Assuming one of the defendants provided some form of disclosure to Stewart about the Cisco sale, it would have taken months and potentially a Section 220 lawsuit before Stewart could be satisfied that he had obtained the information he needed. To the extent Stewart decided at some point to explore another sale, the process would take additional months, as demonstrated by the lengthy timeline required for each of the transactions at issue in this case. I find that Stewart still would have been holding his shares approximately one year later when Wayport announced that it would be acquired by AT & T for $7.20 per share. Instead, because of the "no bluebirds" representation and Trellis's failure to correct it, Stewart sold 100,000 shares to Trellis on September 27, 2007 for $2.50 per share.

### 4. Scienter

[34]   The final hurdle for Stewart's common law fraud claim is *scienter*. Under Delaware law, *scienter* can be proven by establishing that the defendant acted with knowledge of the falsity of a statement or with reckless indifference to its truth. *See* Metro, 854 A.2d at 143. Stewart proved that Trellis acted with *scienter* by establishing that Long knew of the Cisco transaction by July 2, 2007 (via Vucina's email) and received detailed information on July 20 (via the distribution of Board materials) and on July 25 (via Board meeting). On June 8, less than a month earlier, Long read Broeker's "no bluebirds" representation. Yet despite repeated communications from Wayport management about the importance of the Cisco sale, which demonstrated that the "no bluebirds" representation was false, Long remained silent.

[35]   It would have been evident to Long that if Trellis disclosed the Cisco sale to Stewart, the stock purchase would not have gone forward as planned. Long knew from personal experience that Stewart was a volatile and combative fellow. He also knew that Stewart was deeply interested in the Company's patents and its monetization efforts, having been copied on the Patent Strategy Memo which suggested selling the MSSID Patents to Cisco. If Long told Stewart about the

Cisco sale, Stewart would have demanded information and wanted to analyze its implications, just as he ultimately did when he saw a reference to a patent sale in Wayport's financial statements. The process would be unpleasant, and Stewart could be expected to indulge his penchant for eloquent accusations. But if Long and Trellis failed to mention the sale, there was a good chance that Stewart might never find out—or find out too late for it to matter. Wayport and Cisco had agreed to keep the sale confidential, and during approximately the same period, Williams was **\*327** attempting to keep any mention of the sale out of the Company's financial statements. The evidence is circumstantial but sufficient to find that Long knew disclosure would place the stock sales at risk and therefore decided not to correct Trellis's earlier representation. *Scienter* is therefore met.

### 5. Damages for Fraud

[36]   "The recipient of a fraudulent misrepresentation is entitled to recover as damages ... pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation." Restatement of Torts § 549. The best measure of the quantum of Stewart's damages is approximately $470,000, or $4.70 per share, calculated as the difference between the $7.20 per share Stewart would have received in the AT & T merger and the $2.50 per share that Stewart received from Trellis in the final stock sale. I say "approximately $470,000" because to account for Stewart's use of the cash he received from Trellis, the parties will add interest to that amount at the legal rate, compounded quarterly, for the period from September 27, 2007 until December 11, 2008. *See* Lynch v. Vickers Energy Corp., 429 A.2d 497, 506 (Del.1981). Trellis is liable to Stewart for the net amount, plus pre- and post-judgment interest at the legal rate, compounded quarterly, from December 11, 2008, until the date of payment.

### C. The Equitable Fraud Claim

In addition to their common law fraud claim, the plaintiffs asserted that the defendants are liable for "equitable" or "constructive" fraud. "Constructive fraud is simply a term applied to a great variety of transactions, having little resemblance either in form or nature, which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud...." 3 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 922, at 626 (5th ed.1941).

**[37]**  The principal factor distinguishing constructive fraud from actual fraud is the existence of a special relationship between the plaintiff and the defendant, such as where the defendant is a fiduciary for the plaintiff. *See NACCO,* 997 A.2d at 33. On the facts of this case, the breach of fiduciary duty count confronts directly the implications of the fiduciary relationship, rendering the constructive fraud count redundant and superfluous. *See Parfi Hldg. AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1236–37 (Del.Ch.2001), *rev'd on other grounds,* 817 A.2d 149 (Del.2002).

Equitable fraud also has been described as a form of fraud having all of the elements of common law fraud except the requirement of *scienter. See Zirn v. VLI Corp.,* 681 A.2d 1050, 1061 (Del.1996) (explaining that equitable fraud "provides a remedy for negligent or innocent misrepresentations"); *Stephenson,* 462 A.2d at 1074 (noting that with equitable fraud, a "defendant [does] not have to know or believe that his statement was false or to have

proceeded in reckless disregard of the truth"). To the extent this formulation is used, the outcome is no different. The plaintiffs failed on their common law fraud claims against NEA and Williams for reasons other than *scienter,* and hence their equitable fraud claims would fail as well. The plaintiffs succeeded on their common law fraud claim against Trellis.

### III. CONCLUSION

Trellis is liable to Stewart for damages in accordance with this opinion. Otherwise judgment is entered in favor of the defendants and against the plaintiffs. All parties will bear their own costs. The plaintiffs will submit a form of Final Order **\*328** and Judgment after consulting with the defendants as to form.

### All Citations

76 A.3d 296, 38 Del. J. Corp. L. 1077

### Footnotes

1    Trellis Opportunity Fund is the only Trellis-affiliated defendant in the case. Non-party Trellis Partners Opportunity Management, LLC ("Trellis GP") is the general partner of Trellis Opportunity Fund, and non-party Alex Broeker is the managing member of Trellis GP. Non-parties Trellis Partners, L.P. and Trellis Partners II, L.P. were Trellis-affiliated funds also managed by Broeker through Trellis GP. Trellis Partners, L.P. acquired the Series A Preferred Stock. Trellis Partners II, L.P. and Trellis Opportunity Fund held later series of preferred stock. For simplicity, I refer only to "Trellis."

2    New Enterprise Associates VIII L.P. and New Enterprise Associates 8A L.P. (jointly, the "NEA Funds") are the only NEA-affiliated defendants in the case. Non-parties NEA Partners VIII, L.P. and NEA Partners 10, L.P. were the general partners, respectively, of the two NEA Funds. Non-party Charles W. Newhall, III was the general partner of the two NEA Funds' general partners. For simplicity, I refer only to "NEA."

3    By contrast, a non-fiduciary aider and abettor could face different liability exposure than the defendant fiduciaries if, for example, the non-fiduciary misled unwitting directors to achieve a desired result. *See In re Del Monte Foods Co. S'holders Litig.,* 25 A.3d 813, 838 (Del.Ch.2011). ("[U]nless post-closing discovery reveals additional facts, the plaintiffs face a long and steep uphill climb before they could recover money damages from the independent, outside directors on the Board. Admittedly other prospects for recovery are not so remote. By their terms, Sections 102(b)(7) and 141(e) do not protect aiders and abettors, and disgorgement of transaction-related profits may be available as an alternative remedy."). It is thus possible for a non-fiduciary to be liable for aiding and abetting "even if the Board breached only its duty of care" and is exculpated for that breach. *In re Celera Corp. S'holder Litig.,* 2012 WL 1020471, at *28 (Del.Ch. Mar. 23, 2012), *aff'd in part, rev'd in part,* 59 A.3d 418 (Del.2012); *see Arnold v. Soc'y for Sav. Bancorp, Inc.,*

38 Del. J. Corp. L. 1077

1995 WL 376919, at *8 (Del.Ch. June 15, 1995) (holding that plaintiffs could maintain a claim against acquirer for aiding and abetting a breach of the duty of disclosure, notwithstanding that defendant directors were protected by an exculpatory provision), *aff'd,* 678 A.2d 533, 541–542 (Del.1996) (affirming analysis and remanding for further proceedings on aiding and abetting claim); *see also In re Shoe–Town Inc. S'holders Litig.,* 1990 WL 13475, at *8 (Del.Ch. Feb. 12, 1990) (denying motion to dismiss aiding and abetting claim against financing advisor in going-private transaction where financial advisor "was closely involved with the management group, the special committee and the Shoe–Town board").

4    *See In re Int'l Bus. Machs. Corporate Sec. Litig.,* 163 F.3d 102, 110 (2d Cir.1998) ("A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event."); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997) ("[T]here may be room to read in an implicit representation by the company that it will update the public with news of any radical change in the company's plans" when it makes public disclosure.); *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1331 (7th Cir.1995) ("The [duty to update] applies when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not. The company then must correct the prior statement within a reasonable time."); *Backman v. Polaroid Corp.,* 910 F.2d 10, 16–17 (1st Cir.1990) ( "Obviously, if a disclosure is in fact misleading when made, and the speaker thereafter learns of this, there is a duty to correct it.").

---

End of Document                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.